## TABLE OF CONTENTS FOR EXHIBITS

#1 – State supreme court's opinion pursuant to Guardianship of Aiden Stein

#2 – State appellate court's opinion pursuant to direct criminal appeal

#3 – March 15, 2004 Emergency Room Report

#4 – Testimony of Dr. Richard Steiner

#5 – CT scans' analysis by Dr. Carl Martino of Akron General Hospital (authored by Mr. Jim Gutbrod)

#6 – Testimony of Dr. Paul A. Bryne

#7 – CT scans' analysis by Dr. Patrick D. Barnes

#8 – Unverified, abrigded Statement of Matthew P. Stein

#9 – Affidavit of Sean Berendt

105 Ohio St.3d 30, 821 N.E.2d 1008, 2004-Ohio-7114

Briefs and Other Related Documents

Supreme Court of Ohio.
In re GUARDIANSHIP OF STEIN.
No. 2004-0928.
Submitted Oct. 26, 2004.
Decided Dec. 30, 2004.

Background: Proceeding was brought for appointment of limited guardian to make medical decisions for infant, including withdrawal of life support. The Court of Common Pleas, Summit County, Probate Division, No. 2004 GA 0086, appointed a limited guardian. Parents appealed. The Court of Appeals, 157 Ohio App.3d 417, 2004-Ohio-2948, 811 N.E.2d 594, affirmed. Discretionary appeal was accepted.

Holding: The Supreme Court, Lundberg Stratton, J., held that the probate court's statutory authority to appoint a limited guardian for an infant did not give the probate court authority to vest the limited guardian with power to withdraw all life-sustaining support, in absence of termination of parental rights.

Reversed and remanded.

O'Donnell, J., filed a concurring opinion.
Moyer, C.J., filed an opinion concurring in part and dissenting in part.
Pfeifer, J., filed an opinion concurring in part and dissenting in part.
O'Connor, J., filed a dissenting opinion.

$EXHIBIT$
$\#\ 1$

West Headnotes
[1] KeyCite this headnote
198H Health
  198HVI Consent of Patient and Substituted Judgment
    198Hk913 Terminal Illness; Removal of Life Support
      198Hk915 k. Substituted Judgment; Role of Courts, Physicians, Guardians, Family or Others.
Probate court's statutory authority to appoint a limited guardian for an infant did not give the probate court authority to vest the limited guardian with power to withdraw all life-sustaining support, in absence of termination of parental rights. (Per Lundberg Stratton, J., with two Justices concurring and two Justices concurring separately.) R.C. §§ 2111.06, 2111.50(F), 2133.08.

[2] KeyCite this headnote
196 Guardian and Ward
  196II Appointment, Qualification, and Tenure of Guardian
    196k8 k. Jurisdiction of Courts.
Infant hospitalized within county on 24-hour, seven-day-per-week basis, while in persistent vegetative state, was a resident of that county, for purposes of statute giving probate court jurisdiction to appoint a guardian who resides in the county in which the infant resides. (Per Lundberg Stratton, J., with two Justices concurring and two Justices concurring separately.) R.C. § 2111.02(A).

[3] KeyCite this headnote
198H Health
  198HVI Consent of Patient and Substituted Judgment
    198Hk913 Terminal Illness; Removal of Life Support
      198Hk915 k. Substituted Judgment; Role of Courts, Physicians, Guardians, Family or Others.
The Uniform Rights of the Terminally Ill Act, which explicitly authorizes the removal of life-sustaining treatment from adults, does not authorize the removal of life-sustaining treatment from infants. (Per Lundberg Stratton, J., with two Justices concurring and three Justices concurring separately.) R.C. § 2133.08.
**1009 E.P. Markovich Co., L.P.A., and Edward P. Markovich, Akron, for appellants.
Brouse McDowell, Linda B. Kersker, Jay E. Krasovec, and Clair E. Dickinson, Akron, for appellee Ellen Kaforey, guardian.
David Kitzler, Mansfield, for appellee Richland County Children Services Board.

LUNDBERG STRATTON, J.
[1] {¶ 1}*30 Today this court must consider the narrow legal issue of whether the Summit County Probate Court exceeded its statutory authority when it appointed a guardian with the power to authorize the withdrawal of all life-sustaining support and treatment for Aiden Stein, an infant. Although the unique facts of this case are tragic and raise many issues, this case does not require us to decide whether either of Aiden Stein's parents abused him or whether Aiden's father, appellant Matthew Stein, is guilty of any criminal charges. It does not require us to decide whether it would be in Aiden's best interest to have life-supporting *31 treatments

withdrawn and comfort care administered or whether the constitutional rights of his parents were violated. Rather, this case involves a narrow legal issue of statutory authority.

{¶ 2} For the reasons that follow, we conclude that the probate court exceeded its statutory authority, and we, therefore, remand the cause to the Summit County Probate Court to amend the guardianship order to remove the portion of the order authorizing the guardian to withdraw life-supporting treatment for Aiden.

History

{¶ 3} On March 15, 2004, five-month-old Aiden Stein was taken from his home to MedCentral Hospital, Mansfield, in Richland County by emergency transport. When Aiden arrived at MedCentral, he was in critical condition, not moving, and unable to breathe on his own. He was placed on a mechanical ventilator, resuscitated, and transferred to Akron Children's Hospital Medical Center of Akron in Summit County.

{¶ 4} Upon arrival at Children's Hospital, Aiden was found to have excessive amounts of blood on his brain. He was moved to the critical care unit, where doctors attempted to drain some of the excess blood from his head. In the emergency department, Aiden was diagnosed as having suffered a traumatic brain injury.

{¶ 5} Dr. Richard D. Steiner, D.O., an attending physician in the emergency department at Children's Hospital, was called to evaluate Aiden soon after his arrival. Dr. Steiner testified that because of the child's age, there was a suspicion by the emergency room physicians that Aiden may have suffered the injury as a result of abuse.

{¶ 6} Aiden's sole caretaker on the day he sustained these injuries was his father, Matthew Stein ("Stein"). In addition, there was evidence of a possible prior incident of abuse, regarding which neither parent could be ruled out as a suspect. On March 16, 2004, appellee Richland County Children Services Board ("RCCSB") was **1010 granted emergency temporary custody of Aiden based upon the above diagnosis and allegations that the injuries were inflicted by Stein, with whom Aiden's mother, appellant Arica Heimlich, was residing.

{¶ 7} Aiden's prognosis, based on a reasonable degree of medical certainty, is that he will have no awareness of or ability to interact with his environment other than reflexive actions. Three of four doctors who testified at the hearing opined that, at best, Aiden's outcome would be a permanent unconscious state, also described as a persistent vegetative state.

{¶ 8} Due to Aiden's diagnosis and prognosis, the Children's Hospital Ethics Committee was consulted regarding ethical issues involved in continuing, limiting, *32 or withdrawing life-supporting treatment for Aiden. The ethics committee is a multidisciplinary group of people, including physicians, nurses, therapists, community members, clergy, and legal counsel, and is not associated with the hospital. Because Stein was under suspicion of causing Aiden's injuries, and because Heimlich remained allied with Stein after the alleged abuse, the committee recommended that due to the significant potential for a conflict of interest, a guardian should be appointed to help make medical decisions for Aiden. In addition, the ethics committee recommended that life-supporting treatment be withdrawn and comfort care be administered to Aiden.

{¶ 9} On April 6, 2004, at the request of Children's Hospital, appellee Ellen Kaforey applied to the Summit County Probate Court for appointment as Aiden's guardian "to evaluate and determine the withdrawal of life-sustaining medical treatment currently being administered" to Aiden. Kaforey is an attorney and a registered nurse who is often called upon by the probate court to assist families in cases where medical decisions need to be made for a family member.

{¶ 10} The Summit County Probate Court held an evidentiary hearing on Kaforey's application on April 14, 16, 21, and 22, 2004. At the hearing, testimony was taken from Aiden's parents, Stein and Heimlich, Dr. John Pope, Ellen Kaforey, Michelle Renee Flaherty (an investigator for RCCSB), Dr. Richard Steiner, Janet Roberts (a licensed practical nurse), Leanne Sessler (sister of Arica Heimlich), Dr. Max Wiznitzer, and Dr. Paul A. Byrne.

{¶ 11} Dr. John Pope, a pediatrician and critical care pediatric specialist at Children's Hospital, testified that Aiden's condition was consistent with shaken baby syndrome. He testified that Aiden had "tremendous intracranial injuries inside of his skull, blood around his brain, as well as significant evidence on [the] CT of injury to the brain itself, and also had a significant amount of bleeding in the back of his eyes or retinal hemorrhages. These injuries without a history of an immediately preceding significant traumatic event are only consistent with shaken baby syndrome."

{¶ 12} Dr. Pope testified that Aiden "not only suffered from the bleeding and the direct traumatic injury, but the brain, his upper brain, the cortex, the parts of the brain that makes us who we are, suffered for some period of time [from] inadequate oxygen and inadequate blood flow."

{¶ 13} Further, Dr. Pope testified that Aiden's most recent CAT scan at that time, which was March 22, "showed that part of the brain to be essentially completely black which is an indication that that part of the brain is dead." A subsequent x-ray showed that Aiden also had a fractured skull, which Dr. Pope testified was consistent with a "discard injury," occurring when a victim of shaken baby syndrome is tossed aside after having been **1011 shaken. Dr. Pope testified that *33 Aiden was the victim of shaken infant syndrome and that he will remain in a persistent vegetative state until he dies.

{¶ 14} Dr. Steiner, attending physician at Children's Hospital Department of Emergency Medicine, testified that Aiden was the victim of shaken infant syndrome, and he concurred with Dr. Pope's prognosis that Aiden will remain in a persistent vegetative state until he dies.

{¶ 15} Dr. Max Wiznitzer, appointed by the court as an independent medical reviewer, is on staff at Rainbow Babies and Children's Hospital, Department of Pediatrics, and at University Hospitals of Cleveland, Department of Neurology. Dr. Wiznitzer testified that Aiden was the victim of shaken infant syndrome and that he will remain in a persistent vegetative state until he dies.

{¶ 16} Dr. Paul Byrne testified on behalf of Aiden's parents. Dr. Byrne testified that he had examined Aiden and reviewed the file and concluded that Aiden's injuries were not caused by shaken infant syndrome. Rather, Dr. Byrne testified that Aiden had a preexisting condition and that an unspecified acute event sent him into respiratory arrest. He testified that the withdrawal of life-sustaining medical treatment was not appropriate. When asked whether there are any circumstances where the withdrawal of life-sustaining

medical treatment is ethically appropriate, Dr. Byrne responded, "Let's put it this way, I haven't seen that."

{¶ 17} On the second day of the hearing, the parties reached an agreement that the court could move forward to appoint Ellen Kaforey as the guardian of Aiden Stein for limited purposes, defined to include making all medical decisions with the exception of the withdrawal of life-sustaining treatments, for Aiden Stein from that point forward until further order of the court.

{¶ 18} Following the hearing, on April 29, 2004, the probate court appointed Ellen Kaforey as "limited guardian" of Aiden Stein but, despite the agreement, ordered that her powers include (1) giving consent to all medical treatment, (2) withdrawing all life-sustaining support and treatment, (3) requesting a do- not-resuscitate order, (4) directing the infant's medical care providers to cease all medical treatment that would prolong the life of the infant, and (5) making recommendations regarding Aiden's eventual disposition if he requires posthospital care elsewhere.

{¶ 19} R.C. 2133.08 authorizes the removal of life-sustaining treatment for terminally ill adults. However, the probate court concluded that R.C. 2133.08 "arguably" does not apply to minors, and, therefore, the court instead derived its authority from R.C. 2111.06, a general statute that authorizes the probate court to appoint a guardian to make medical and other decisions for a minor if the parents are unsuitable.

{*34 ¶ 20} The Summit County Court of Appeals affirmed the judgment of the probate court on June 9, 2004. In re Guardianship of Stein, 157 Ohio App.3d 417, 2004-Ohio-2948, 811 N.E.2d 594. This court granted the appellant parents' motion to stay execution of the court of appeals' judgment on June 11, 2004. In re Guardianship of Stein, 102 Ohio St.3d 1475, 2004-Ohio-2995, 810 N.E.2d 441.

{¶ 21} This cause is now before us upon our acceptance of a discretionary appeal.

Jurisdiction

[2] {¶ 22} R.C. 2101.24(A)(1) defines the jurisdiction of the probate court:

{¶ 23} "Except as otherwise provided by law, the probate court has exclusive jurisdiction:

{¶ 24} "* * *

**1012 {¶ 25} "(e) To appoint and remove guardians * * *."

{¶ 26} The probate court concluded that Aiden is a resident of Summit County as required by R.C. 2111.02(A), a conclusion with which we agree. A minor's resident status is to be construed consistently with the best interest of the minor. See In re Fore (1958), 168 Ohio St. 363, 369, 7 O.O.2d 127, 155 N.E.2d 194. Further, "residence" refers to a place of dwelling within the state. Id. at 371, 7 O.O.2d 127, 155 N.E.2d 194. Since being admitted to Akron Children's Hospital on March 15, 2004, Aiden has been residing in Summit County on a 24-hour, seven-day-per-week basis. Moreover, the parties do not appear to contest the probate court's finding of residency or of jurisdiction. We, therefore, hold that Aiden is a resident of Summit County for purposes of this case under R.C. 2111.02(A), and the probate court had jurisdiction to consider these questions.

Guardianship

{¶ 27} "[A] parent's desire for and right to 'the companionship, care, custody and management of his or her children' is an important interest that 'undeniably warrants deference and, absent a powerful countervailing interest, protection.' " Lassiter v. Dept. of Social Serv. (1981), 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640, quoting Stanley v. Illinois (1971), 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551.

{¶ 28} Ellen Kaforey filed for guardianship of Aiden Stein after the Ethics Committee at Akron Children's Hospital concluded that Aiden's parents have a conflict of interest regarding Aiden's care due to the potential for enhanced criminal charges if Aiden dies. R.C. 2111.06 provides that "[a] guardian of the person of a minor shall be appointed as to a minor * * * whose parents are unsuitable persons to have the custody and tuition of such minor."

{*35 ¶ 29} The probate court granted that application and granted to Kaforey the authority to withdraw life-supporting treatments for Aiden. Stein and Heimlich contend that any decision to remove life-supporting treatment from Aiden would have the effect of terminating their parental rights without due process. The RCCSB and Guardian Kaforey argue that if life-supporting treatments are withdrawn and Aiden dies, it would be the neurological injuries Aiden sustained that would be the cause of death, not the act of withdrawing the life-supporting treatments.

[3] {¶ 30} R.C. 2133.08, part of Ohio's version of the Uniform Rights of the Terminally Ill Act, is the only Ohio statute that explicitly authorizes the removal of life-sustaining treatment. The statute, by its very terms, however, applies only to adults. R.C. 2133.08(A)(1). If a statute is unambiguous, we must apply it as written. State v. Hairston, 101 Ohio St.3d 308, 2004-Ohio-969, 804 N.E.2d 471, ¶ 13. See, also, State v. Hughes (1999), 86 Ohio St.3d 424, 427, 715 N.E.2d 540 ("In construing a statute, we may not add or delete words"). If the General Assembly wanted to apply R.C. 2133.08 to minors, it could have expressly done so. Because it has not, we will not extend the statute's application by judicial decree. Thus, the probate court correctly concluded that R.C. 2133.08 does not permit the withdrawal of life-sustaining treatment for a minor.

{¶ 31} The probate court then turned to R.C. Chapter 2111, concerning guardianships and conservatorships. Specifically, R.C. 2111.50(F) provides that "[w]hen considering any question related to, and issuing orders for, medical or surgical care or treatment of incompetents or minors subject to guardianship, the probate court has full parens patria powers unless otherwise **1013 provided by a section of the Revised Code." Moreover, R.C. 2111.06 provides that "[a] guardian of the person of a minor shall be appointed as to a minor * * * whose parents are unsuitable persons to have the custody and tuition of such minor."

{¶ 32} Aiden's parents have been considered unsuitable due to the conflict of interest that exists in this case, namely, if life-supporting treatments are withdrawn, Aiden will die, and if Aiden dies, his father, who was the sole caretaker on the day Aiden sustained his injuries, could be charged with murder, as he is suspected of injuring the baby. Further, Aiden's mother, Heimlich, who resides with and has since become engaged to Stein, does not believe that Stein caused Aiden's injuries, and neither can be ruled out as having caused a possible prior incident of abuse.

{¶ 33} In accordance with R.C. 2111.06, the probate court in this instance concluded that it had the jurisdiction to appoint a guardian for the purpose of making or recommending medical decisions for Aiden, including life-and-death issues of removing life-sustaining

treatments. We find, however, that the decision *36 to withdraw life-supporting treatments goes beyond the scope of making medical decisions.

{¶ 34} The Richland County Juvenile Court placed Aiden in the emergency temporary protective custody of the RCCSB on March 16, 2004. On October 26, 2004, at the time this court heard this case on the merits, permanent custody of Aiden had not been determined, and he remained in the temporary custody of the RCCSB.

{¶ 35} In this case, the parents' rights have been merely suspended, not terminated. We acknowledge the argument that the abuse would be the true proximate cause of Aiden's death should life-supporting treatments be withdrawn. However, many scenarios are possible in this unique case, such as the possibility that Heimlich could choose to leave Stein and seek sole custody of Aiden. If it cannot be established that she participated in any of the possible instances of abuse, there may not be grounds to deny her reunification with her son. The fact that a child is in a permanent vegetative state is not a sufficient reason to deny parental rights, absent evidence of abuse or neglect. The right to withdraw life-supporting treatment for a child remains with the child's parents until the parents' rights are permanently terminated.

{¶ 36} "The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life. If anything, persons faced with forced dissolution of their parental rights have a more critical need for procedural protections than do those resisting state intervention into ongoing family affairs. When the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures." Santosky v. Kramer (1982), 455 U.S. 745, 753-754, 102 S.Ct. 1388, 71 L.Ed.2d 599.

{¶ 37} We conclude that the probate court's order authorizing the guardian to withdraw life-supporting treatments has the effect of terminating parental rights. We, therefore, hold that the probate court exceeded its statutory authority in granting the guardian the power to withdraw life-supporting treatments before the parents' rights were permanently terminated. If the Richland County Juvenile Court permanently terminates the parental **1014 rights of Stein and Heimlich, the guardian will then fully stand in the shoes of the parents. Until then, the granting of authority to withdraw life-supporting treatment for Aiden is premature.

{¶ 38} The heartbreak and tragedy in this case cannot be overstated. However, we believe that without a full and proper adjudication of parental rights concluding in a termination of those rights, a probate court has no authority to *37 allow a guardian to make a decision that will terminate the life of a child, when parental rights have not been permanently terminated, thereby terminating the parent-child relationship. Accordingly, because the parties have otherwise stipulated to the order of the Summit County Probate Court, we remand the cause to the Summit County Probate Court to amend the guardianship order to remove the portion of the order authorizing the guardian to withdraw life-supporting treatments for Aiden.

Judgment reversed and cause remanded.

RESNICK and FRANCIS E. SWEENEY, SR., JJ., concur.
O'DONNELL, J., concurs separately.
MOYER, C.J., concurs in part and dissents in part.
PFEIFER, J., concurs in part and dissents in part.
O'CONNOR, J., dissents.

O'DONNELL, J., concurring.

{¶ 39} The majority has correctly concluded that the judgment of the court of appeals should be reversed; I write separately to emphasize the fact that the Richland County Juvenile Court had exercised jurisdiction over Aiden Stein, had not terminated parental rights, and in my view, never relinquished its jurisdiction over the custody of the infant.

{¶ 40} Against that factual background, after the infant was transported to Akron Children's Hospital in Summit County and at the request of the hospital, Ellen Kaforey, an attorney and a nurse, applied to the probate court to serve as guardian for the infant.

{¶ 41} The parties consented to her appointment, but not to her authority to withdraw life support; despite the agreement, the Summit County Probate Court granted her that authority.

{¶ 42} Two questions arise: one, which court should be acting on the infant's behalf, and two, does the statute authorize a probate court to terminate life support of a minor? The answer to the first question is that the Richland County Juvenile Court has jurisdiction over this child and the answer to the second is that the legislature has not provided authority to a probate court to exercise this jurisdiction. Decisions of this kind involving minors are properly left to parents. Unless or until their rights as to their child are terminated, they are the proper parties to make the decision with respect to their own child.

{*38 ¶ 43} I do not agree that a guardian is in a position to make decisions regarding the termination of life support for Aiden if the Richland County Juvenile Court does terminate parental rights. Juvenile courts of our state must consider the best interest of the child in making custody decisions and must place custody of the child with the party best suited to provide care. See, generally, R.C. 2151.353 and 2151.414.

{¶ 44} The General Assembly recognized the role of parents and the duty of courts to defer to the decisions of parents or those who exercise parental rights and, in enacting R.C. 2133.08 regarding the **1015 rights of the terminally ill, specifically chose to extend application only to adults, and not to minors.

{¶ 45} Therefore, in my view, the Summit County Probate Court abused its discretion in authorizing the guardian to terminate life support for Aiden Stein. Accordingly, I concur with the majority in its decision to order the Summit County Probate Court to amend its judgment deleting the authority to withdraw life support, because that is not authorized by R.C. 2133.08, but I would also remand the matter to the Richland County Juvenile Court for further proceedings regarding the adjudication of parental rights.

MOYER, C.J., concurring in part and dissenting in part.

{¶ 46} We live in a technological age in which the dividing line between life and death is sometimes a fine one. Aiden Stein "lives" because his heart is beating and his body is capable of sustaining itself when provided nutrition, water, and technological assistance. We are told that every area of his brain, however, has been significantly damaged except for the "very deep center of the brain stem which is the very primitive area of the brain." The clear consensus of medical opinion is that Aiden's ability to relate to people and events around him no longer exists--and will never return. He is described as being in a persistent vegetative state with no chance for recovery. The trial court described Aiden's existence as "not life but a cruel shadow of life."

{¶ 47} Ethical people of good will disagree as to what is in the best interest of a person under such circumstances. I agree with the majority that the ultimate inquiry before us is not whether life-supporting treatment should be continued. Rather, the ultimate question we must resolve is whether Aiden's parents retain the legal right to make that decision, even though one parent is suspected of (but not charged with) causing Aiden's injuries and the other believes in the father's innocence. Or did the state, acting through the probate court and in light of the accusations against one or both of Aiden's parents, validly vest a guardian with *39 the limited authority to make the decision whether life-supporting treatment should be continued? The issue is Solomonic.

{¶ 48} As does the majority, I acknowledge that the right of natural parents to direct the care and upbringing of a child is a fundamental liberty interest of constitutional dimension. Troxel v. Granville (2000), 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49. However, that authority is not unlimited. The state clearly has parens patriae power over minors in certain circumstances.

{¶ 49} Ohio courts do not, however, have inherent jurisdiction to determine a child's best interests, as they possess only the jurisdiction that the General Assembly has expressly conferred upon them. See Section 4(B), Article IV of the Ohio Constitution; Seventh Urban, Inc. v. Univ. Circle Property Dev., Inc. (1981), 67 Ohio St.2d 19, 22, 21 O.O.3d 12, 423 N.E.2d 1070. Thus the question remains whether Ohio's statutory scheme grants the trial court the authority to terminate Aiden's life support contrary to the will of his parents.

{¶ 50} The trial court proceeded under the authority of R.C. 2111.02 and 2111.06. R.C. 2111.02 states:

{¶ 51} "(A) When found necessary, the probate court * * * shall appoint * * * a guardian of the person, the estate, or both, of a minor * * *.

{¶ 52} "* * *

{¶ 53} "(B)(1) If the probate court finds it to be in the best interest of [a] * * * **1016 minor, it may appoint * * * on its own motion or on application by an interested party, a limited guardian with specific limited powers. * * * [T]he order of appointment and letters of authority of a limited guardian shall state the reasons for, and specify the limited powers of, the guardian. The court may appoint a limited guardian for a definite or indefinite period. * * *

{¶ 54} "(C) Prior to the appointment of a * * * limited guardian under division (A) or (B)(1) of this section, the court shall conduct a hearing on the matter of the appointment." (Emphasis added.)

{¶ 55} R.C. 2111.06 provides:

{¶ 56} "A guardian of the person of a minor shall be appointed as to a minor having neither father nor mother, or whose parents are unsuitable persons to have the custody and tuition of such minor, or whose interests, in the opinion of the court, will be promoted thereby. A guardian of the person shall have the custody and provide for the maintenance of the ward, and if the ward is a minor such guardian shall also provide for the education of such ward." (Emphasis added.)

{¶ 57} R.C. 2111.02 and 2111.06 vest the probate courts of Ohio with broad power. Upon a mere finding that it is in the "best interest of a * * * minor," R.C. 2111.02(B)(1) authorizes a probate court to supplant a parent's rights and *40 responsibilities through appointment of a limited guardian. Similarly, R.C. 2111.06 authorizes a probate court to appoint a guardian of a minor not only where the court finds the child's natural parents to be "unsuitable persons" but also upon the mere finding that the child's "interests * * * will be promoted thereby."

{¶ 58} These conclusory statutory criteria stand in stark contrast to the comprehensive statutory scheme set forth in R.C. Chapter 2151 governing the adjudication of children as dependent, neglected, or abused, and ultimately, the permanent termination of a natural parent's legal rights. Indeed, where parents are believed to be unfit, R.C. Chapter 2151 is more commonly invoked to accomplish transfer of responsibility for children from natural parents to the state than is the probate code.

{¶ 59} Nevertheless, R.C. 2111.02 clearly authorizes a probate court to appoint a limited guardian where the court finds it to be in the child's best interests to do so. Nothing in the text of the statute precludes the court from authorizing a limited guardian to direct a child's medical provider to terminate life support.

{¶ 60} I do not accept the majority's premise that a decision to withdraw life-supporting treatments is something other than a medical decision. Nor do I believe that a decision to withdraw life-supporting treatments is equivalent to the termination of the parent-child relationship. That relationship is legal in nature, and while the death of either clearly changes it, the relationship survives death. See, for example, the statute of descent and distribution, R.C. 2105.06(F), providing that a surviving parent is entitled to inherit from the estate of a deceased child not survived by a spouse or his or her own children.

{¶ 61} In short, I believe that the General Assembly has authorized probate courts to enter orders like that made by the Probate Court of Summit County.

{¶ 62} I believe that the question whether R.C. 2111.02 and 2111.06 were constitutionally applied to Aiden's parents is a separate, serious, and legitimate one. The court of appeals refused to address it, observing that the parents first raised constitutional objections "during their closing argument at the conclusion of a four-day hearing, when it was clearly too late for **1017 the trial court to correct the alleged error."

{¶ 63} I disagree. It is true that counsel's advocacy was less than artful and that he did not specifically argue that application of the guardianship statutes to Aiden's parents would be unconstitutional. I cannot subscribe to the premise, however, that constitutional issues were waived because not raised "at a time when such error could have been avoided or corrected by the trial court." State v.

Childs (1968), 14 Ohio St.2d 56, 43 O.O.2d 119, 236 N.E.2d 545, paragraph three of the syllabus.

{*41 ¶ 64} Counsel for Aiden's parents stated at closing argument:

{¶ 65} "The issue in this case is not merely jurisdiction * * *. This court's primary jurisdiction over guardianship, your Honor, is a mere footnote to the fundamental interest in life, liberty and property which is the core constitutional issue in this case.

{¶ 66} "* * *

{¶ 67} "This constitutional issue is--partakes of the First Amendment, your Honor, the associative right of the parent, the Fifth Amendment in the depravation [sic] of a human life, and most particularly the Fourteenth Amendment through the state's participation through the person of this honorable court in making this decision. And, your Honor, I do not question the jurisdiction of the Court, I simply request that the fundamental due process to be accorded my clients be permitted to proceed just as this application for a best interest substitute of judgment has been permitted to proceed.

{¶ 68} "* * *

{¶ 69} "And respectfully, your Honor, * * * I'm asking this Court to reconsider its own opinion in [a prior analogous case] and that's because of the constitutional issues presented * * *.

{¶ 70} "* * *

{¶ 71} "My clients have * * * not been permitted their procedural due process and substantive due process rights before the state of Ohio."

{¶ 72} In my view, these comments adequately preserved constitutional issues for appellate review. The trial court clearly was put on notice that Aiden's parents believed that their constitutional rights were in jeopardy before the trial court granted the guardianship application. The fact that the written trial court decision granting the guardianship did not address these issues does not mean that they were not raised. Nor did they waive their constitutional rights by stipulating that a guardian would be appointed to make medical decisions not involving the termination of life support. I note, moreover, that "[e]ven where waiver is clear, this court reserves the right to consider constitutional challenges to the application of statutes in specific cases of plain error or where the rights and interests involved may warrant it." (Emphasis added.) In re M.D. (1988), 38 Ohio St.3d 149, 527 N.E.2d 286, at syllabus (reviewing the constitutionality of a statute as applied even though the constitutional challenge was presented at the trial court "in general terms"). Id. at 151, 527 N.E.2d 286.

{¶ 73} In Troxel, the Supreme Court of the United States reviewed a Washington visitation statute invoked by grandparents Jenifer and Gary Troxel. The statute permitted " '[a]ny person' to petition a superior court for visitation rights 'at any time,' and authorize[d] that court to grant such visitation rights whenever*42 'visitation may serve the best interest of the child.' " Id., 530 U.S. at 60, 120 S.Ct. 2054, 147 L.Ed.2d 49. The children's mother did not object to a grant of some visitation, but asked the **1018 court to order only one day of visitation per month, with no overnight stay. The superior court, however, entered a visitation order allowing the grandparents more extensive visitation based on its conclusion that more extensive visitation was in the children's best interests.

{¶ 74} Justice O'Connor of the Supreme Court of the United States concluded, in a plurality opinion, that, as applied, the "breathtakingly broad" Washington statute exceeded the bounds of the Due Process Clause. Id. at 67, 120 S.Ct. 2054, 147 L.Ed.2d 49. She concluded that the Washington trial court had "directly contravened the traditional presumption that a fit parent will act in the best interest of his or her child," and specifically noted that the grandparents "did not allege, and no court has found, that [the mother] was an unfit parent." Id. at 69 and 68, 120 S.Ct. 2054, 147 L.Ed.2d 49. The latter aspect of the case was characterized as "important." Id. at 68, 120 S.Ct. 2054, 147 L.Ed.2d 49.

{¶ 75} Notably, in the case at bar, allegations of unfitness have been made against one, if not both, of Aiden's parents. The trial court did not, however, find that either parent was responsible for Aiden's injuries, only that they may have been responsible. [FN1]

FN1. {¶ a} The trial court appointed a limited guardian based on the following reasoning:

{¶ b} "Matthew Stein has allegedly abused Aiden Stein * * *. Matthew Stein is the subject of a criminal investigation related to the infliction of Aiden's current injuries and will undoubtedly be charged with homicide or negligent homicide if Aiden is allowed to die from the underlying cause of his condition. Further, the mother, Arica, supports the father's assertion that he is not to blame for the current injuries. Additionally, there is evidence that Aiden Stein has suffered prior brain bleeds consistent with nonaccidental trauma. Neither Arica Heimlich or Matthew Stein can be ruled out as suspects in the prior injury or injuries that Aiden has suffered. Therefore, Arica Heimlich and Matthew Stein are in a position of a conflict of interest and are unsuitable such that this Court in its role as parens patriae has a duty to act in the best interest of Aiden Stein and appoint a neutral third party as limited guardian to make medical decisions on his behalf." (Emphasis added.)

{¶ 76} After Troxel it is unclear whether, and under what circumstances, a state may constitutionally override a fit parent's decision as to the care or upbringing of a child based on the state's disagreement with the parent's conclusion as to a child's best interests. ("Our cases, it is true, have not set out exact metes and bounds to the protected interest of a parent in the relationship with his child." Id., 530 U.S. at 78, 120 S.Ct. 2054, 147 L.Ed.2d 49 [Souter, J., concurring in judgment].) It seems clear, however, that "the Due Process Clause does not permit a State to infringe on the fundamental right of parents to make child rearing decisions simply because a state judge believes a 'better' decision could be made," id. at 72-73, 120 S.Ct. 2054, 147 L.Ed.2d 49, and that a court *43 must accord "special weight" to a fit parent's determination of the child's best interests, id. at 70, 120 S.Ct. 2054, 147 L.Ed.2d 49.

{¶ 77} It is not overly dramatic to observe that this case presents a life-and-death issue and implicates one of our society's most precious and fundamental interests--the rights of parents in their relationship with their children. For this reason I believe that this cause should be reversed and remanded to the court of appeals with instructions that it consider the constitutional implications of the

• 2004 WL 2542417 (Appellate Brief) Brief of Richland County Children Services Board (Oct. 15, 2004)
• 2004 WL 2475709 (Appellate Brief) Brief of Appellants Matthew Stein and Arica Heimlich (Oct. 01, 2004)
• 2004 WL 5305718 (Appellate Petition, Motion and Filing) Memorandum in Support of Jurisdiction of Appellants Matthew Stein and Arica Heimlich (Jul. 26, 2004)
END OF DOCUMENT
(C) 2007 Thomson/West. No Claim to Orig. US Gov. Works.

COURT OF APPEALS
RICHLAND COUNTY, OHIO
FIFTH APPELLATE DISTRICT

COURT OF APPEALS
RICHLAND COUNTY OHIO
FILED

2007 MAR 14 PM 12: 31

LINDA H. FRARY
CLERK

STATE OF OHIO

    Plaintiff-Appellee

-vs-

MATTHEW STEIN

    Defendant-Appellant

JUDGES:
Hon. W. Scott Gwin, P. J.
Hon. Sheila G. Farmer, J.
Hon. John W. Wise, J.

Case No. 05 CA 103

O P I N I O N

CHARACTER OF PROCEEDING:

Criminal Appeal from the Court of Common
Pleas, Case No. 05 CR 224D

JUDGMENT:

Affirmed

DATE OF JUDGMENT ENTRY:

APPEARANCES:

For Plaintiff-Appellee

KIRSTEN L. PSCHOLKA-GARTNER
ASSISTANT PROSECUTOR
38 South Park Street
Mansfield, Ohio 44902

For Defendant-Appellant

EDWARD P. MARKOVICH
209 South Main Street
Suite 201
Akron, Ohio 44308

EXHIBIT

App x #2

*Wise, J.*

{¶1}   Appellant Matthew Stein appeals from his conviction for felonious assault in the Court of Common Pleas, Richland County. The relevant facts leading to this appeal are as follows.

{¶2}   On October 27, 2003, Aiden Stein was born to Arica Heimlich and Appellant Matthew Stein. Aiden was born with his umbilical cord around his neck, but he suffered no trauma as a result. For the first four and one-half months of his life, Aiden was generally a normally developing baby boy. On March 14, 2004, Arica, his mother, woke Aiden up and fed him at approximately 6:30 AM. When she left for work at 7:43 AM, leaving Aiden in appellant's care, the baby appeared fine. However, at about 10:30 AM that day, appellant banged on the door of his neighbor, Gerald Holland, stating that Aiden had stopped breathing.

{¶3}   Holland immediately took the baby from appellant's arms and checked him for signs of choking. Finding nothing, Holland began performing CPR and directed his girlfriend to call 911. Paramedics arrived about five minutes later and transported Aiden to Med Central Hospital. The emergency room physician, Dr. Anthony Midkiff, was told by the paramedics and appellant that the baby had gagged while nursing from a bottle. Dr. Midkiff later testified that he did not see the usual symptoms of choking in Aiden during the examination.

{¶4}   Aiden was intubated and transported by helicopter to Akron Children's Hospital. Dr. Daryl Steiner thereupon took over treatment of Aiden. A CT scan revealed evidence of extensive bleeding around Aiden's brain, as well as indications of "older" blood in the baby's subdural region. Dr. Steiner further observed indication of

brain swelling and discovered a skull fracture on the left side of Aiden's skull.  Dr. Steiner also observed Aiden had severe retinal hemorrhages, not in the nature of hemorrhages caused by birth.  His eventual diagnostic conclusion was that Aiden had suffered brain damage caused by physical abuse.  Two other examining physicians at Akron Children's, Dr. Vivek Malhotra and Dr. John Pope, concurred in the diagnosis.

{¶5}   In the meantime, the Mansfield Police Department and Richland County Children's Services began an investigation concerning Aiden's injuries, which had left him in a permanent vegetative state.  On April 7, 2005, the Richland County Grand Jury indicted appellant on one count of felonious assault and one count of child endangering, both felonies of the second degree.  The matter proceeded to a jury trial which commenced on August 25, 2005, and lasted until September 7, 2005.  The State's theory of the case was premised on Shaken Baby Syndrome.  At the conclusion of the trial, the jury found appellant guilty on both counts of the indictment.

{¶6}   A sentencing hearing was conducted on September 12, 2005.  The trial court thereupon imposed the statutory maximum sentence of eight years in prison for the offense of felonious assault.  The court further found the child endangering charge to be an allied offense of similar import; hence, appellant was not sentenced for said offense.

{¶7}   On October 13, 2005, appellant filed a notice of appeal.  He herein raises the following sole Assignment of Error:

{¶8}   "I.   THE INEFFECTIVENESS OF DEFENSE COUNSEL VIOLATED APPELANT'S (SIC) RIGHT TO COUNSEL UNDER THE SIXTH AMENDMENT TO THE

UNITED STATES CONSTITUTION AND ARTICLE I, S. 16 OF THE OHIO CONSTITUTION."

I.

{¶9} In his sole Assignment of Error, appellant contends he was deprived of his right to the effective assistance of counsel at trial. We disagree.

{¶10} Our standard of review is set forth in *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. Ohio adopted this standard in the case of *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373. These cases require a two-pronged analysis in reviewing a claim for ineffective assistance of counsel. First, we must determine whether counsel's assistance was ineffective; i.e., whether counsel's performance fell below an objective standard of reasonable representation and was violative of any of his or her essential duties to the client. If we find ineffective assistance of counsel, we must then determine whether or not the defense was actually prejudiced by counsel's ineffectiveness such that the reliability of the outcome of the trial is suspect. This requires a showing that there is a reasonable probability that but for counsel's unprofessional error, the outcome of the trial would have been different. Id. Trial counsel is entitled to a strong presumption that all decisions fall within the wide range of reasonable professional assistance. *State v. Sallie* (1998), 81 Ohio St.3d 673, 675, 693 N.E.2d 267.

### Seating of Jurors Schwartz and Smith

{¶11} Appellant first argues that his trial counsel was ineffective for failing to object to the seating of two jurors, Allen Schwartz and Lindsey Smith, who he alleges had "direct connections" to certain witnesses in the case.[1] Appellant's Brief at 5.

{¶12} "[T]he selection and qualification of jurors are largely under the control of the trial court and, unless an abuse of discretion is clearly shown with respect to rulings thereon, they will not constitute ground for reversal." *State v. Trummer* (1996), 114 Ohio App.3d 456, 461, 683 N.E.2d 392, citing *Berk v. Matthews* (1990), 53 Ohio St.3d 161, 559 N.E.2d 1301.

{¶13} Appellant herein chiefly raises the issue of "implied bias," a principle we have previously addressed only in limited fashion. See *State v. Winegardner* (Feb. 1, 1984), Licking App.No. CA-2958. In *State v. Vasquez*, Franklin App.No. 03AP-460, 2004-Ohio-3880, the court recognized: "Because the bias of a juror will rarely be admitted by the juror himself, partly because the juror may have an interest in concealing his own bias and partly because the juror may be unaware of it, it necessarily must be inferred from surrounding facts and circumstances." Id. at ¶ 14, quoting *McDonough Power Equipment, Inc. v. Greenwood* (1984), 464 U.S. 548, 558, 104 S.Ct. 845, 849, 78 L.Ed.2d 663, Brennan, J., concurring (internal quotations and additional citations omitted).

{¶14} "[C]ourts have been inclined to presume bias in 'extreme' situations where the prospective juror is connected to the litigation at issue in such a way that is highly unlikely that he or she could act impartially during deliberations." *Vasquez*, supra, at ¶

---

[1]  Appellant also briefly mentions Juror Birmelin in his brief, but does not develop the argument. See App.R. 16(A)(7).

14. Nonetheless, a juror " * * * ought not to suffer a challenge for cause when the court is satisfied from an examination of the prospective juror or from other evidence that the prospective juror will render an impartial verdict according to the law and the evidence submitted to the jury at the trial." *State v. Duerr* (1982), 8 Ohio App.3d 404, 457 N.E.2d 843, paragraph two of the syllabus.

{¶15} The record indicates Juror Allen Schwartz is employed as an administrator at Med Central Hospital, where Aiden was first taken on March 14, 2004. Several testifying physicians from Med Central testified at trial. One of them, Dr. Anthony Midkiff, was a work acquaintance of Schwartz. Upon being questioned by the court during voir dire, Schwartz stated that his acquaintance with Dr. Midkiff would not influence his judgment regarding the physician's testimony. Tr. I at 40. Schwartz also stated he could think of no reason that he would not want someone like himself on the jury, were he to be in appellant's place. Tr. I at 154-156. Schwartz also noted he was aware that appellant had filed a lawsuit against the hospital, but denied it would impact his jury service.[2] Tr. I at 155.

{¶16} The second instance cited by appellant centers on Juror Lindsey Smith. She indicated during voir dire that her children are seen by pediatrician Dr. Brad Olson, another Med Central physician, who had assisted in Aiden's care. Appellant suggests that Smith was dependent on Dr. Olson's expertise to treat her own children, and this would create concern in her mind were she to consider the possibility of Dr. Olson being mistaken in Aiden's treatment. Nonetheless, Smith stated that she would not treat Dr. Olson's testimony in a different manner than the other witnesses, and that she

---

[2] We note appellant's trial counsel did challenge Schwartz because of his knowledge of the lawsuit; however, the court overruled said challenge. Tr. I at 246-247.

would be objective in listening to Dr. Olson on the stand. Tr. I at 39-40. Smith indicated

that she had seen a picture of Aiden, but that it would not affect her judgment, and she

otherwise had not experienced any pre-trial publicity. Tr. I at 85-86.

{¶17} Having reviewed the pertinent voir dire portions of the trial transcript, we

are unable to conclude the trial court would have abused its discretion in seating Jurors

Schwartz and Smith, such that we find no violation of trial counsel's duty to appellant.

*Duerr, Bradley,* supra. We therefore find no merit in appellant's ineffective assistance

claims in regard to trial counsel's performance during voir dire.

### Misconduct of Juror Smith

{¶18} Appellant next argues that trial counsel was ineffective for failing to object

to the court's denial of a hearing on the allegation of juror misconduct by Juror Smith.

{¶19} Toward the end of the trial, the court obtained information that Smith had

allegedly had conversations about the case with an individual named Shawn Berendt at

her place of employment, Flex-Pak, Inc. When confronted by the trial judge, Smith

repeatedly denied knowing anyone by that name. Tr. VIII at 1876. In response to

further questioning, Smith stated she had only mentioned appellant's name at work, just

one time. Tr. VIII at 1877. She denied making any statements concerning the evidence

in the case. Id. Although the court thereafter allowed each side the opportunity to

explore the conversation further, neither the prosecutor nor defense counsel chose to

do so. About six months after the trial, appellant's counsel moved for a new trial on the

alleged misconduct, which the court denied.

{¶20} "Conversations by a third person with a juror during the progress of a trial

for the purpose of influencing the verdict may invalidate the verdict, but where there is

nothing in the record to demonstrate that the decision might have been influenced by such conversation, the refusal of the trial court to grant a new trial will not be disturbed." *State v. Hipkins* (1982), 69 Ohio St.2d 80, 83, 430 N.E.2d 943, citing *State v. Higgins* (1942), 70 Ohio App. 383, 41 N.E.2d 1022. Furthermore, as an appellate court reviewing a claim of ineffective assistance, we "must keep in mind that different trial counsel will often defend the same case in different manners." *State v. Samatar*, 152 Ohio App.3d 311, 787 N.E.2d 691, 2003-Ohio-1639, ¶ 88.

{¶21} Upon review of the record, we are unpersuaded that appellant was prejudiced by his trial counsel's performance, in regard to the issue of Juror Smith's third-party contact, to the degree that the outcome of the trial would be suspect. *Strickland*, supra.

{¶22} Appellants' sole Assignment of Error is therefore overruled.

{¶23} For the foregoing reasons, the judgment of the Court of Common Pleas, Richland County, Ohio, is affirmed.

By: Wise, J.

Gwin, P. J., and

Farmer, J., concur.

JUDGES

JWW/d 212

IN THE COURT OF APPEALS FOR RICHLAND COUNTY, OHIO
FIFTH APPELLATE DISTRICT

COURT OF APPEALS
RICHLAND COUNTY OHIO
FILED

2007 MAR 14  PM 12: 31

LINDA H. FRARY
CLERK

STATE OF OHIO                     :

     Plaintiff-Appellee          :
                                  :
-vs-                              :          JUDGMENT ENTRY
                                  :
MATTHEW STEIN                     :
                                  :
     Defendant-Appellant         :          Case No. 05 CA 103

For the reasons stated in our accompanying Memorandum-Opinion, the judgment of the Court of Common Pleas of Richland County, Ohio, is affirmed.

Costs to appellant.

JUDGES

edCentral Health System + 335 Glessner Ave + Mansfield, Ohio 44903

ATIENT NAME:        Stein, Aiden P.
ED.REC.NUMBER:      373422
CCOUNT NUMBER:      4241355
HYSICIAN:           Anthony Midkiff, M.D.          MANSFIELD HOSPITAL
DMISSION DATE:      03/15/2004          EMERGENCY DEPARTMENT REPORT
=====================================================================

EMERGENCY ROOM TRANSFER

HIEF COMPLAINT:  Respiratory arrest.

ISTORY OF PRESENT ILLNESS:  A 4 month-old who paramedics found with
gonal respirations.  Apparently they suctioned some clear fluids from
he child.  The patient was not cyanotic on their arrival.  Apparently
as being bottle fed, formula, coughed, gagged, and then started
aving respiratory problems.  Apparently CPR and rescue breaths given
y neighbor.

nable to obtain any further history at this time.

n talking with the parents the child was close to full-term as far as
hey know.  No significant problems with the pregnancy.  Mother states
here was a question of some wheezing once before, but no other
edical problems.  The child has not had persistent vomiting.  The
hild has been feeding well and gaining weight according to parents.

EVIEW OF SYSTEMS:  Apparently has been doing well until today when
his episode of choking and respiratory distress occurred.  The child
bviously does not contribute to HPI or review of systems.
nformation above is from parents and EMS who were present on the
cene.

AST MEDICAL/PAST SURGICAL HISTORY:  Significant for questionable
istory of bronchospasm.

AMILY/SOCIAL HISTORY:  The patient does live with parents.  He was
ith father today.  Mother was at work.

EDICATIONS:  No programmed home medications.

LLERGIES:  No known drug allergies according to parents.

*EXHIBIT #3*

PATIENT NAME:   Stein, Aiden P.
PHYSICIAN:      Anthony Midkiff, M.D.
MED.REC.NUMBER:373422                    ACCOUNT NUMBER:4241355
AGE 2                                    EMERGENCY DEPARTMENT REPORT

PHYSICAL EXAMINATION:  This is a 4 month old child who does have an
occasional effort at respiration, does seem to have movement of
extremities intermittently.  The pupils are 6 mm, sluggishly reactive.
The child is breathing only 4 to 6 times a minute, but is pink.  Good
breath sounds bilaterally with bagging, using bag-valve mask although
has some coarse rhonchi bilaterally.  Temperature was 95, pulse was
121, respiratory rate listed at 6 on nursing assessment.  However,
with bagging it is 20.  The child does have an IV in place, right
scalp, site is clean, no swelling.  I see no signs of trauma on Head,
Eyes, Ears, Nose and Throat exam.  The neck is supple.  The trachea is
midline.  There is no jugular venous distention.  Lungs do have
symmetrical breath sounds bilaterally with bagging.  Heart is regular
rate and rhythm.  I hear no evidence of any gallop, click, rub.  No
Hayman's crunch.  Heart sounds appear normal.  Abdomen slightly
distended, but soft.  I did hold bagging for a second.  I was able to
just put a little pressure on the abdomen and it is soft and then
resumed bagging immediately again.  Femoral pulses are symmetrical.
Skin has good color and warmth.  Capillary refill appears right at 2
seconds.  I see no rash.

ED COURSE/PLAN OF CARE/MEDICAL DECISION MAKING:
At this time, I did decide to electively intubate the patient,
However, when I went to take a look the patient has a good strong gag
reflex.  Arms came up and he gagged, but this was not enough to get
the patient breathing any better.  We continued bagging the patient.
At this time, I did treat the patient with atropine, Norcuron,
succinylcholine.  ET tube was inserted under direct laryngoscopy, a #4
ET tube to 13 cm at the lip.  Symmetrical breath sounds bilaterally
with bagging.  No borborygmi.  Orogastric tube was in place.  The
abdomen is soft at this point, scaphoid.

The IV had to be restarted in the hand as during intubation process.
At some point the IV in the scalp blew.

I did actually treat the patient with a second dose of succinylcholine
to intubate the patient.  He did receive IV Ativan as well.

After the patient was intubated and tube placement confirmed I did
treat the patient with Norcuron 1 mg IV.

Portable chest x-ray shows ET tube to be just above the carina, good
aeration of lung fields.  No infiltrate.  No pneumothorax.  Cardiac
silhouette and mediastinum within normal limits.  I did pull the ET
tube back a centimeter.

PATIENT NAME:   Stein, Aiden P.
PHYSICIAN:      Anthony Midkiff, M.D.
MED.REC.NUMBER: 373422                    ACCOUNT NUMBER: 4241355
PAGE 3                                    EMERGENCY DEPARTMENT REPORT

I spoke with Akron Children's Hospital, Dr. Lee, in the Emergency
Department.  He accepts the patient in transfer.  I then called Metro
LifeFlight, spoke with them, and they did send a helicopter.

I called for an isolette to be brought down.  I placed the patient in
this under warming lights with blankets.  I ordered a blood culture,
an urinalysis.  Treated the patient with Rocephin 500 mg IV,
ampicillin 250 mg IV.  I did ask for a second IV site, however, we
were unable to find one.  The nurse anesthetist actually came down as
well and looked and could not find a second IV site.  We do have one
good line at this point so I left it alone.  I did not feel that it
was necessary to stick an interosseus line in when the patient does
have a good line at this point.

Laboratory studies come back with a glucose at 293.  I had done a
fingerstick sugar which was 301.  The BUN is 14, creatinine 0.5,
sodium 136, potassium 4.2, chloride 103, CO2 15, anion gap is 18 which
is elevated.  The patient's urine showed a yellow, clear specimen.
Negative leukocytosis esterase, negative nitrates, negative protein,
but there is one gram per deciliter of glucose in the urine.  Negative
ketones.  Moderate bacteria.  Positive reducing substances.  40 to 60
fine granular casts.  I asked for the urine to be sent for culture.
The patient's hemoglobin was 11.1, hematocrit 32.6, platelets 283,000.
The white count is still pending.

I did speak at length a physician on the Metro Lifeflight on his
arrival.  I was with him in the room during assessment and helped him
move the patient over and get him ready for transfer.  I did call the
pharmacy, spoke with Scott, who very quickly got us the antibiotics
when they were needed.  I did go over risks and benefits of transfer
with mother and father.  I explained to them that Aiden was not stable
at this point, however, he needs to be transferred to a pediatric
facility as we do not have any way to care for a 4 month-old who needs
intensive care monitoring.  Mother and father understand the risks and
benefits and they did sign the consent form for transfer.

DIAGNOSIS:
-   Acute respiratory failure requiring intubation.
-   Hyperglycemia, rule out diabetes mellitus.
-   Metabolic acidosis secondary to #2.
-   Urinary tract infection.

PATIENT NAME:    Stein, Aiden P.
PHYSICIAN:       Anthony Midkiff, M.D.
MED.REC.NUMBER:373422
PAGE 4

ACCOUNT NUMBER:4241355
EMERGENCY DEPARTMENT REPORT

### ADDENDUM

The patient was critically ill here in the Emergency Department and required multiple reassessments, discussion with specialists, Akron Children's Hospital, discussion with the physician on Metro LifeFlight and with parents, multiple reassessments.  I did reexamine this child's lungs every 4 or 5 minutes to make sure the tube had not shifted, that he still had good breath sounds.  I reexamined capillary refill to make sure that he was still having good perfusion every 3 to 5 minutes and I spent a lot of time at the bedside.  Reexamined the patient as well as with parents and I did spend at least one hour of critical care time with this patient and this is in addition to time spent intubating the patient.


_____
Anthony Midkiff, M.D.

M/vjl
D:   03/15/2004
T:   03/15/2004
c:   Akron Children's Hospital


Authenticated by Dr. ANTHONY J. MIDKIFF On 3/15/2004 5:16:11 PM

531

| | |
|---|---|
| 1 | THEREUPON, the attorneys approached to read |
| 2 | the questions posed by the jury and the following |
| 3 | bench conference began. |
| 4 | MS. COUCH-PAGE: I don't know what that |
| 5 | means. |
| 6 | MR. CASTOR: No objection. |
| 7 | MR. BOGGS: I don't either. |
| 8 | THEREUPON, the bench conference concluded. |
| 9 | THE COURT: Dr. Olson, I don't know if |
| 10 | you can answer this question, but let me ask. What |
| 11 | are some symptoms of low and high lung surfactant |
| 12 | levels for newborns? Do you know what that question |
| 13 | means? |
| 14 | THE WITNESS: Sure. The symptoms, gosh, |
| 15 | you know, if it helps to give a quick analogy, when |
| 16 | you've got a big canyon and you've got a train track |
| 17 | and the trestle underneath, there's a lot of |
| 18 | components to the trestle. When the train falls, |
| 19 | nobody asks which component of the trestle collapsed, |
| 20 | it's just the trestle collapsed. So when you have |
| 21 | respiratory distress, there can be a lot of reasons |
| 22 | to have respiratory distress, but what matters is |
| 23 | treating the respiratory distress. |
| 24 | Surfactant is a chemical that comes out in |
| 25 | the lungs and should be complete by 36 weeks. |

532

| | |
|---|---|
| 1 | There's a component that comes out at 32 weeks and a |
| 2 | component that comes out at 36. By 36 you would not |
| 3 | expect surfactant to be a factor in respiratory |
| 4 | distress. |
| 5 | THE COURT: What is lung surfactant? |
| 6 | THE WITNESS: It's a chemical, a chemical |
| 7 | that the lungs produce. As a matter of fact, you |
| 8 | produce more of it if the time around delivery is |
| 9 | stressful. |
| 10 | THE COURT: Okay. If a baby incurred a |
| 11 | birth-related brain bleed, what kind of physiological |
| 12 | symptoms would be present during the first few months |
| 13 | or weeks? |
| 14 | THE WITNESS: Well, you could -- again, |
| 15 | the timing needs to be considered again. I'm the |
| 16 | wrong guy to ask, but to my knowledge, you don't have |
| 17 | birth-related brain bleeds after like 30, 32 weeks, |
| 18 | it just doesn't happen. I may not be up on that |
| 19 | literature, I leave that to a neonatologist. But |
| 20 | again, anything that affects the brain can cause |
| 21 | problems with anything the brain has control over. |
| 22 | The respiratory centers are in the brain stem, |
| 23 | sleeping, you know, there's a lot of electrical |
| 24 | activity, you can have seizures. Muscle tone and |
| 25 | strength all stem from the brain. Hearing, vision. |

533

| | |
|---|---|
| 1 | Gosh, you name it. What couldn't you have? |
| 2 | THE COURT: Follow-on questions? |
| 3 | MR. CASTOR: No. |
| 4 | MR. BOGGS: No. |
| 5 | THE COURT: Thank you, Dr. Olson, you |
| 6 | are done. We're going to take our break now, the |
| 7 | last one of the day. We will come back in ten |
| 8 | minutes. |
| 9 | THEREUPON, there was a brief recess. |
| 10 | THE COURT: Dr. Steiner, I think you |
| 11 | are going to testify next. Would you come up here |
| 12 | beside me, please. Please walk in front of the |
| 13 | chair. She will swear you in before you sit down. |
| 14 | THEREUPON, the witness was duly sworn. |
| 15 | DIRECT EXAMINATION OF DR. RICHARD STEINER |
| 16 | BY MR. CASTOR: |
| 17 Q | State your name, please, for the record. |
| 18 A | My name is Richard Darryl Steiner, S-T-E-I-N-E-R. |
| 19 Q | And what is your business address? |
| 20 A | I work at Children's Hospital Medical Center of |
| 21 | Akron, that is One Perkins Square, Akron, Ohio. |
| 22 Q | What is your business profession or occupation? |
| 23 A | I'm a pediatrician. I work in the emergency |
| 24 | department at Akron Children's Hospital. I'm also |
| 25 | the medical director of the care center, which is the |

534

| | |
|---|---|
| 1 | clinic in the hospital that evaluates children that |
| 2 | have alleged to be abused or neglected. |
| 3 Q | Can you tell the jury about what your formal |
| 4 | education has been? |
| 5 A | I graduated from undergraduate school at Goshen |
| 6 | College, Goshen, Indiana, and then spent four years |
| 7 | in medical school at the Des Moines College of |
| 8 | Osteopathic Medicine and Surgery. I graduated there |
| 9 | in 1975. I did one year of internship at Cuyahoga |
| 10 | Falls General Hospital, and three years of pediatric |
| 11 | residency at Akron Children's Hospital. I then went |
| 12 | into private practice, and was in private practice |
| 13 | for eight years before returning to Children's |
| 14 | Hospital in the emergency department. In 1991 I was |
| 15 | given the directorship of the Care Center and have |
| 16 | been in that position since 1991. |
| 17 Q | Do you have a ... sk |
| 18 | it, within the a... |
| 19 A | Yes. I have a ... |
| 20 | is pediatric e... |
| 21 Q | Are you Boar... |
| 22 A | Yes. I'm Boa... |
| 23 | also sub-Boa... |
| 24 | medicine. |
| 25 Q | Can you tell the jury what Board certification means? |

*EXHIBIT # 4*

537

1         been abused.

2   Q   And have you also lectured at various places around

3        the State and country?

4   A   Yes. The lecture series took me around the nation,

5        and also into Canada. I have also lectured in the

6        region providing lectures to various hospitals and

7        medical staffs. I lecture at the medical school. I

8        lecture at our institution to residents, medical

9        students, nursing staff. I provide lectures to law

10       enforcement, to prosecutors, to Children Service

11       workers on my role in evaluating children that have

12       been alleged to have been abused.

13  Q   Are you licensed to practice medicine?

14  A   Yes, I am. I got my license to practice medicine in

15       1976, and have maintained that licensure in the State

16       of Ohio since that time.

17  Q   And have you previously qualified to testify as an

18       expert in the area of child abuse?

19  A   Yes. I have been qualified in each of the counties

20       in northeast Ohio, with the exclusion of the lake

21       shore county.

22  Q   How many times, roughly, would you say you testify?

23  A   I testify probably, oh, three or four times a month.

24  Q   And for how long --

25  A   Since 1991.

---

535

1  A   Board certification is a recognition by the American

2       Board of Pediatrics that acknowledges that a

3       physician has successfully completed training in a

4       series of examinations. The process is that you have

5       to be trained in a residency program. You have to

6       have experience in the practice. You have to take a

7       written examination, and then a -- well, in my day,

8       an oral examination to be Board certified in

9       pediatrics.

10       To be sub-Board certified in pediatric

11       emergency medicine, you have to have specialized

12       training in that sub-Board of emergency medicine.

13       You have to have experience in pediatric emergency

14       medicine, taking care of kids who have been injured

15       or ill, and then pass a written examination.

16  Q   Have you also developed, for lack of a better term, I

17       will call it, some subspecialty regarding child

18       abuse?

19  A   Yes. Since 1991 my continuing medical education has

20       been within the discipline of evaluation of children

21       that have been alleged to have been abused, both

22       sexually abused, physically abused and neglected.

23  Q   Do you belong to any professional organizations, and,

24       if so, do you hold any or have you held any positions

25       within them?

---

538

1  Q   Several hundreds of times?

2  A   Yes.

3       MR. CASTOR:    Your Honor, I would submit

4       that Dr. Steiner is qualified to testify as an expert

5       in the area of child abuse.

6       THE COURT:    Proceed.

7       MR. CASTOR:    Thank you.

8  Q   Doctor, I'm going to ask a question that may take you

9       a while to answer, but using, I believe, the doll

10       that you brought with us, the model of the eye, which

11       I have placed there in front of you, that I believe

12       is labeled as State's Exhibit 9, the tablet we placed

13       up there, would you describe what Shaken Baby

14       Syndrome is, with or without impact, its causes,

15       attributes and the basis for its diagnosis?

16  A   Yes, that is a question that may take a little while

17       to answer. But Shaken Baby Syndrome is a mechanism

18       by which infants receive traumatic brain injury.

19       Traumatic brain injury is really trauma that has

20       force that has been directed toward a brain, an

21       infant's brain, and causes brain injury. It's a

22       mechanism where the head is whiplashed back and

23       forth. The head moves in a whiplash manner back and

24       forth. When it does so, the brain inside the skull

25       is subject to the force of that whiplash, and is

---

536

1  A   I am a member of the American Academy of Pediatrics,

2       and within that organization the section on child

3       abuse and neglect. I'm also a member of the Ohio

4       Chapter of the American Academy of Pediatrics, and

5       there I am a member of the committee on child abuse

6       and neglect. I'm a member of APSAC, which is the

7       American Professional Society on the Abuse of

8       Children. I'm a member of the Rahey Helper's

9       Society, which is a society of professionals that

10       devote their professional careers to the clinical

11       practice of child abuse evaluation.

12  Q   And have you occupied any teaching positions?

13  A   Yes. I am Assistant Clinical Professor of

14       Pediatrics, and emergency medicine, pediatric

15       emergency medicine at Northeast Ohio University,

16       College of Medicine.

17  Q   Is that located in Akron?

18  A   Well, it's in Rootstown. It's an affiliation of the

19       University of Akron, Youngstown State and Kent State

20       University Medical School.

21  Q   And have you had any publications?

22  A   I have publication in a pediatric emergency medicine

23       book on apnea, which is a -- means the problem of

24       children who stop breathing. I also have published a

25       lecture series on the abuse of children that have

---

539

1  banged against the inside of the skull, and as it
2  does so it will deform and cause injury to the brain,
3  the blood vessels of the brain, and cause the brain
4  tissue to become injured and damaged, as well as
5  bleeding to occur on the surface of the brain and
6  within the brain. It is a particular devastating
7  form of child abuse because it is -- injures the
8  brain, and the brain in an infant, because of its
9  structure and its development, will not recover. It
10  won't -- those injuries are permanent, and the child
11  loses potential, loses the ability to grow and
12  develop normally.
13       There are other injuries besides the brain
14  injury. There are associated injuries to the eye, to
15  the retina of the eye, the back side of the eye. And
16  I might use the model. I might use the model here of
17  the eye to demonstrate that.
18       The eye itself is a hollow structure, and
19  what I have in my hand is really the lining of the
20  inside of the eye itself. This is the white part of
21  the eye. Inside the eye is a lining called the
22  retina. It is the back side of the eye that is
23  damaged during this whiplash or shaking process. The
24  reason it's damaged is that there is a gelatinous
25  interior, a filler of the eye, called the vitreous,

541

1  patients.
2       The mechanism of Shaken Baby Syndrome, as I
3  said, involves a whiplash of the baby's head. That
4  whiplash -- since you invited me to use the doll, I
5  will demonstrate that. The whiplash, the baby's head
6  goes back and forth like so (indicating) when this
7  shaking is occurring. When it does that it pivots
8  about a point, the point is at the shoulders or in
9  the neck, and as it pivots, it sets up a peculiar and
10  complex force within the brain that is called angular
11  acceleration and deceleration.
12       Angular acceleration and deceleration is
13  important because each part of the brain is moving at
14  a different speed and in a different direction.
15  Angular acceleration occurs, as you may be able to
16  understand, when you play crack the whip on the
17  frozen pond in the winter time. Somebody in the
18  middle moves in a short arc and each person outside
19  that, further away from that person, moves in a
20  longer arc until the person way out at the end moves
21  very, very rapidly. So each person moves at a
22  different speed.
23       The same thing happens with the head in a
24  whiplash manner. Each incremental distance from the
25  pivot point moves farther and faster, farther and

540

1  that fits inside somewhat like this, and that clear
2  jelly is adhered to the retina on the inside. And
3  when the head is shaken back and forth, or the head
4  whiplashes back and forward, this jelly compresses
5  forward and backward, and as it does so it pulls the
6  retina apart. That's what causes the retinal
7  hemorrhage. The retina is damaged. The retina is
8  pulled apart because of the deformity of the vitreous
9  within the eye, and that causes the retinal
10  hemorrhage, the pulling apart of the retina.
11       That occurs in approximately 80 percent of
12  children that have been subjected to shaking. The
13  brain injury occurs in all of these children.
14  Retinal hemorrhages occur in about 80 percent of
15  those children.
16       There are some other associated injuries,
17  fractured ribs, because most of these children are
18  held by the rib cage, and during the shaking process,
19  there is gripping and compression to the rib cage,
20  which will cause rib fractures. That occurs in about
21  60 percent of the cases. And in about 40 percent of
22  the cases there are fractures to the arms and legs at
23  the joints, and that's because the arms and legs
24  whiplash back and forth and it can cause injury to
25  the joint. Again, that's in about 40 percent of the

542

1  faster as you move out. That causes a lot of torque
2  and shearing force within the brain and causes the
3  injury to the brain.
4       What happens is very much like taking a bowl
5  of jello and shaking it. If you shake it a little
6  bit, it will separate from the sides of the bowl. If
7  you shake it a lot, the jello will crack. And if you
8  shake it very hard, the jello will liquefy. It's the
9  same principle as what goes on inside the baby's
10  skull when its being shaken.
11       We have an understanding of how these babies
12  are shaken, mostly from confessions by those who have
13  shaken babies. We don't go up in the nursery and
14  take a baby and shake it and see what happens, but we
15  have received information from those who have
16  confessed to shaking, and we have an understanding of
17  how this occurred. Our understanding is that babies
18  are grasped on the chest or thorax or trunk and then
19  shaken violently. To do that, when that happens, the
20  baby's head will whiplash. Sometimes the babies are
21  grabbed like this (indicating), sometimes they may be
22  grabbed like this, sometimes down here, but they are
23  grabbed and then shaken violently.
24       Now, what I will do to demonstrate the
25  violence of this and how it is easy to see how babies

545

1    are injured. What I am going to do is to shake this
2    doll so that you can recognize how violent this is
3    and how the baby will be injured. This is simply a
4    representation of our understanding of how these
5    babies are shaken. They are grasped -- and allow me
6    to stand a minute -- they are grasped, held tightly
7    and then shaken violently (indicating). And when
8    that happens, it's apparent to anybody that a baby
9    would be seriously injured.
10  Q    Thank you. You indicated, I believe, in 60 percent
11       that there would be damage to the chest, or 80
12       percent?
13  A    Damage to the chest, 60 percent.
14  Q    So that means four out of ten times there would be no
15       bruising or broken ribs, that sort of thing?
16  A    Correct.
17  Q    Are there predisposing factors that have been found
18       to a child suffering Shaken Baby?
19  A    Yes. There are predisposing factors, and the biggest
20       one is size. Babies are small, and so when an adult,
21       who is a 150 pound adult, is ten times the size of an
22       infant, and when a 150 pound adult or someone larger
23       that than, picks up a baby and shakes it, you have
24       that great size and strength discrepancy that
25       predisposes the baby to be injured.

546

1    over-extension of the neck. And the baby's chin
2    likewise serves as a stop on the front to keep the
3    baby's head from bending too far forward. So the
4    baby's neck just pivots, but does not suffer injury.
5         As I said, there are some babies who do
6    suffer neck injuries. Those babies are very
7    seriously injured, and almost always die as a result
8    of the injury of the shaking.
9  Q    A two-part question -- well, no, never mind. Just
10       one to start with.
11       Does the diagnosis of Shaken Baby involve
12       ruling out other causes?
13  A    Oh, absolutely.
14  Q    Can you explain that, please?
15  A    Yes. When a child comes to us, the child presents to
16       us with a life-threatening condition, a serious
17       health crisis. And we begin to evaluate that child
18       to find out why. And as we do that, we begin to
19       eliminate causes for that life-threatening event,
20       that life crisis.
21       Often times we will do a CT Scan, and we will
22       see bleeding on the CT Scan. The CT Scan, as it
23       shows bleeding, tells us that there has been trauma.
24       We then begin to eliminate accidental causes of
25       trauma. We begin to eliminate any congenital

544

1         Secondly, as I mentioned before, the
2    developing brain is prone to injury because of its
3    development. And the baby's skeleton, also, is in
4    the stage of immaturity which allows for these
5    injuries to occur.
6         This type of thing is not limited, however,
7    to infants. We have had children as old as three
8    years of age be shaken, and there is at least one
9    case of an adult suffering the injuries of a Shaken
10   Baby Syndrome where two adults shook a prisoner and
11   caused that to occur. So there's a size discrepancy
12   by far -- size and strength discrepancy are by far
13   and away the most important predisposition.
14  Q    What about neck injuries in babies diagnosed with
15       Shaken Baby Syndrome?
16  A    Neck injuries do occur, although not very commonly.
17       And the reason for that is that the baby's neck
18       serves as a passive hinge. The baby's neck is weak,
19       and so it doesn't resist the shaking and just acts as
20       a passive pivot point for the baby's head. The
21       baby's head is also large, and that -- and because
22       it's large, it serves as a protective mechanism for
23       the neck. As the baby's head goes backs, the large
24       back of the head and the large occiput hits on the
25       back and prevents a hyper-extension or an

546

1    anomalies that could cause bleeding on the brain, and
2    bleeding conditions, blood clotting conditions. Once
3    we have eliminated all those other causes of what
4    might be seen on the CT Scan, the bleeding on the CT
5    Scan, the brain injury and swelling on the CT Scan,
6    then we are left with the only diagnosis, and that is
7    that the child has suffered abusive brain injury as a
8    result of the shaking event.
9  Q    I forgot to ask this before, how does impact factor
10       into Shaken Baby?
11  A    Impact can occur in the Shaken Baby Syndrome, babies
12       that are shaken are often thrown following the
13       shaking. Often times their head impacts on a
14       surface, either a hard surface or a soft surface, and
15       what that impact does is multiply the traumatic
16       forces delivered to the brain.
17       As you might expect, as the baby is being
18       shaken repeatedly, repeatedly back and forth, there's
19       a momentum that builds up within the brain as it
20       moves around. Then when it suddenly stops with an
21       impact, the forces are highly magnified and greater
22       injury occurs with the impact. Babies who have
23       impact injury are more seriously injured and suffer
24       more extensive sequelae and death.
25  Q    That happens both with impacts on solid surfaces and



1      impacts on soft surfaces?
2  A   Correct. It's the sudden cessation of that movement
3      that is going on that causes the multiplication of
4      the force.
5  Q   You are talking about injuries inside the skull, not
6      to the outside of the skull?
7  A   That's right. This is to the brain itself, right.
8  Q   Is Shaken Baby Syndrome or Shaken Baby Impact
9      Syndrome a scientifically recognized diagnosis?
10 A   Yes. It is recognized. There is a tremendous amount
11     of literature in pediatric journals and pediatric
12     textbooks that diagnose this particular syndrome, and
13     identify its characteristics.
14 Q   Is there any, in your opinion, serious dispute over
15     the existence of Shaken Baby Syndrome?
16 A   No. There is no serious dispute over its existence.
17     It's a well-recognized diagnosis and syndrome among
18     the medical profession.
19 Q   Thank you.
20      MR. CASTOR:   Your Honor, at this point,
21     I would move into the questions about Dr. Steiner's
22     treatment of Aiden. It's going to take a
23     considerable amount of time. Perhaps would it be
24     more convenient for the jury's understanding --
25      THE COURT:   If you would prefer to

STATE OF OHIO    )
            ) ss.
COUNTY OF ASHLAND )

    I, Linda K. Vozar, Stenotype Reporter and
Notary Public within and for the State aforesaid,
duly commissioned and qualified, do hereby certify
that the foregoing, consisting of 246 pages, was
taken by me in stenotype and was reduced to writing
by me by means of Computer-Aided Transcription; that
the foregoing is a true and complete transcript, to
the best of my ability, of the proceedings held in
that courtroom on the 26th day of August, 2005 before
the Honorable James DeWeese. I also further certify
that I was personally present in the courtroom during
all of the proceedings.

    IN WITNESS WHEREOF, I have hereunto set my hand
and seal of office at West Salem, Ohio this ___ day
of _____, 2005.

           Linda K. Vozar
           Notary Public
           3195 Manzanita Drive
           West Salem, OH 44287

           My commission expires 12/26/10.

548

1      conclude now, or use the last ten minutes, either way
2      is fine with me.
3       MR. CASTOR:   Rather than break just
4      after he gets started, we will probably have to
5      repeat that again on Tuesday. And he will be back
6      Tuesday afternoon.
7       THE COURT:   We will pick up his
8      testimony then again on Tuesday.
9       MR. CASTOR:   Thank you.
10      THE COURT:   Folks, at this time we're
11     going to conclude for the day. I am going to send yo
12     home. I have a couple of things to say to you.
13     Remember your instructions not to discuss the case.
14     You've only heard part of it. Remember your
15     instructions not to pay any attention to media
16     coverage of the case, newspapers, TV, radio. Again,
17     you can have somebody cut those out or videotape
18     those things, you can see afterwards if they got it
19     right, but you have been here for the whole trial.
20      We will see you back here on Tuesday. We
21     will try to start promptly at nine. Please leave
22     your pads and buttons back there on the table. We
23     will lock the jury room while you are gone.
24      THEREUPON, court adjourned for the day.
25

**MEMO TO:**    The File

**FROM:**    Jim Gutbrod

**DATE:**    March 3, 2005

**SUBJECT:**    Aiden Stein

     I met with Dr. Carl Martino, a neuroradiologist at Akron General Medical Center on March 2, 2005. I provided to him the copies of the CT scans of Aiden Stein's brain and skull from March 15, March 16, March 17 and March 22, 2004 along with the plain films of the skull from March 22, 2004. Aiden Stein was born on October 27, 2003. According to his mother Arica, Aiden was born not breathing at all, and had a blue color. He also was not moving and was taken to the isolette and had a 36% oxygen level. He did not move at all, was not crying, eyes were bulging. He failed a hearing test; his oxygen level was low for 1 and ½ days. At one month of age or less he had a dramatic increase in his head circumference.

     On an ER visit on February 18, 2004 Aiden had a swollen toe and blood spots in both eyes, which was diagnosed as subconjunctival hemorrhage, which eventually cleared in a week or so. There was also an instance where Aiden rolled off the couch and hit his head on a coffee table and he had a bruise or lump on his forehead. There was not fussing or crying and he took food okay. Then in another instance his babysitter was holding him up over her head and his head contacted the globe of the ceiling fan.

     On March 15 about 6:45 a.m. ~~Mathew Stein~~ Arica heard Aiden crying, went and got him and put him in the car seat and gave him a bottle, changed his diaper and his clothes. Mathew then put him on the floor, used the bathroom and came back out and put him in the bedroom. About 10 a.m. Aiden was crying and Matt Stein made him a bottle. He quit crying and went back to sleep and then woke up. His eyes were red, glassy, bloodshot and he put him in the basinet and he was coughing and fussing. He then was coughing and choking, went limp and was not breathing. Aiden began to turn blue and became motionless. Matt picked him up and ran down the hall and CPR was done by a neighbor, 911 was called, an ambulance arrived 5 minutes later and Matt rode with Aiden to Med Central. It did not appear that he was breathing until he got to the hospital. They immediately put a tube down his throat and there is a question whether they x-rayed to see the placement of the tube. It appears that the tube was not placed properly and was essentially in the right bronchus. They tried to put an IV in his head and according to the clients the "IV blew". He was at Med Central for 2 hours and life flighted to Children's Hospital Medical Center of Akron. They were bagging him the whole way up there. They took him to do the first CT scan. Dr. Steiner came and the CT scan was done. Aiden had hemorrhaging in his head. They said he had shaken baby syndrome, they were blaming his father Matt Stein and said that he would probably die.

     The review by Dr. Martino of the March 15 CT scan showed an acute hemorrhage in the subarachnoid and subdural space on the left, with a small amount on the right.

*EXHIBIT*
*#5*

/

Therefore, he would describe it as bilateral subarachnoid, a medium amount of subdural on the left, all acute. In addition, there was extraaxial fluid bilaterally. He did not known if it was due to old blood or due to atrophy of the brain with space taken up by the brain. He did say it could be due to previous blood which had been resorbed and replaced by serous material. The overall size of the brain in this CT scan is small, with approximately 10% decrease in size. *(or small b/o a/o Normal)*

The CT scan of March 16 showed a significantly greater subdural hematoma on the left side much greater than the right side, but now the right side also. A drain had been put in some time between March 15th and March 16th. This scan shows much less extraaxial fluid and the space that had been taken up by that fluid is now filled by brain. There had been fluid removed via the drain on the right side. There was more blood there. It appears that perhaps there are two drains one on the left and one on the right with the one on the left not having drained as fast. There is more blood accumulated on the left, now blood filling up the space where the fluid was on the left. Most likely there is more blood as a result of the draining of the extraaxial fluid. The review of the CT scan on the 16th strengthens the theory that the brain was small on the 15th because the fluid had squeezed the brain. Once the fluid was removed, the brain expanded. This lends credence to the idea that the fluid was there as a result of old blood. He would give the age of the blood as greater than one month and as much as six months or even the blood could have been there *in utero.*

The CT scan of March 17, 2004 indicates that the blood is less. The subdural hemorrhage on the left side is less than on March 16th. This indicates that it may have been drained. There is a tiny amount of blood on the right.

The CT scan on March 22 is striking insofar as it appears that Aiden has stroked *→ WHAT HAPPENED* out, lost blood supply. There is a new hemorrhage in the right cerebral hemisphere, the brain tissue is lower in density, as if Aiden had had a massive adult-like stroke. This condition is so severe that it appears that at this point Aiden is living on his brain stem. There is no more brain. It was probably caused by the brain being bathed in blood causing the vessels to go into spasm. Dr. Martino would say this with 90% certainty. It appears to him that the brain is dead. He said that one would want to do a flow scan of the brain.

The scan on March 15th demonstrates the brain is still perfused and normal, though small. The viability of the brain tissue gave out between March 17th and March 22nd. They tried to relieve it with the drains but got a bad result. While the CT scans could be consistent with shaken baby syndrome that is not the only explanation. It is possible that the bleeding could be ongoing. Once you have a big fluid collection around the brain this stretches the veins which could easily lead to ripping one of them.

I asked Dr. Martino about the misplacement of the endotracheal tube. He did not see how that could lead to acute subdural hemorrhaging, but he did think that it could affect the brain cells causing ischemia of the brain which could have lead to the end result of the infarct. I asked him if what he saw on the CT scan could have been caused by birth

and he said that he thought that it could. He explained that when you have fluid outside the brain, called hygroma, once again this stretches the bridging veins and any minor thing could cause a tear of these veins and thus a subdural hematoma. Even a minor trauma such as jostling could do this.

We then reviewed the plain skull films and compared those with the CT scans of the skull. Dr. Martino stated that he could with a 100% certainty say that there was no right parietal bone fracture.

Dr. Martino said that he would be willing to be involved in the case and write a report or give deposition but would not be interested in going to trial.

1478

IN THE COURT OF COMMON PLEAS OF RICHLAND COUNTY OHIO

```
 1
 2
 3    STATE OF OHIO           :
 4         Plaintiff :
 5                            :
 6    -vs-                    :   No. 2006-CR-224
 7                            :
 8    MATTHEW STEIN           :
 9         Defendant :
10              - - - - -
11       HONORABLE JAMES DEWEESE,
12            Presiding
13
14    TRANSCRIPT OF TRIAL PROCEEDINGS
15              - - - - -
16         SEPTEMBER 6, 2005
17            VOLUME VII
18              - - - - -
19
     APPEARANCES:
20
     ROBERT CASTOR, FIRST ASSISTANT PROSECUTOR
21   BAMBI COUCH-PAGE, ASSISTANT PROSECUTOR
22         On behalf of the State of Ohio.
23   KENNETH BOGGS, ESQUIRE
24         On behalf of the Defendant.
25              - - - - -
```

COPY

1479

```
 1         THEREUPON, the Pledge of Allegiance was
 2    recited.
 3         THE COURT:      Once again, I am glad to
 4    see there is still fourteen of you. The weather is
 5    nice. I know it is hard to come in, but we're back
 6    today to hear the final witnesses in the case. And
 7    we're going to start hearing the defendant's medical
 8    expert, Dr. Byrne.
 9         Dr. Byrne, would you come to the stand,
10    please, and we will have you sworn in.
11         THEREUPON, the witness was duly sworn.
12    MR. BOGGS:      Good morning, Dr. Byrne.
13    THE WITNESS:    Good morning.
14    DIRECT EXAMINATION OF DR. PAUL BYRNE
15    BY MR. BOGGS:
16 Q  Could you state your full name and address, please?
17 A  I'm Dr. Paul Byrne. Our home is at 577 Bridgewater
18    Drive in Oregon, Ohio.
19 Q  And could you tell us something about your education,
20    like where you went to college and medical school?
21 A  Yes. I went to Xavier University in Cincinnati,
22    Ohio. And then I went to medical school at St. Louis
23    University in St. Louis, Missouri.
24 Q  And when did you get your license to practice?
25 A  I got my license to practice -- my first license in
```

LINDA K. VOZAR, COURT REPORTER          (419) 945-3101

1480

```
 1    1957, and I have been licensed to practice since that
 2    time.
 3 Q  Where did you do your residency?
 4 A  I did my residency at the St. Louis University Group
 5    of Hospitals, which included the Cardinal Glennon
 6    Memorial Hospital for children.
 7 Q  And did you do any postgraduate work?
 8 A  Yes, I did. I studied the care of premature newborn
 9    infants at the University of Colorado, and also in
10    Boston.
11 Q  And are you Board certified in any specialties?
12 A  Yes, I am.
13 Q  Can you tell us which ones?
14 A  I am Board certified in pediatrics, and I am Board
15    certified in neonatal, perinatal medicine, which is
16    neonatology.
17 Q  And what is neonatology?
18 A  Neonatology is the study, diagnosis, treatment and
19    care of ill newborn infants, which includes premature
20    infants and infants that are born with any kind of
21    difficulty.
22 Q  Have you had any academic appointments or taught in
23    any medical schools?
24 A  Yes. I have been on a faculty of medical school --
25    of a medical school since 1961. I started as an
```

1481

```
 1    instructor, and then worked my way up to where I was
 2    appointed as clinical professor of pediatrics at St.
 3    Louis University.
 4         I held that same rank of clinical professor
 5    at Creighton University, and I was full professor of
 6    pediatrics at Oral Roberts University, where I was
 7    the director of neonatology and chairman of the
 8    department of pediatrics.
 9         And, currently, my faculty appointment is a
10    clinical professor of pediatrics at the Medical
11    University of Ohio. They've recently changed the
12    name from Medical College to Medical University of
13    Ohio. And I'm director of the department of
14    pediatrics at St. Charles Mercy Hospital in Oregon,
15    and also a director of neonatology at that hospital.
16 Q  And are you a member of any societies or committees?
17 A  Yes. I'm a member of the American Medical
18    Association. I'm a member of the American Academy of
19    Pediatrics. And also a member of the Academy of
20    Medicine in To
21 Q  Have you writt                              1g,
22    sir?
23 A  Yes, I have. I
24    over the years
25    publications.                               on
```

*EXHIBIT #6*

1481

1484

1   problems with the nervous system in children as well
2   as adults, and also with issues that have to do with
3   ethics and related topics.
4  Q  Have you written any books?
5  A  Yes. A book on life support and death, and then I
6   have chapters in books also for related topics.
7  Q  Have you recently done any work with the --
8      THEREUPON, the Reporter cautioned Mr. Boggs
9   to slow down and repeat the question.
10     MR. CASTOR:    Object.
11     THE COURT:    Are you talking about
12  something related to medicine?
13     THE COURT:    Yes, sir.
14     THE COURT:    Overruled.
15     THEREUPON, the Reporter asked Mr. Boggs to
16  repeat the question.
17  Q  Have you recently done any work or a consultation
18   with the Pope in the Catholic church?
19  A  Yes.
20     THE COURT:    Regarding medicine?
21     THE WITNESS:    Yes.
22     THE COURT:    Go ahead.
23  A  I was invited by the Pontifical Academy of Sciences
24   last February to give a presentation to them. I was
25   one of twelve people from around the world who were

1485

1  A  I'm sorry, sir?
2  Q  Can you tell us what medical records of Aiden Stein
3   you have reviewed?
4  A  Yes. I reviewed the medical records of Aiden Stein
5   at -- from Akron Children's Hospital, at least for
6   the first several weeks that he was there. Those
7   were all the medical records that I have been
8   presented with from there.
9      I have reviewed the medical records from the
10   emergency room at Mansfield Hospital. Also, the
11   medical records from the birth of Aiden, and the
12   medical records from the well baby clinic. I call it
13   the well baby clinic, where he went to get evaluation
14   for the feedings and immunizations and the like.
15  Q  I'm going to have you refer to some records here,
16   which would be State's Exhibit 16-A, which is his
17   birth records.
18     MR. BOGGS:    May I approach, Your Honor?
19     THE COURT:    Go ahead.
20  Q  Can you just skim through those real quick, Doctor.
21   After reviewing those records, Doctor, can you look
22   at the October 27, 2003, the notation at 0225 time?
23  A  Yes.
24  Q  It says in those records that stimulation was given,
25   he was slow to cry. Oxygen per mask was given. Bulb

1483

1   invited to present on the topic of brain death and
2   related topics. It was at the Pontifical Academy of
3   Sciences.
4  Q  And regarding the topic of brain death, you have
5   written several articles, or co-authored several
6   articles in several books, is that correct?
7     MR. CASTOR:    Object, Your Honor.
8     THE COURT:    Overruled.
9     THE COURT:    You're talking in
10  general -- you are trying to lay out his full
11  professional qualifications?
12     MR. BOGGS:    Yeah, Your Honor. I'm
13  trying to shorten it from eight pages long.
14     THE COURT:    I understand.
15     MR. BOGGS:    I could read the whole
16  thing.
17  Q  Dr. Byrne, have you testified in any cases prior to
18   this?
19  A  Yes, I have.
20  Q  Have you been qualified as an expert before?
21  A  Yes, I have.
22  Q  Can you tell us where and what cases you've talked
23   about?
24  A  I was qualified as an expert in the Baby Kay case,
25   which was in Virginia, which went all the way to the

Supreme Court. And I also testified in the Baby
2   Tabitha case in Omaha, Nebraska, and that, too, I was
3   qualified as an expert in both of those cases, and
4   that one also went to the Supreme Court in the State
5   of Nebraska.
6  Q  So you have been qualified as an expert in at least
7   two other jurisdictions?
8  A  Yes, that's correct.
9  Q  Have you also testified in this case in a different
10   court and qualified as an expert there?
11  A  Yes, I did.
12  Q  And where was that at?
13  A  That was in Akron, Ohio in the Probate Court. Oh,
14   I'm sorry, sir, I also -- I don't know that I was
15   qualified as an expert, but I testified in the
16   juvenile court hearing in Mansfield in this case.
17     MR. BOGGS:    Your Honor, at this time
18  I'd tender him as an expert in this case.
19     THE COURT:    Being no objection, you can
20  proceed.
21  Q  Dr. Byrne, have you had a chance to review the
22   medical records of Aiden Stein?
23  A  Yes, I have.
24  Q  And can you tell us what medical records you have
25   reviewed?

1488

1     suction for moist breath sounds. Eyes are bulging.
2     Slight tone of extremities, and his color is pale.
3     What does that tell us as a physician, within
4     reasonable degree of medical certainty, of Aiden's
5     condition at that time?
6 A  That tells us that the baby is in some kind of
7     difficulty, that the baby is pale, needing
8     stimulation to breathe, and also being given oxygen
9     by the nurse because of her concern with the
10    condition of the infant.
11 Q  Now, it says oxygen per mask, does that mean -- is
12    that significant?
13 A  Well, we put a mask in front of the baby's face and
14    give the oxygen that way.
15 Q  And at 0230, eyes appear to roll back in the head.
16    Color remains pale. Cries only to stimulation. Does
17    that raise any additional concerns, from a medical
18    standpoint?
19        MR. CASTOR:    Excuse me, I didn't
20    understand.
21        THE COURT:    Would you ask the question
22    again, please?
23        MR. BOGGS:    Sure.
24 Q  Eyes appear to roll back into head. Color remains
25    pale. Cries only with stimulation. Does that raise

1 A  Yes. The five liters tells how much flow there is.
2 Q  Pulse ox is 90 percent. Heart rate 160. Respiratory
3    rate is 80. What does that tell us, from a medical
4    standpoint?
5 A  The pulse ox is low. The pulse ox is a measure of
6    oxygen in the blood. Cyanosis is a measure of the
7    carbon dioxide. Too much carbon dioxide, the pulse
8    ox is low, it's 90 percent. There is not as much
9    oxygen. If we did the pulse ox on all of us now, it
10    would be 95 or 98 percent, at least, in all of us
11    ordinarily. But even with the oxygen, the pulse ox
12    was still low in Aiden at that time.
13 Q  What is a pulse ox level that would raise some
14    concern by the doctors?
15 A  Well, we would, at least in the babies that we treat,
16    ordinarily we try to keep them above 95. When you
17    get down around 92, they will tolerate it okay, but
18    below that, you don't want that to happen. You want
19    to get the oxygen up from that.
20 Q  At 0243 it says suprasternal retractions and nasal
21    flaring. The pulse ox is still at 90 percent.
22 A  Yeah. That tells you that the baby is still in
23    trouble. The retraction is when we breathe in, our
24    chest moves out, our diaphragm moves down, and the
25    air goes in and follows that. Well, in a little baby

1487

1    any medical concerns or considerations?
2 A  Yes. That's five minutes after delivery, and the
3    nurse is still concerned that he's not focusing, he's
4    not crying normally, requiring stimulation to cry,
5    and he's still pale. And so the nurse is concerned
6    about the baby at that time.
7 Q  Look at 0240. Baby arrived in nursery. Baby not
8    crying. And tone slightly floppy. What does that
9    mean medically?
10 A  Well, that means that fifteen minutes after delivery,
11    the baby is still in some kind of difficulty.
12 Q  And it says color is pale and cyanotic. Now, that
13    cyanotic is a new term. Does that mean he's turning
14    blue?
15 A  Yes, that means the baby is blue. In order to have
16    cyanosis, you have to have five grams percent reduced
17    hemoglobin is what makes the cyanosis, and so it
18    tells you that the baby isn't able to get oxygen in
19    all of the hemoglobin, so the baby is blue. It's not
20    a good thing for babies or for any of us to be blue.
21 Q  And that's even with the oxygen per mask, is that
22    correct?
23 A  Yeah, the oxygen will hopefully help that. That's
24    the reason we give the oxygen.
25 Q  And he was given five liters per mask?

1    who is in trouble, attempts to breathe in, but can't
2    get the air in, and so the chest is weak and it
3    retracts in. And then the flaring, the nose flares,
4    and it's another manifestation of respiratory
5    difficulty in the newborn baby.
6 Q  So he's having trouble breathing?
7 A  Yes.
8 Q  Stimulate baby to cry. Lungs slightly congested.
9 A  Still, you know, another problem that the baby has.
10    Little babies can only show their difficulty,
11    wherever it is, in certain ways. And one of them, no
12    matter where the problem is, whether it's in their
13    lungs or their heart or their brain or their kidneys,
14    they manifest with difficulty with breathing. And so
15    it tells you that something is wrong, it doesn't tell
16    you exactly what is wrong, but it tells you that if
17    you give some oxygen, at least you can keep the baby
18    oxygenated during that time.
19 Q  At 0247 it says weight done with oxygen mask on face.
20    Is that normal?
21 A  I got to follow you just a second. Oh, at 2:47 is
22    that where you are?
23 Q  Yes.
24 A  I lost the place. What --
25 Q  Weight done with oxygen mask --

1490

1    A·   Oh, yeah, weight done with the mask on, okay. Here's
2         what happens, parents always want to know how much
3         the baby weighs, that's the first thing they ask. So
4         we get the baby weighed as soon as we can because we
5         know they're all going to ask. But the baby is still
6         in trouble, so the nurse put the baby on the scale,
7         but put the mask there to keep the oxygen going so
8         that the baby doesn't get into difficulty -- further
9         difficulty while the baby is being weighed.
10   Q    Baby's color is pale, but not cyanotic. So has he
11        improved slightly?
12   A    Yes, he has improved, and the pulse ox has come up at
13        that time, but no longer is the baby cyanotic,
14        indicating that more of the hemoglobin is being
15        oxygenated.
16   Q    Okay. Now, you said in the same note there, they
17        have the weight at thirty-one hundred and eighteen
18        grams, the length at 43.9 centimeters, and HC, is
19        that the head circumference at 33.7 centimeters?
20   A    Yes.
21   Q    Or 13 and a quarter inches, roughly?
22   A    I think you are getting that from a different page,
23        correct?
24   Q    Yes.
25   A    Yes, right. And once the nurse measures the head

1491

1         circumference, and the length and the weight, then
2         what we do is plot them on a growth grid, and the
3         nurse did that, I assume she's a she, but I don't
4         really know that. It's signed with an initial. But,
5         in any event, the nurse plotted the head
6         circumference, the weight and the length. And all of
7         them were right at the 50th percentile or below that
8         percentile.
9              The mean, the average of all of us, is right
10        at the 50th percentile. Those that are smaller or
11        shorter are below the 50th percentile. Those that
12        are higher or longer are above the 50th percentile.
13             At birth, Aiden's weight, height, and head
14        circumference were either right at the 50th
15        percentile or below the 50th percentile.
16   Q    Let's go down to 0305.
17   A    Okay. I have 0300 in the column, and 0310.
18   Q    Let's go to 0300. Pale, pink, eyes appear bulgy with
19        edematous eyelids or swelling.
20   A    I have to get on the correct page, okay. Eyes appear
21        bulgy with edematous eyelids, yes.
22   Q    Is that unusual or is that common?
23   A    I think that we see that, but we pay attention to it
24        because -- excuse me, because when the eyes are bulgy
25        and edematous, sometimes it's a manifestation of

1492

1         pressure on that part of the head when the baby is
2         being born.
3    Q    0305, Vitamin K was given?
4    A    Yes.
5    Q    That's forty minutes after delivery. Is that common?
6    A    Well, we try to give the Vitamin K as soon as we can,
7         and that's about fifteen minutes after delivery. All
8         babies are born with a tendency to bleed. In the old
9         days, they didn't circumcise the boys until eight
10        days because they knew if they did it before that
11        they would bleed.
12             When I was a younger physician, we didn't
13        have any Vitamin K to counteract that, so we still
14        paid attention to that. But then during the time
15        that I have been a physician we got Vitamin K first
16        as a preparation we can give in the muscle, later in
17        the vein, and it helps a lot to correct the bleeding
18        problems that all babies have. They all have a
19        tendency to bleed, but we now give it to all babies.
20             If you don't give it, every now and then a
21        baby will literally bleed to death. Before we had
22        the Vitamin K, they would get the GI hemorrhage. If
23        their liver got a little tear in it, they would bleed
24        to death. Anything in the brain, wherever it is,
25        they would keep on bleeding. But the Vitamin K

1493

1         changes that, and so we give it to every baby now,
2         and it stops things.
3              This baby had the bleeding tendency until
4         fifteen minutes after birth, and then the Vitamin K
5         was given, and then that helps the blood clotting at
6         that time.
7    Q    Now, 0310, Dr. Olson was called by the nurse, and he
8         responded, ordered some oxygen, CBC and a blood
9         culture. Is that medically significant?
10   A    Well, that's very significant because it tells you
11        that ten after three in the morning -- morning,
12        middle of night, depending on how you look at it --
13        the nurse was still concerned enough about Baby Aiden
14        that she called Dr. Olson to relate to him the
15        condition of the baby. His response was to get a
16        blood count and a blood culture, and continue to give
17        the oxygen, which is the general things that we do.
18        Because, remember, that when a baby has trouble with
19        breathing, we can't really tell what the problem is.
20        It's the way it's manifest. They don't come with
21        tags. They can't communicate saying my head hurts,
22        my belly hurts, or whatever it is. And so we have
23        certain things that we do, and one of the things we
24        commonly do is get a blood culture, get a blood
25        count, and we would continue the oxygen.

1494

1 Q Okay. Let's go down to 0420. Minimal crying during
2 blood drawing. That's two hours, roughly, after
3 birth.
4 A Yes. Babies, you know, we never like any baby to be
5 hurt. On the other hand, if we draw blood on a baby
6 and the baby doesn't respond at all or minimally, we
7 get concerned about that because normally they don't
8 like it to get their blood drawn. Sometimes we don't
9 like to do it either. But they do cry normally. If
10 they don't cry, they don't cry very much, we get
11 concerned that there is something making the baby not
12 respond in a normal fashion.
13 Q And then 0620 Dr. Olson called to check on the status
14 on the infant. That's about three hours after he was
15 called at home.
16 A Yes. If Dr. Olson is like other people that get
17 called at 3:10, you give the orders, go back to
18 sleep, and then when you wake up, you call in because
19 you are concerned about the baby. That's what I see
20 Dr. Olson doing at that time.
21 Q 0800, notation is pale, pink, slightly pale, eyes
22 with some bulging.
23 A Yes. Still bulging of the eyes. The baby, all
24 babies, essentially all, during the birth process,
25 the head has pressure on it, at the eyes they can

1495

1 bulge, the head is molded. These are all things that
2 happen to babies in the birth process. And many of
3 you might have seen babies, recall that, and you
4 recall sometimes they look like that, and they get
5 better quickly, but we pay attention to it. Wherever
6 the swelling or bulging is, it tells you that's where
7 the pressure was.
8 Q You said you also looked at the medical records from
9 the Health Clinic where he had his head measured and
10 his vaccinations provided?
11 A Yes.
12 Q Let me hand them to you.
13 A I might -- well, anyway --
14 Q Look in the notation for November 24th.
15 A This one?
16 Q Yes. Shows his weight, length and head
17 circumference.
18 A Yes.
19 Q Can you tell us what percentile he was in for the
20 weight?
21 A Yes. He was below the 50th percentile, would be down
22 around maybe the 35th percentile, somewhere in there.
23 Q How about the length?
24 A The length? The length is just a little bit lower,
25 right around the 30th or 35th percentile.

1496

1 Q And how about his head circumference?
2 A His head circumference is beyond the 95th percentile,
3 it's off the grid, probably beyond the 97th
4 percentile.
5 Q And that's shortly within the first month of his
6 life, isn't it?
7 A Yes, that's one month. Approximately one month after
8 delivery his head circumference was out of proportion
9 to his weight and length.
10 Q Does that cause you any concern as a physician?
11 A Absolutely.
12 Q Now, if Dr. Pope and Dr. Olson testified that they
13 also would be concerned, what kind of concerns would
14 they have?
15 A Well, our concern is at that time, is why is the head
16 so big? We pay attention to that, and then we need
17 to answer that question, why is the head so big? And
18 so we -- I would be very concerned.
19 Q What kind of things would you do in response to that
20 concern as a physician?
21 A Well, in modern times we have testing that we can do
22 in terms of CAT Scans and MRIs and these things, give
23 us images of what goes on inside the head. And so a
24 baby that has a head that's too big like this, very
25 likely skull films would be taken and a CAT Scan

1497

1 would be done. And then, if it would be indicated,
2 further imaging in terms of MRI would be done.
3 Q And what kinds of things would you be looking for on
4 an MRI or CAT Scan?
5 A Well, we have basic principles in medicine that we
6 look for, and the more common one of them, one that's
7 more common in the newborn baby is, is the baby's
8 head made correctly? Is the inside of the head made,
9 that is, is there an -- we use the word anomaly. Is
10 there an abnormality of development of the brain or
11 something inside.
12 Then once we get past the abnormality of
13 development, then we have to think of tumors. Tumors
14 aren't too common, but they do occur in newborns, so
15 we think of tumor. And then we think of trauma, and,
16 of course, all newborn babies have just gone through
17 a traumatic event. It's difficult to be born. Mom's
18 know that, and people who observe babies after birth
19 know that it's tough to be born, and so we look for
20 manifestations of trauma in a baby whose head is too
21 big at one month of age.
22 Q Okay. Would you be looking at a CAT Scan or MRI for
23 any subdural hematomas at that time?
24 A Yes. Subdural hematoma is one of the manifestations
25 of trauma, but actually subdural hematomas, sometimes

1500

1    babies are born with subdural hematomas. They
2    actually -- you know, modern times we have the
3    ability to use ultrasound, and subdural hematomas
4    have been found in the unborn baby, they are born
5    with the abnormality. And, of course, when I was a
6    younger physician, the way that we would have to look
7    for subdural hematoma was that we would use needles
8    in the soft spot, over the side, and very carefully
9    look at that, and then if the head is subdural, we
10   would get the fluid. Actually I brought a
11   picture --
12 Q  Can you show a diagram of what you are referring to?
13 A  Yeah. I brought a picture from home because I know
14   it might help to see how we used to do it.
15       The soft spot of the baby's head, everybody
16   is aware of the soft spot, you go over to the side
17   and get fluid out, and make the diagnosis of
18   subdural. And I, as a younger physician, this is the
19   way it was done. Modern times we use CAT Scans and
20   neurosurgeons and the like. A neurosurgeon taught me
21   how to do this. But we get the fluid out, and then
22   we can analyze the fluid, because the fluid could be
23   just cerebral spinal fluid, and it could be blood,
24   but we would see blood. Or, if it's been there for a
25   while, the red blood cells tend to disintegrate, and

1    on our hand, it has a blood supply and the body
2    cleans it up relatively quickly and takes care of
3    that, but the subdural space has no blood supply.
4        So it has the blood in there that reacts, but
5    what happens to it is that it becomes a dynamic
6    fluid. Blood is leaking into it on a regular basis,
7    and then it's being absorbed. Then what happens to
8    the little baby, because the little baby has bones
9    that aren't closed together yet, our bones are closed
10   together, but newborn baby has the bones that are
11   separated, and the baby gets along with that,
12   sometimes pretty well. And the head can be too big,
13   and but if it's not diagnosed, it can stay there for
14   months. Although once it's there, it's abnormal, and
15   then things can happen that will affect the pressure
16   inside the head, that will affect the amount of blood
17   that leaks into the subdural, and things go on like
18   that. But they can go on for a long time with a
19   subdural collection of fluid.
20 Q  Now, if you are looking at a CAT Scan, how would the
21   collection of subdural fluid look?
22 A  Well, so far as the CAT Scan is concerned, it's an
23   x-ray, but it's done with a computer. And then that
24   basically gets slices of the head, and then you look
25   at it. But the subdural would be at the outside,

1499

1    then you end up with something like serum, so it
2    would be kind of a yellowish fluid. But we analyze
3    it, and we look at the protein, and it's very
4    dramatic, because the protein on subdural fluid is
5    very high. That's how we could tell the difference,
6    compared to spinal fluid, obviously you can tell
7    blood because you can see it.
8 Q  And you performed that procedure yourself?
9 A  Yes. I have done it many times as a younger
10   physician. I haven't done it for a long time because
11   medicine changes, but it can still be done, but now
12   the neurosurgeon does it.
13 Q  If that procedure, or some procedure a neurosurgeon
14   would do today, is not done, what is the outcome of
15   the baby?
16 A  Well, what happens is the subdural fluid, see, the
17   dura is a covering around the brain. And subdural
18   means under the dura, but there is really no space
19   there. It all fits in tightly, and there is no
20   space. But what happens that makes the subdural
21   occur is that the blood vessels over the brain get
22   stretched. And when they get stretched, they tear,
23   and they leak a little bit of blood out. Then there
24   is blood in the subdural space, but it's a space that
25   doesn't have a blood supply, like if we get a bruise

1501

1    just underneath the skull. And what happens to blood
2    when it gets in the subdural space on the CAT Scan,
3    it shows up as white. And then over time, as it
4    progresses, it tends to have the same density as the
5    brain, so that maybe for the first week or so would
6    be white, then as you go on for one to three weeks,
7    it would have the same density of the brain. And
8    sometimes you can't even see it, wouldn't even be
9    able to see it so easily. But then once you get
10   beyond three or four weeks, the red blood cells have
11   been absorbed and then its fluid, it's very high in
12   protein, but it has the appearance on the CAT Scan as
13   being darker than the brain.
14       And so we use those, and we use the terms --
15   in terms of density, hyperdense in the brain meaning
16   whiter than the brain; isodense, iso means the same
17   as; and then hypodense, it's less white, it's
18   blacker. So that's how the subdural fluid, we can
19   determine the age of the subdural fluid when one
20   looks at the CAT Scans.
21 Q  I want you to have a look at Exhibits 8-A, B and C.
22   In referencing State's Exhibit 8-A, B and C, it has
23   on there head circumference charts. Are those
24   similar charts, are they all comparing apples to
25   apples?



1502

1    A    Yes, they are similar. There is a difference in them
2         in the sense that -- actually this one, the way that
3         we use it, has some colors in it, but the basic
4         difference is that it is done statistically in
5         standard deviation. And so this black line is the
6         median or the middle, and then this dotted line is
7         two standard deviations. And what happens, and
8         statistically in one standard deviation, you get 68
9         percent of the population. Two standard deviations
10        you get 95 percent of the population. So this is
11        done in that way, so that really the midline is 50,
12        but it's for a different reason. The dotted line
13        would be five, theoretically five, but it's really 45
14        percent from the middle, so that's a little
15        different.
16             Now, when you go to the one that was made in
17        the well baby clinic, and the one done at the well
18        baby clinic, and then the one by Dr. Steiner, the
19        well baby clinic goes up to the 95th percentile. Dr.
20        Steiner's graph has more lines on it, and it goes up
21        to the 97th percentile, but, either way, they show
22        the same thing. Where the chart that I showed you
23        had the length and weight going right at the 50th
24        percentile, as you can see those Xs, but you can see
25        beyond, outside the 95th percentile is where the head

1503

1         circumference was at one month of age. Dr. Steiner
2         doesn't show that part. He just shows the head. But
3         he shows that the head goes up at one month of age to
4         about the 95th percentile. At three months of age,
5         his graph still shows that it's beyond the 90th
6         percentile, but it's out of proportion to weight and
7         the length. It doesn't show you that part on this,
8         that part is left blank, but they all show that the
9         head is too big already at one month of age.
10   Q    And Dr. Steiner's chart, I believe, is three years,
11        yours is a one-year chart?
12   A    I'm sorry, sir, what's your --
13   Q    Dr. Steiner's chart, is it three years?
14   A    Yeah. Dr. Steiner's goes to three years, and, of
15        course, my chart, the one that I made, goes to twelve
16        months. But it also shows what happens before birth,
17        in terms of how these things go. But, you know,
18        there are different people, some are very big, some
19        are very small. So you have a graph for them, but
20        they go together. The weight, length and head
21        circumference go together for big people; go together
22        for small people.
23             In Aiden's case, he was right in the middle
24        at birth for all three of them. At one month of age
25        his head circumference was way out of proportion,

1504

1         depending on how you make that graph in terms of
2         beyond the 95th percentile or 97th or 90th
3         percentile, or whatever it is. No matter how you do
4         it, his head was too big at one month of age.
5    Q    Now, when they measured his head circumference, is
6         there a standard way that the nurses are trained to
7         do the measurements so that we all know what they are
8         doing?
9    A    Yes. The head circumference, you know, it's done
10        with a tape measure, it goes around the head, and the
11        standard anteriorly is the glabella. That glabella
12        is this part of the anatomy that's between the
13        eyebrows, but it's right here. Then we use the most
14        prominent part of the occiput. The occiput is the
15        back part of the head. The most common part of the
16        occiput, so you get it in the back, just as far as
17        you can, and then in the front where it is, and
18        that's how head circumference is measured.
19   Q    Okay. Now, Aiden had two visits to the emergency
20        room, one in January 23rd and one in February 18th of
21        '04. January 23rd, I believe, was for a cold;
22        February 18th was for an eye problem.
23             Now, he's had a problem with his right eye
24        from birth. Do you know what is causing that?
25   A    Well, I can't say for sure. I have to be concerned

1505

1         because his eye was bulging when he was born, and
2         actually an ophthalmologist saw him when he was in
3         the nursery shortly after birth, and so there is
4         something there. Whether that has to do with
5         obstruction of venous flow being manifest that way,
6         or what he has, I can't say for sure.
7    Q    Have you yourself seen Aiden since he has been born?
8    A    Yes, I have.
9    Q    When?
10   A    I saw Aiden approximately April the 20th, 22nd, at
11        Akron Children's Hospital. And I saw him again maybe
12        about a month or six weeks ago.
13             When I saw him the first time, I examined
14        him. I did not examine him when I saw him the second
15        time.
16   Q    When was it that you saw him the second time?
17   A    About a month or six weeks ago.
18   Q    Did he still have the droopy eyelid?
19   A    Yes, he did.
20   Q    The puffiness in the right eye?
21   A    He did.
22   Q    Is that unusual for a child to have that after almost
23        two years?
24   A    Yes, it is unusual. Obviously there is more to
25        consider at this time than there was right at birth.

**1506**

1  Q   Now, let's go to March 14th of '04. Testimony in
2      this case has been that Aiden was with his
3      grandmother earlier in the day, and that evening he
4      went with his parents to visit another grandmother.
5      They testified that he was crying and they couldn't
6      get him to stop crying. He was turning red, holding
7      his breath, and making a funny "eehh" sound. Would
8      that raise any concern to you as a doctor?
9  A   Well, babies do those things, as all of us that have
10     been around babies know. They do cry, and sometimes
11     it's difficult to console them. But if we're used to
12     the baby, and we can usually console them, and then
13     if we can't console them with our ordinary things we
14     do, feeding, holding, rocking, and the like, then
15     there is concern about what's the problem.
16         And, of course, the issue often with babies
17     is they don't tell you, you know, my head hurts, my
18     belly hurts, or whatever it is. So it's a general
19     thing, but babies can only do so many things. When
20     they are first born, they have to breathe, so we pay
21     a lot of attention to that. Later on they have to
22     eat, so we pay a lot of attention to how they eat.
23     They cry, we pay a lot of attention to that.
24         So, yes, on March 14th Aiden could have been
25     not able to be consoled, and somebody could have been

**1507**

1      paying attention to him at that time.
2  Q   On March 15th around 10 to 10:25, the father notes
3      that he's not breathing, he's turning blue, and he
4      goes to seek help, takes him to the neighbor's. The
5      neighbor starts performing CPR by tilting his head
6      back and blowing in his mouth and nose. He says that
7      he hears a funny noise in his chest, and he realized
8      he didn't have a good airway, so he cleared out a lot
9      of mucous. I believe he said he did that twice. The
10     squad arrives, they clear out some formula, more
11     mucous, and then they get him to the hospital at
12     MedCentral.
13         Have you had a chance to look at the
14     MedCentral records on March 15th?
15  A   Yes, I have.
16  Q   Dr. Midkiff was the treating physician for him there.
17     And Dr. Midkiff says that he was not cyanotic on
18     arrival, he was -- they were told he had some
19     formula, he coughed, gagged and started having
20     respiratory problems; noted there's some congestion;
21     no signs of any physical injury or trauma; no
22     redness, no swelling, no blood clots, no streaks,
23     welts, no nothing. He did determine that he thought
24     he had acute respiratory failure requiring
25     intubation, and the records show, I believe, that he

**1508**

1      had to make four attempts to intubate the child.
2          Can you tell us what kind of procedure
3      intubation is?
4  A   Yes. Intubation is a procedure where we look in the
5      throat, find the airway, and put a tube in there,
6      endotracheal tube. They attempted that at Mansfield
7      emergency room, and they were unable to get the tube
8      in because Aiden was coughing and gagging and
9      throwing his arms up and responding, rebelling
10     against them, so they couldn't do it.
11         Eventually with -- they paralyzed him, gave
12     him a drug so he couldn't respond anymore, gave him a
13     tranquilizer-like drug, Ativan, to cut down on
14     things. Gave two paralyzing agents, Succinylcholine
15     and Vecuronium, and each one of these was another
16     dose because Aiden was still responding.
17         What happens when you go to intubate a baby,
18     it's moist, and you have to find the airway. Then
19     you go to put it in and it slips off, especially if
20     they respond and rebel. Sometimes babies that are
21     about five months of age, or thereabouts, are the
22     more difficult ones to intubate, because they are
23     bigger, stronger, and they respond more in the like
24     than newborns. But that's why they had to do that.
25     Aiden was such that, yes, he was in trouble, but he

**1509**

1      wasn't in so much trouble that he couldn't respond to
2      them, and they had to paralyze him to intubate him.
3  Q   Do you recall from the records, did they have to pull
4      the tube back?
5  A   Yes. There are few notes on the record. One note is
6      from the radiologist who noted that the endotracheal
7      tube was too low, and he called the emergency room to
8      tell them that and have them pull the tube back, but
9      he makes note in his note that Aiden had already left
10     the emergency room, and so he wasn't able to
11     communicate that to anyone.
12         It's also noted somewhere in his chart that
13     the endotracheal tube was pulled back one centimeter
14     by Dr. Midkiff or someone at Mansfield emergency
15     room.
16  Q   Are you aware what happened to that tube once he got
17     to Akron?
18  A   Yes. And the fact of the matter is we can show the
19     x-rays and show you exactly where the tube was too
20     low at Mansfield, and then show that when he got to
21     Akron Children's Hospital, that, again, was diagnosed
22     as having the tube too low. The difference is that
23     it had been too low long enough so that all of the
24     air in the left side is absorbed so there is no air
25     in the left lung. There is air only in the right



1510

1 lung. He is being aerated by just the right lung at
2 the time of his arrival at Akron Children's Hospital,
3 which is about two hours after the first x-ray was
4 taken.
5 MR. BOGGS: Your Honor, at this time I
6 would like to set the box up and show the x-rays.
7 THE COURT: Sure. He comes fully
8 equipped.
9 (Laughter).
10 THE WITNESS: Well, you get into these
11 things.
12 Q Doctor, we have marked as State's Exhibit 24, that's
13 a chest x-ray, that's what you are showing there?
14 A Yes.
15 Q Tell us what that shows you.
16 A This is the chest x-ray from Mansfield emergency
17 room. And the time of this is 11:25. This white --
18 two white lines are the endotracheal tube, and
19 someone has put a circle around that. This is a
20 copy, I didn't put the circle around it, but I
21 suspect that the physician at Mansfield put the
22 circle around it. And shows the endotracheal tube
23 down here. This is the left main stem bronchus.
24 This is the right. So this goes to the right lung,
25 this goes to the left lung. And it's down too far.

1511

1 One of the common problems that we get in
2 when we intubate, it tends to more easily go into the
3 right side if we go down too far. So where we would
4 like that tube to be is up about two centimeters
5 higher, so that it's up here at the level of the
6 clavicles or just below.
7 Q Can you show us the x-ray when he got to Akron?
8 A When he got to Akron Children's Hospital -- I will
9 move this one back over a little bit so we can see
10 them both together.
11 Akron Children's Hospital, you can compare
12 the two, and still the endotracheal tube is just
13 about the same position it was there, but it's too
14 far, and you can see what occurs is just the right
15 lung is being aerated, and the left lung, all the air
16 that's in there gets absorbed because there is no
17 more air to get in. And young children are a bit
18 different from adults, but young children, the air
19 can get absorbed and the lung collapses.
20 THE WITNESS: Are you able to see these?
21 MR. CASTOR: I'm fine.
22 A But, in any event, you can see what happens.
23 Q What clinical significance is the collapsed lung?
24 A Well, it's possible to keep them oxygenated because
25 all of us have known someone that has had a whole

1512

1 lung removed and they go on and live. So we're made
2 with more lung than what we need for every day, we
3 have reserve. So it's possible to keep them
4 oxygenated.
5 What happens is when this lung collapses,
6 that interferes with the circulation. And the way
7 the circulation works, the blood that returns to the
8 heart, goes to the right lung, goes to the lungs for
9 oxygenation, gets rid of carbon dioxide, then comes
10 over to the left heart and goes out to the rest of
11 the body.
12 So what happens is that because of
13 interference with the circulation coming through the
14 chest at this time, the blood backs up, and it backs
15 up in all of the veins, but especially in the veins
16 of the head, because it's made without ballast, and
17 so it backs up, and then that affects wherever it
18 goes, including the cerebral circulation. So it
19 backs up into the brain, and eventually backs up into
20 the eyes.
21 So when you have this kind of situation, the
22 baby is set up to have hemorrhage in the brain, if
23 there's a weak place, to have hemorrhage. The eye
24 vessels tend to be weak and has a tendency for those
25 eye vessels to break. This is a significant thing.

1513

1 There are a few other things on there. He
2 has a tube that goes down into the stomach. The
3 stomach is big here. Part of why it's big here is
4 because they were using bag and mask to ventilate him
5 before they were able to intubate him, trying to help
6 him in that way, and the stomach gets way too big.
7 The stomach is reduced a bit here. This is at 13:10,
8 which is almost two hours after the first film.
9 Q So the oxygenation of the lung is not the same thing
10 as venous pressure, is it?
11 A No, they're different. The lung to function, it's to
12 get oxygen in, is to get carbon dioxide out, but to
13 do that there has to be circulation and the
14 circulation return is passive. You know, we have a
15 pump, the heart that pumps it out. The return of the
16 blood is passive, and if anything interferes with
17 that circulation through the chest it backs up. And
18 this is one of the examples, the chest compression,
19 when they do that, to resuscitate, during the time
20 that the chest is compressed, that backs up the blood
21 in the veins that come from the head. And that's a
22 problem that we have to pay attention to.
23 Q Do you recall looking at the Med Flight records?
24 A Yes.
25 Q Was there anything that was significant in the Med

1514

1 Flight records with regard to what you just testified
2 to regarding the collapsed lung?
3 A   Not that I recall. It seems to me that his -- he was
4 oxygenated. They had him on supplemental oxygen, as
5 far as I can tell, in route.
6 Q   I'm going to hand you what has been marked as State's
7 Exhibit 2. Can you look at those for a second,
8 please?
9       Is there anything on the Med Flight record,
10 on the initial assessment part, that you find to be
11 striking?
12 A   Well, it says that Aiden became apneic while being
13 fed the bottle. And he was intubated. And before
14 they intubate him they had given him Ativan, which is
15 kind of like a paralyzing -- I mean, kind of like a
16 tranquilizer -- Succinylcholine, they also gave
17 antibiotics. And it says here, and also gave
18 Vecuronium, which is another paralyzing agent.
19       His blood sugar was 310, you know, and his
20 urine sugar was greater than a thousand, indicating
21 that something was going on with his sugar metabolism
22 at that time.
23       It says that his fontanel -- that's that soft
24 spot I showed you the picture of. We pay a lot of
25 attention to fontanels because sometimes they are

1515

1 depressed, sometimes they are straight across, and if
2 there is pressure in there that's too much, it bulges
3 out. So we pay a lot of attention to that, and they
4 did, too. And they said fontanel non-depressed or
5 bulging. So at the time he was in route, his
6 fontanel was not depressed or bulging. His head was
7 too big, but he was able to get along with that
8 pressure still even at that time.
9       It says that the ET tube at 13 centimeters,
10 13 centimeters is the same note that they had at
11 Mansfield Hospital. And then they had to come back
12 two centimeters, that would make it 11 centimeters.
13 Q   Now, the MedCentral records also note that there was
14 nothing wrong with the fontanels at that time. But
15 when is the first time, do you recall, that there was
16 a problem with the fontanels on March 15th?
17 A   Yes. After he was admitted to Akron Children's
18 Hospital.
19 Q   I believe the time on that would be around 1405?
20 A   Yes. I would have to look it up to be sure.
21 Q   And they pulled the tube back, according to the
22 notation, around 1515 --
23 A   Yes.
24 Q   -- by two centimeters?
25 A   Yeah. So, again -- did you say 1515?

1516

1 Q   Uh huh.
2 A   So even that, that's another two hours from the time
3 this is here until it's pulled back, so.
4 Q   And we notice that the blood sugar at MedCentral,
5 before they transported, was also elevated. And when
6 the squad arrived that morning, it was elevated.
7 MedCentral had the blood sugar at 293. Is there a
8 possibility this baby was diabetic?
9 A   Well, at least for that time he would fit the
10 diagnosis of diabetes. It doesn't fit the diagnosis
11 of diabetes mellitus that we would think of at
12 another time, because certainly he had higher sugar than
13 what was good for him at that time. And he was
14 spilling the sugar in the urine, which also -- any
15 time the sugar gets over about 180, it goes out in
16 the urine.
17       And the discrepancy, or the difference, in
18 the 310, the 293, the 310 is what is done on finger
19 stick. Many people take care of their diabetes at
20 home with finger sticks. And if we a draw blood
21 sample, there's a little difference. So there is a
22 difference between 293 and 310, but not a lot, and
23 there is some acceptance, accepted difference in the
24 two, but it's two methods.
25 Q   Now, would the trauma from being sick that morning

1517

1 and gagging and having trouble breathing raise his
2 blood sugar?
3 A   Well, something raised his blood sugar, and he really
4 had that. I don't know for sure why his sugar went
5 up. He was very sick at that time because he was
6 coughing, gagging, not breathing, and during that
7 time his blood sugar went up. So that's all I can
8 say. It isn't normal, but I can't say other than
9 that.
10 Q   If the parents have testified that they fed the child
11 Similac with a cereal rice, or whatever, with the
12 formula, would that be improper?
13 A   It's commonly done, and certainly the Similac is very
14 common. The addition of rice cereal is done. I,
15 myself, prefer not to encourage people to do that
16 because you really don't need to.
17       In modern times the words Similac is similar.
18 In modern times we can analyze the breast milk, know
19 what's in it, and they make formulas to be as close
20 to breast milk as we know how to do it. It's not
21 exactly the same, but you don't really need
22 supplementation for that. People do it, though, for
23 all kinds of reasons. You can't fault them for it,
24 but I, myself, don't do it.
25       You're making me think. I can fault them a

1520

1    little bit because what happens is that, it's often
2    done because the baby is a little bit irritable and
3    that, and then when the rice is given, it's a
4    processed cereal, and the outside of the grain is
5    taken away, and the outside of the grain is where the
6    magnesium is, and babies get deficient in magnesium
7    when they get cereal. So that's another reason I
8    don't do it.
9          If you look at my CV, it will probably tell
10   that I've done some research with magnesium and
11   newborn babies. So I tend not to give them rice
12   cereal. They'll do fine with Similac, but I can't
13   fault them for it.
14   Q   Now, once he got to Akron and they got the tube
15       pulled back and got the lung inflated, they also ran
16       a CAT Scan of his skull. Did you get a chance to
17       read those CAT Scans?
18   A   Yes.
19   Q   Could you show us what you see in the CAT Scans and
20       tell us about it?
21   A   Yes.
22   Q   Dr. Byrne, you have the ones that have been marked
23       State's Exhibits, which I think in this case is --
24          THE COURT:    The six series, B through
25   E. It looks like he has the same thing.

1    least look at a model of the brain.
2          They are not nice to look at, I guess, but,
3    in any event, you get the idea, the large part of the
4    brain, the cortex. This part that's green is the
5    cerebellum, and these CAT Scans will be slices that
6    come across this. Obviously the eyes are missing
7    there, but I will show you where that fits in the
8    whole thing.
9          And then this is another model that gives you
10   the idea of the cortex being the large part of the
11   brain, and then the cerebellum.
12         And this one, nicely, you can turn it around,
13   and when you turn it around, you get what the brain
14   looks like on the inside. I can take this one apart
15   and show you, too, but for our purposes, it shows you
16   the cortex, the ventricles or the fluid-filled space
17   in there. And right up here under the skull are
18   where the blood vessels are, much -- somewhat similar
19   to like they are in this model. No model, no picture
20   is exactly like it really is in real life, but it
21   helps.
22         There really is nothing under the skull,
23   except the coverings, and then the blood vessels are
24   under there. And then when they make CAT Scans, they
25   use with electronic gadgetry, can essentially make it

1519

1          MS. COUCH-PAGE:  He doesn't have the ones
2    that are marked.
3          MR. BOGGS:      That's the only difference.
4    They are not marked.
5          THE WITNESS:    We can easily match it up.
6    I can put the little marks on this side, in the
7    right-hand corner, and put the date on.
8          MS. COUCH-PAGE:  Those aren't the right
9    ones --
10         THE COURT:      While you are getting that
11   sorted, why don't we take our morning break. We will
12   come back in ten minutes.
13         THEREUPON, there was a brief recess.
14         THE COURT:      Go ahead whenever you are
15   ready.
16   BY MR. BOGGS:
17   Q   Dr. Byrne, before we start looking at the CAT Scans
18       of the brain and the head of Aiden, do you have any
19       other model that would show us, in a
20       three-dimensional approach, what we're talking about?
21   A   Yes, I do.
22   Q   Would you pull one out for us, please?
23   A   I actually brought two. It's not easy to put all
24       this together to make good sense out of it. In order
25       to interpret these CAT Scans, I think it helps to at

1521

1    like slices. Then you have to keep going from slice
2    to slice.
3          This one happens to be that we can see the
4    eyes. And if you look at the eyes, here you can see
5    the lens of the right eye, and the lens of the left
6    eye. I know it's right and left because this says L
7    and that says right -- R, so we have to look at it
8    like that. It's always hard sometimes, too, and one
9    of the first things you learn in medical school is
10   what's right and left and how to make it right and
11   left on the patient, so you get used to this.
12         For our purposes, right eye, left eye. These
13   slices come through the eye part, straight back, and
14   then as you come across here, you keep going up
15   higher. And I have another one here that shows it
16   all the way to the top.
17         One of the things I want to show you is that
18   here you see the lens of both eyes. Here you only
19   see the lens of the right eye. You don't see the
20   lens of the left eye. Why not? Because it's not
21   straight across. So that always when you interpret
22   radiographs of something the technician positions
23   them as correctly as they can, but it won't be
24   exactly the same, so that's there. So there's always
25   a little difference in the two sides.

But, anyway, as we come -- go up further from the eyes, up further, and these are millimeters differences, as you go up further, you see less and less of the eye. And the first thing you know, you get up into where the frontal part of the brain is.

In the front part of the brain, this is -- essentially the gray part is brain, and then this black part is the subdural collection of fluid. And that's very abnormal. That's not abnormal at all.

You can also see that this is in the front part. It extends off to the side, both sides, so this is a large subdural collection of fluid. It's not proper to call it a hematoma, although its started. Hematoma means blood. It started with leakage of blood, but the body is working on it all the time. The body is trying to get rid of it. It keeps forming.

Studies were done by the Japanese to show that there is a leakage into these on a regular basis. And then there can be an exaggerated leakage. But we can see the large part of this collection of fluid, it's subdural, and remember what I told you, is that it's darker than brain.

We use the brain to determine what we compare to, so when there is new blood -- and I will show you

1524

keep going up higher on the brain, higher on the brain, but this is all around the brain. This is a massive subdural, massive chronic subdural. As we get up towards the surface, yes, there is this new blood, it's way up on the top of the head. It's localized here more on the left. There's a little bit that goes down here between, what we call the interhemispheric fissure down in that area, so it heads down there.

But you see this is the first CAT Scan that was done, and you see Baby Aiden's problem was chronic subdural, there for longer than a month. When we say month, it's because we can't tell how long. And then the new bleeding is new. All we can do is say that it's new. We can't tell whether it got there in the ambulance as he was going to Akron Children's. We can't tell if it got there in the ambulance as he was going to Mansfield. We can't tell if it got there before he ever left his home. All we can say is it's new, and that's all you can say. And, actually, the report says acute and chronic subdural, or possibly sub acute, they put that in there. If you don't go look at the films, you don't know what it is. You just read the report. You got to go look at it.

1523

that on the next one -- it's white, and as we go up higher. But the large amount of fluid here is blacker than brain. It means its been there for longer than four weeks. We can't tell because the body can only do so much. So we have to say that it's longer than four weeks that that's been there. So the large subdural is chronic.

What's a chronic subdural? That's one that wasn't diagnosed. So it changes from the acute, the new, to one that is there for a longer time. This is a chronic subdural collection of a large amount of fluid.

Down here, you can see the ventricle, I showed you the fluid-filled compartment. It's actually blacker than this, but that's cerebral spinal fluid. If you analyze cerebral spinal fluid, the protein is about 45, cerebral spinal fluid, and that's what that would be there.

In subarachnoid fluid, as was measured and analyzed in Baby Aiden's case, was nineteen hundred and ninety-three. That is tremendous. That is clearly subdural fluid, is what they got out, and that fits this picture as a chronic subdural.

Now, if we keep making the slices, and, remember, this is a continuation of the one. So we

1525

Once you look at these films, you say, my goodness sakes, this thing has been there for a long time. And the big problem with Aiden is the chronic subdural, yes. He's in a serious problem that caused him to vomit, cough, choke at home, and the respiratory difficult. But the acute problem is superimposed on the chronic problem that we see here.

Now, electronically, they do something different. I can show you these bones, and we already talked about the fontanel, the soft spot. A fontanel is where more than one bone comes together in the newborn baby. It happened to all of us a long time ago. A suture is where two bones come together.

So, normally, the baby has the soft spot in front, the fontanel, but it's made up of the coronal sutures come down each side; the frontal sutures, also known as the metopic that comes in the front; and then the sagittal suture goes down the middle. So the anterior fontanel is where those come together.

Well, coming down on the side, you can see here, this is the coronal suture. You can see the coronal suture on each side. When you get to the back, you can see the lamdoid, and you will see it better because this was electronically done to look

1526

1 at the brain and the subdural fluid.
2     Now, they changed the setting on the machine,
3 it's the exact same test, but they changed the
4 setting on the machine, and it's similar. You don't
5 see the lens, although up here I can see the eyeball
6 is there. So we start moving up. And, as you move
7 up, now look what the coronal suture looks like? And
8 you can see the coronal suture on each side.
9     And then the back, the posterior fontanel is
10 where three bones come together, the parietal bone on
11 each side, and the occipital bone in the back, and
12 it's kind of triangular shaped, but when you do it on
13 the CAT Scan you see coronal suture on each side.
14 You see the lamdoid suture on each side. This is
15 over on the right. It's a little different from the
16 other side, but that has to do with how the slice is
17 made. Nothing is like the real thing. It gives us
18 some clue.
19     But these are called bone windows, and these
20 bone windows, and this was interpreted as no fracture
21 seen, and a little later on, we will look at another
22 film, but I want you to keep in mind that the other
23 film that gets looked at is the antiquated way of
24 looking for fractures. I did it many times when I
25 was a younger physician, all we had was skull films.

1527

1 We would get that and we would see things that we
2 couldn't tell for sure. It still happens. We get
3 the antiquated film, which is what they'll show you
4 after about eight days, and then what do you do when
5 you have an abnormal skull film? You get a CAT Scan.
6 Well, they did the CAT Scan right away. When Aiden
7 got in, he had no evidence of fracture. They even
8 make note on the report, no evidence of fracture.
9     To continue on so that you get to see the
10 rest of them. As you keep coming up, and you get --
11 this is all the way up at the very top of the head.
12 This is actually probably the scalp as the slice is
13 made, and then you start to see -- if it was straight
14 across, they would look alike on the two sides. But
15 as you come down, and this is the parietal bone,
16 there is nothing in the parietal bone. Not only is
17 there nothing in the parietal bone, but there is no
18 swelling. We can see it easier if we hold it up to
19 bright light and look for swelling, but there is no
20 swelling.
21     If there's a fracture, something has to hit,
22 traumatize to do it, and then just like any bone, if
23 you've ever had a broken bone, it swells and bleeds.
24 Fracture of the skull swells and bleeds.
25     Likewise, if we come back to this one, where

1528

1 we look at the sutures that we can see, what happens
2 is if you have a fracture -- and they do fracture in
3 the suture, you know, they can fracture in the middle
4 of the bone, they can fracture in the suture -- you
5 see bleeding. And the same as I showed you, the
6 blood is white on there. It's white at a fracture,
7 too. Thank God we don't see them too often, but
8 about two weeks ago I saw a baby that shortly after
9 birth, and had a fracture on one coronal suture,
10 on the lamdoid suture, and the blood leaks around
11 there. You can see the blood on the x-ray. This
12 baby has no blood. There is no acute fracture. And
13 they correctly interpret it at that time.
14 Q   In the CAT Scans, when you point out the lenses of
15     the eye, will a CAT Scan show whether or not you have
16     a retinal hemorrhage?
17 A   I would say probably not. You would like to think
18     that, but I doubt it. I've looked for them on this
19     baby, and you got to remember that what they call
20     hemorrhages in the eye are relatively small compared
21     to the eye itself. And then the retina is the back
22     of the eyeball, and I tried to see maybe some
23     thickening, but I don't think you can call that on
24     here.
25         Here you can see the optic nerve on the left

1529

1 side coming off there. But the optic nerve and the
2 retina are actually developed as part of the brain,
3 and the blood supply comes from that. The arterial
4 blood supply, the venous blood supply goes right to
5 the brain. It's all part of the brain, the back part
6 of the eyeball there.
7     So what you see when you look in the eye, you
8 get a reflection of what is going on in the brain.
9 Maybe some of you have gone to the doctor and he uses
10 the ophthalmoscope to look in the eye. People with
11 glasses know that they look a little fancier, the
12 ophthalmoscopes. One of the things that we look for
13 when we look at the back of the eyes, we look for
14 hemorrhages. Now, little babies, it's a little more
15 complicated, and we dilate the eyes and we use a
16 little sophisticated -- a different technique, but we
17 look in there for hemorrhages. We look for some
18 swelling. But when we see hemorrhages and swelling,
19 we are seeing a reflection of what is going on in the
20 brain.
21 Q   So, the one CAT Scan, I think it's 6-C?
22 A   That one is 6-B.  6-C.
23 Q   Yeah. Has different shading than what --
24 A   Just a minute. Let me get it up here, please. Okay,
25     go ahead, sir.

1532

1  Q⁻  In that one, do you see any skull fracture?
2  A   Well, let me -- I have already reviewed it carefully,
3      but I will review again. And the frontal bone, the
4      coronal suture, the parietal bone, and, again -- now,
5      remember, these are done for the brain, and the
6      inside, they are not really done. The other ones are
7      the bone windows. But I see no fracture on this.
8          I see coronal suture, you can see a split in
9      it. You can see a split in it. And it's a little
10     different from the other side, but, remember, it's at
11     a little different level. It's a little different
12     level. But it's a split, but it's a normal split.
13     Babies normally have splits. Actually, I went to the
14     anatomy laboratory, and I did bring a skull, it's in
15     my car, but to show you the way these sutures are,
16     and how they are when a baby is born, and then how
17     they grow together. Ours are all sealed and solid.
18     But newborn baby, those bones are separated because
19     that's what they have to do to mold and change in
20     position to get born.
21         I have seen a few babies over the years that
22     those sutures close before birth, and they can't be
23     born. They have to get delivered by section because
24     the head has to mold, so it has to be open.
25         Well, then what happens in Baby Aiden is his

1533

1  down there, there were two people there, and I asked
2  for them, and they started looking for them. After
3  looking for them a little bit, they said they
4  couldn't find them. So whatever the retina scans
5  are, they weren't able to be found.
6      Is there an advantage to a retina scan?
7  Sure. If they took the picture of the retina, then
8  we could all look at it. Same as they take a picture
9  of the CAT Scan, you can all look at it. In some
10 ways you can come to your own conclusion about what
11 is blacker than whiter, and how big it is. In some
12 ways you don't have to be a super-duper doctor to
13 tell what this is once you have the picture. It's
14 the same way with the retina scan. It could show
15 what the hemorrhages are, if there are hemorrhages,
16 or if there is not, it would show that.
17     For whatever reason, they can't find the
18 retina scans. I'm very surprised. I wasn't
19 surprised they couldn't find them when I went over
20 there, but I'm very surprised they haven't turned up
21 by now.
22 Q  What significance would retinal scans have on retinal
23     hemorrhages regarding in assisting and diagnosing
24     Baby Aiden?
25 A  Well, it's essentially a picture, but it shows a

1531

1      sutures are delayed in closing because he's got extra
2      pressure in his head. Since birth, he's had extra
3      pressure in his head. Makes these sutures actually
4      be a little more apparent. It's possible that if he
5      didn't have that, we might not be seeing these
6      sutures as distinctly as we see them there, but there
7      is no evidence of fracture on this.
8          If we look at the bone window, which would be
9      comparable to that 6-C, which would be done to look
10     at the bones, again, coronal suture, coronal suture,
11     you come down, coronal suture, lamdoid suture. See,
12     these are made to show the bones, so you can see them
13     better. It's the same slice as the other place.
14     Here's the parietal bone, and it's on the left side
15     where the question is. And you go slice after slice
16     and you can't see a fracture anyplace, so.
17 Q  In your review of the records at Akron Hospital, did
18     you get a chance to look for any retinal scans?
19 A  I did. When I went to the hospital, actually on the
20     order sheet there are two places where the retina
21     scan was ordered. And there is two places indicating
22     where they were taken. So I asked for them, and they
23     told me they couldn't find them. So I said take me
24     to the department that does them, to the photography
25     department or whatever department it was. I went

1533

1  picture -- see, when the ophthalmologist looks in the
2  eye, he's the only one that can say what's there.
3  Or, anybody else can look in the eye, too, but there
4  is only one person that can look at a time.
5      You take a picture of it, and now everybody
6  can see what the retina looks like. And the retina
7  is the part of the eye that we use for vision.
8  Everybody can see what it looks like, and it has
9  blood vessels. If I look in any one of our eyes with
10 ophthalmoscope, I can see the arteries, I can see the
11 veins, I can see where they come out of the optic
12 disk, the optic nerve. I can see all that. And if
13 they had a hemorrhage, had a break in it, I could see
14 the hemorrhages. We are trained to look for those.
15     And so whenever we have a question of
16 something wrong with the central nervous system, we
17 always look at the retina. It's difficult to do in
18 little babies. And you and me, we can say focus on
19 the clock in the back and look at it and keep our eye
20 steady, because every time you came in with a light
21 you tend to close the eye and move away from the
22 light, a normal and natural thing. So you have to
23 kind of chase after the little baby to see it, but we
24 look any time we suspect central nervous system
25 problems.

1536

1   Q   Dr. Malhotra, who is the ER Doc, did an examination
2       of Baby Aiden, and he said that he had decreased
3       breath sounds on the left, skin without abrasions, no
4       ecchymosis, no lesions and no petechia. Head was
5       normal cephalic. No oral depression, no soft tissue
6       swelling. Anterior fontanel bulging. What does that
7       tell you as a doctor?
8   A   Well, that tells you in some ways the exam is
9       identical as to what it was in Mansfield. No
10      evidence of any bruises, petechia, or ecchymosis.
11      All of those mean the same thing, evidence of
12      bruising.
13              On the other hand, it's significantly
14      difficult because the fontanel is not bulging at
15      Mansfield, and by the time he got to the emergency
16      room, then he has a bulging fontanel. And I can't be
17      absolutely sure, but I suspect that they looked for
18      evidence of bruising or marks or something on Baby
19      Aiden's outside, especially on his head if they were
20      concerned about his head. And they made particular
21      note, and I don't believe that they would make that
22      note in Mansfield, or I don't believe they would make
23      that note, the transferring doctor, as no bulging and
24      no evidence of bruising and swelling on the head
25      unless it was so. Yet when he got to the emergency

1   subdural collection of fluid is old. If I were more
2   like I really think it is, I would say that probably
3   95 percent of the subdural collection of fluid is old
4   and that's been there for longer than a month.
5           This new and this is -- you got to know that
6   it's on the surface of the brain and it spreads out.
7   Relatively speaking, it's small. It's significant,
8   you can't have anything inside the head that's not
9   significant. So I'm not saying it's not significant.
10  It's relatively small and it's new bleeding that
11  occurred prior to this being done, which was being
12  done on March 15th in the afternoon sometime. It was
13  prior to that. Whether it was an hour before, or two
14  hours before, or three hours before, or even further,
15  a day before, a week before, there is no way to tell.
16  But it's pretty bright, which makes it pretty recent.
17  As soon as it's there, you know, the body is always
18  trying to clean it up as well as it can.
19          One of the things that we have going on in
20  all of us all the time, which gives us a better shot
21  at it than the automobile mechanic has, that as soon
22  as something goes wrong with the body, the healing
23  process begins. And the healing process has to do
24  with circulation. It heals faster where there is
25  good circulation as to where there is not so good.

1535

1   room, it shows that the fontanel is full and bulging.
2   Something probably happened between Mansfield
3   emergency room and the emergency room in Akron.
4           I'm not here to be critical of those people.
5   They were doing it as good as they knew how to do it.
6   But I am here to figure out what happened, and
7   Aiden's problem happened a long time before March
8   15th, his major problem. And then something happened
9   before he got to the emergency room at Akron
10  Children's Hospital, and exactly when or what, I
11  can't tell you. I'm very concerned about the
12  endotracheal tube being too low and impeding the
13  venous drainage and backing up into cerebral vessels,
14  backing up into the retinal vessels, as to what
15  happened to him.
16  Q   Are you able to measure the amount of the old
17      subdural bleed versus the new bleed?
18  A   Well, what you can do is this, you can see that on
19      all of these slices there isn't any evidence of
20      anything new so far as the subdural space. You start
21      to see a little bit here in the interhemispheric
22      space. And it isn't until you get way up here on
23      top, and the top of the skull is much smaller than it
24      is. So you put all that together, if I were very
25      conservative, I would say that 90 percent of the

1537

1           The healing process goes on.
2                   So any time something happens, the healing is
3       going on immediately when there is circulation. And
4       sometimes something happens that is a little leak,
5       and the body is trying to do that, and then you get
6       more leak. So, anyway, it's recent, but it's five,
7       at the very most, ten percent. You got to know that
8       it's all around and then how do you estimate, very
9       difficult to do, but I would say the new is, at the
10      most, five or ten percent.
11  Q   And the new blood, we can't determine how many days
12      or how many hours before it would show up on the
13      film?
14  A   No. All you can do is say it's there before the film
15      is taken.
16  Q   Now, they also performed a skeletal survey on the
17      22nd of March. Are you familiar with those films?
18  A   I am. And one of the things about the skeletal
19      survey, and I will go back to this one for just a
20      minute, because we didn't pay attention to this chest
21      x-ray. But you get somewhat of a skeletal survey
22      already here, because you've got to look at every one
23      of the ribs, and there is no fracture. There is no
24      evidence of new fracture, there is no evidence of old
25      fracture.

Case Compress STATE OF OHIO VS. MATTHEW STEIN, NO. 05-CR-224, VOLUME ...

Case: 1:07-cv-03696-CAB  Doc #: 1538  Filed: 12/03/07  45 of 71.  PageID #: 54

1540

1  In the old days when we first started to
2 identify what is called child abuse or battered child
3 syndrome, that kind of thing, we would find fractures
4 of the ribs. And then here, you see the right
5 humerus, you see the left humerus, there is no
6 fracture here. So that's the beginning of a skeletal
7 survey.
8  Now, we have a certain number of views that
9 we do in the skeletal survey. They were developed
10 before we had nice things like CAT Scans. But the
11 CAT Scan is the skeletal survey of the head, and
12 there was no fracture on the CAT Scan. But, yeah,
13 those films are here. I think they are underneath
14 that envelope, where they did -- I could only find
15 two of them.
16  It's always amazing to me why --
17  MR. CASTOR:  Object, Your Honor.
18 There's no question before the witness.
19  THE COURT:  Sustained.
20 A  Why people don't bring all three of them. In my pack
21 I have all three. But they are just plain, straight
22 films of the head. And one of the things that you
23 can see is you can see how wide the fontanel is
24 there, indicating that the head has separated.
25 Q  Doctor, first of all, tell us what exhibit number you

1539

1 are referring to, and the date that was taken and
2 time.
3 A  I apologize. It's Exhibit 25-A and it's March the
4 22nd. And it's part of the skeletal survey.
5 Q  Go ahead and tell us what it shows again.
6 A  Yeah. Again, fontanel widely separated, increased
7 intracranial pressure. I believe that what has been
8 called a fracture has to do with this line here. And
9 you can see that line on this film.
10  Now, I can understand how the radiologist
11 would call that a fracture, but he has to put it all
12 together. He has to identify that there is no
13 swelling of the head. If you are going to have a
14 fracture on that part of the head, you've got to have
15 something that hit it or bruised it some time or
16 another. And so there is no bruising. There is no
17 swelling there. There is no bleeding on the CAT Scan
18 that you can see, and it would show up.
19  But, furthermore, there is an abnormality of
20 development of the bone of a fair number of people.
21 And we use the term anomaly, that means it isn't
22 quite like it is in everybody else, but this is an
23 anomalous parietal suture. It's in the middle of the
24 suture. It's a common place for it. Fractures
25 ordinarily are straighter than that. This is kind of

1 curved and irregular, and it's a suture. And if
2 somebody wants to call it a fracture, I can
3 understand that, but if we saw this, and we don't get
4 these films anymore, but if somebody did, what the
5 radiologist would suggest is to do a CAT Scan. They
6 did a CAT Scan on this particular day and showed no
7 fracture. On March 15th, eight days before, showed
8 no fracture.
9  So to call that a fracture, I understand how
10 they would call it, but then they would go to the CAT
11 Scan and show no fracture. They would go to the
12 clinical record. And if, by chance, he truly has a
13 fracture on March 22nd, and he didn't have one on
14 March 15th, I'd have to ask how that happened.
15  And the reason they don't get these films on
16 March 15th is because we know how they aren't very
17 helpful compared to our nice sophisticated CAT Scans.
18 MRIs are very helpful, too, but they are a little
19 more difficult to do, but the CAT Scan, we can get
20 relatively easy.
21  I might mention also, while I'm thinking
22 about it, because of the separation of the fontanel,
23 when I went to Akron Children's Hospital, I tried to
24 find his head circumference when he was admitted to
25 the hospital. They didn't measure his head

1541

1 circumference. His head circumference wasn't
2 measured until two days later. And, yes, it was
3 bigger than it was two months before, even further
4 off the scale of normalcy, but by that time, he had
5 already had operations on his head and other things.
6 But the doctor who was helping me hunt for it, I
7 think was a bit embarrassed also that they didn't
8 have a head circumference on the admission.
9  No head circumference at Akron Children's
10 Hospital, no head circumference at Mansfield. It
11 would be very helpful to have that head circumference
12 right when he got into Mansfield emergency room, or
13 somewhere along the way. But they didn't measure it
14 until two days after he was at Akron Children's.
15 Q  Let's talk about what they call Shaken Baby Syndrome.
16 I understand it's an accepted medical theory?
17 A  Well, not accepted by everybody. What occurred, and
18 I can give you a bit of a history because there are
19 certain key things that occurred in the development
20 of this problem.
21  Dr. Caffey was a radiologist, very famous,
22 and when I studied pediatrics, often times Caffey's
23 book was referred to. So he was renowned, and he
24 came up with the term whiplash injury. That was seen
25 in children who had multiple fractures, had multiple



1542

1 evidence of injury, and they would come up with this
2 thing of the fractures in the subdural.
3     Well, then over time, Dr. Kempe got involved,
4 and I was in Colorado where Dr. Kempe was the
5 professor, and everybody started following this, it
6 seemed to me they were all following this whiplash
7 injury. And so it started there, but it always had
8 evidence of abuse, you know, cigarette burns on the
9 child, multiple fractures, old fractures, new
10 fractures, that kind of thing, repeated injury, and
11 that was battered child syndrome.
12     Well, then they decided, well, they all
13 aren't battered. So somewhere in there they came up
14 with this term Shaken Baby Syndrome. Well, and they
15 make that diagnosis when they see subdural collection
16 of fluid, hemorrhages in the eye, and then they say
17 Shaken Baby.
18     Well, this is not the proper way in a sense
19 that on the label it says what's the cause, where, in
20 fact, there are multiple causes of subdural. There's
21 multiple causes of hemorrhages in the eye. And to
22 call it Shaken Baby is clearly wrong.
23     Now, what is occurring in modern literature
24 is that they are showing that there was something
25 wrong. That Shaken Baby -- yes, children are abused,

1543

1 and I am very much opposed to that, and I'm not for
2 that in any form or fashion. But what happened is
3 that the term started to get used, and now they use
4 it loosely. And just because, you know, when they
5 say Shaken Baby, they are not saying that the baby
6 was shaken, in fact, that they have fact; what they
7 are saying is subdural collection of fluid, retinal
8 hemorrhages, and then, of course, anyone who quits
9 breathing or has trouble has the possibility of lack
10 of oxygen to the brain, or lack of circulation to the
11 brain, and they put that together and call it Shaken
12 Baby Syndrome.
13     There is little or no science -- I really
14 think there is no science, but to give a little
15 room -- there is little or no science to what is
16 called Shaken Baby Syndrome.
17     People have done things like shaken, not
18 really shaken, but done things to monkeys, several
19 years ago, and other animals. Obviously you can't do
20 that to human beings, thank God. But unless -- if
21 it's just a sharp acceleration, you can't get the
22 problem. Impact has to be there if that's going to
23 be involved, so it has to hit something.
24     You can understand that, I think, if you can
25 realize that even if you can imagine how someone

1544

1 would shake a baby, and I can't imagine too much, the
2 head can only move so far. And even if the brain --
3 it can only move so far. You can only get so much
4 speed on it, and then it has to come back. You can
5 get the significance of that if someone would jump
6 out of an airplane and their parachute didn't open,
7 they would fall at a certain rate, but nothing would
8 happen to their brain until they hit the ground.
9     So it's when it gets stopped, it's
10 acceleration, whether it be acceleration or
11 deceleration, and that's what happens if somebody is
12 in an accident and hit their head, or whatever else
13 it is. It's not the fall that makes somebody get the
14 injury to the brain, it's the stoppage that makes it.
15     But just shaking itself, it's very difficult
16 for me to imagine any kind of injury like this
17 without injury to the neck. They look very carefully
18 trying to find injury to the neck in Aiden, on the
19 skeletal survey, and then they did either ultrasound
20 or x-ray, whatever they did, no injury to his neck.
21     Well, if you can imagine Aiden's head, and it
22 was bigger than normal, bigger than normal, and if
23 you can imagine it moving, where is the pressure
24 going to be? It's going to be on his neck. So how
25 can someone even imagine this thing happening from

1545

1 shaking? I have a hard time.
2     And when I went to see Aiden, just so you
3 know, I went because they asked me to see him because
4 they wanted to stop the treatment on Aiden.
5     MR. CASTOR:     Objection, move to strike.
6     THE COURT:     Sustained. Folks, this is
7 not about terminating life support. This is about
8 whether the harm done to this baby, whether this was
9 caused by the defendant. That's the only issue in
10 this case. We've tried to stay away from that issue,
11 and both attorneys know the limits.
12     THE WITNESS:     Your Honor, I apologize.
13 It's my fault. It's not any of them. I was trying
14 to express why I went there. And that's the reason,
15 I didn't go there for any other reason. Then once I
16 got involved, then my question was what happened, and
17 so that's how I got where I am, but I apologize, and
18 I did not mean anything --
19     THE COURT:     Again, Dr. Byrne, I'm not
20 finding fault with you, or the reason you went. What
21 I'm trying to tell you here is that we're
22 concentrating on what the condition is of the baby,
23 and whether the defendant is the one who caused that.
24     THE WITNESS:     Correct, and it's my fault,
25 I apologize.

1    THE COURT:   Thank you.

2 Q   Doctor, Dr. Steiner looked at his records and

3    determined that he thinks he has Shaken Baby

4    Syndrome. He said he determined that by ruling out

5    other causes of his condition.

6    Can you tell us what other causes could cause

7    Baby Aiden's condition?

8 A   Well, things that cause subdural collection of fluid,

9    birth is one of the causes, and it's the cause in

10    Baby Aiden's case, but it could be trauma from

11    anything.

12    Infection causes it. I have seen many babies

13    as they recover from meningitis, and that kind of

14    thing, that they get a subdural collection of fluid

15    as part of that illness. So the ones that I have

16    seen it in have been very certain. I didn't get any

17    indication that he was that sick. But, on the other

18    hand, there can be other causes of subdural

19    collection of fluid other than whatever Dr. Steiner

20    says there.

21 Q   He also links up the Shaken Baby Syndrome with the

22    fact that he thinks he has a skull fracture here.

23    You are saying there is no skull fracture?

24 A   Yes. I don't think, you know, that you can call that

25    a skull fracture. That's an anomalous parietal bone.

1547

1    And it happens, we go through this all the time in

2    children, when we work in the emergency room. I

3    worked in the emergency room for at least a good

4    number of time in my life. And you get the skull

5    films, and the question is, is that a fracture?

6    Well, you go feel the head, you know, if you think

7    there is something there, you go feel the head. If

8    there is no swelling, you get somewhat convinced.

9    It's not absolute, but in modern time we don't have

10    that. We've got CAT Scans, and it gives you good

11    pictures. There is no evidence of fracture on the

12    CAT Scan, as they indicated in their report.

13 Q   Is Shaken Baby the only thing that can cause retinal

14    hemorrhages?

15 A   I'm sorry, sir.

16 Q   Can retinal hemorrhages only be caused by Shaken

17    Baby?

18 A   Oh, no. There's a lot of causes of retinal

19    hemorrhages. The common cause of retinal hemorrhage

20    that you see is hypertension. And people with

21    hypertension -- diabetes causes retinal hemorrhages.

22    So other things -- the eye is made such that it's

23    pretty well protected. And so if you have

24    hemorrhages in the eye, what you are seeing is a

25    reflection of what is in the brain. And if

1    hypertension is in the eye causing the hemorrhages,

2    the hypertension is in the brain, too. And there are

3    all kinds of hemorrhages, and there is no

4    characteristic hemorrhage that means that the baby

5    was shaken.

6 Q   Can blood disorders cause retinal hemorrhage?

7 A   Blood?

8 Q   Disorders.

9 A   Yes. Clotting disorders can do it.

10 Q   How about leukemia?

11 A   Leukemia can do it. The leukemia, and for six years

12    of my life I took care of children with leukemia

13    tumors, and I always looked in their eyes every time

14    I saw them, looking for manifestations of hemorrhage

15    or leukemia.

16 Q   And I think you also said diabetes?

17 A   Diabetes can do it.

18 Q   How about vaccinations?

19 A   Vaccination gets involved in this thing, and actually

20    what happened to Aiden is that he choked and quit

21    breathing. Well, the vaccinations get involved

22    because babies do get swelling of their brain, and

23    they do have abnormalities that happen and make them

24    not function normally.

25 Q   And in Baby Aiden's case, could a change in the

1549

1    venous pressure cause it?

2 A   Yes.

3 Q   And where do the changes in the venous pressure, from

4    your study of his medical history, come from?

5 A   The changes in venous pressure happen with chest

6    compression, with resuscitation. Actually when we

7    even just breathe for a baby, we go differently --

8    you know, we, as physicians, do it differently from

9    the way we normally breathe. The way we get air in

10    is we make a negative pressure and air goes in. When

11    we breathe for a patient, we make the pressure and

12    it's a positive pressure and it pushes the air in.

13    So whenever we are breathing for the baby, we are

14    changing the dynamics of the circulation. Then if

15    you put the endotracheal tube down too far, it

16    changes the dynamics a lot. So the baby is set up to

17    have abnormal venous return from the resuscitation,

18    ventilation, and improper placement of the

19    endotracheal tube.

20 Q   Dr. Olson, the pediatrician who testified earlier in

21    the case, said he thought he might possibly have had

22    a ventricle blockage and that might have caused the

23    venous pressure problem as well. Could that be the

24    case there?

25    THE COURT:   A what blockage?

1551

1     MR. BOGGS:     Ventricle blockage.
2     THE COURT:     Ventricle?
3     MR. BOGGS:     Yes.
4     THE COURT:     Thank you.
5  A  The ventricle blockage would cause the head to get
6     big, but the ventricles would be big. And I showed
7     you the ventricles, they appear to be normal. It
8     would be back when he is one month of age and his
9     head is too big, that's part of the differential
10    diagnosis. You look at the CAT Scan to look for
11    hydrocephalous, which would be the increase in that.
12    And, yes, if you had that, you could get the
13    hemorrhages in the eye. Anything that will increase
14    intracranial pressure makes hemorrhages in the eyes.
15 Q  When he is having the build up of subdural fluid, how
16    much space does he have that to collect in there
17    before he runs out of room?
18 A  Okay. He doesn't have any space. That's the first
19    thing. But what happens is that the baby's head, the
20    sutures are there, and it can expand. Whereas if we
21    would get a subdural collection of fluid, we would
22    have a headache, and we would be complaining, and
23    that kind of thing, because there isn't any room in
24    our head either for subdural collection fluid. They
25    happen, to older people, however old that is. They

1551

1     happen sometimes, and there isn't much room.
2        The little baby, though, like Aiden, Aiden's
3     head expanded. That's the reason that his head
4     increased an inch at birth, and then another inch by
5     three months because the sutures can spread. But
6     it's an acute subdural that was not diagnosed. And
7     it was there before he was a month of age, and with
8     his difficulties at birth, I would say it was there
9     at birth.
10       When I am saying that, I'm not trying to be
11    critical with anybody. I'm trying to figure out what
12    happened. And what happened was he had trouble with
13    being born, a lot of people do. Then his head got
14    too big. It was too big at one month of age, and it
15    was still too big at five months.
16 Q  Are you familiar with the medications that Aiden is
17    currently on?
18 A  Yes. I am familiar somewhat.
19 Q  I believe he takes, what, eight milligrams of Valium
20    a day?
21 A  Of Valium?
22 Q  Uh huh.
23    MR. CASTOR:     I'm going to object. I
24    don't know what the relevance of this is.
25    THE COURT:     Can you come and explain

1552

1     the relevance to me, otherwise I will sustain the
2     objection on relevance.
3        THEREUPON, the following bench conference
4     began.
5        MR. BOGGS:     Dr. Steiner said that the
6     child was in a permanent vegetative stated. He also
7     said that the child is not going to recover from that
8     vegetative state. I think Dr. Malhotra and Lowcastro
9     said the same thing. The jury saw the videotape. I
10    think my doctor is going to tell you he's not in a
11    permanent vegetative state. Part of his condition is
12    he's being over medicated, and that explains a lot of
13    his interaction or actions on the tape. I don't want
14    the jury to think he's --
15    THE COURT:     Is that what they testified
16    to?
17    MS. COUCH-PAGE:  No, they never testified to
18    that.
19    THE COURT:     I don't remember them
20    saying that.
21    MR. BOGGS:     It's in the record in
22    there.
23    THE COURT:     The problem with the
24    medical records, it has not been introduced as an
25    issue in this case. I don't think we need to get

1553

1     into that. The only reason anybody knows what his
2     current condition is, is because you introduced the
3     tape. I don't think you get to use that.
4        MR. BOGGS:     So if I ask him the
5     question would he say Aiden, is he in a chronic
6     vegetative state --
7        THE COURT:     That's not an issue in the
8     case. No one is saying the serious physical harm is
9     a permanent vegetative state. We're only saying,
10    based on what happened to him, up to the time of the
11    injury, the diagnosis and treatment.
12    MR. BOGGS:     I guess what I am trying to
13    say, his condition has nothing to do with any injury.
14    It's a medical condition he has from birth. And if
15    he's in a permanent vegetative state, it was not
16    something done by my client.
17    THE COURT:     Let me say this, why don't
18    you ask him whatever his current condition is, was it
19    caused by assault, however you want to say it. You
20    don't have to use the vegetative state.
21    MR. BOGGS:     The other day we were
22    talking about the mother, and she was talking about
23    the medications, you said that I could ask him about
24    the medications.
25    THE COURT:     I said if it was

**1554**

1  appropriate, if it was relevant, you could ask him
2  about it because he would know what they are used
3  for. I'm not convinced they are relevant. Your
4  defense is he's not -- if your client didn't do it,
5  it's a birth condition.
6      MR. BOGGS:    Okay.
7      THEREUPON, the bench conference concluded.
8      THE COURT:    The objection is sustained.
9  BY MR. BOGGS:
10 Q   Dr. Byrne, what would you describe or state as the
11     medical diagnosis of Aiden's current medical
12     condition?
13 A   Well, I haven't gotten any official reports since the
14     time that I visited, when I examined him, which was
15     about three weeks after he was admitted to Akron
16     Children's. But I did go to see him, and he's on
17     a -- still getting ventilatory support, although when
18     I saw him he was breathing on his own, and he still
19     breathes on his own. The ventilator is used to be
20     hopefully helpful to him. He's grown. He was about
21     fifteen pounds when I first saw him. Now, he's
22     more --
23     MR. CASTOR:    Your Honor, I believe this
24  is not responsive to the question.
25     THE COURT:    Well, I think the

**1555**

1  question -- you want to ask him about the etiology of
2  his condition, the cause of his condition, rather
3  than having him describe in detail what he saw
4  recently.
5  Q   Well, I will ask him, what is his condition today?
6     MR. CASTOR:    Object.
7     THE COURT:    Sustained.
8  Q   Do you have an opinion, Doctor, within a reasonable
9     degree of medical certainty, as to what caused
10    Aiden's condition as you saw him?
11 A   Yes.
12 Q   What is that?
13 A   What caused Aiden's condition was subdural hematoma
14    that occurred at birth, and this was a chronic
15    condition. And on March the 15th he already had that
16    existing condition, for whatever reason he coughed,
17    gagged, had difficulty with taking the bottle, and
18    difficulty with breathing, and then came to where he
19    is now. But his condition is a chronic subdural
20    preexisting condition before March 15th, and then the
21    acute bleeding, which is significant, but relatively
22    minor in his whole condition.
23 Q   So whoever would have been watching Aiden on that
24    morning, around 9:30, 10:30, whoever was in his
25    possession, watching him at that time, would be the

**1556**

1     one sitting in Matt's shoes, is that correct?
2     Wouldn't matter who it was, he's going to be in the
3     same boat?
4  A   Correct. And you mentioned earlier about somebody
5     else watching him the night before. It could have
6     happened the night before, too, or the day before or
7     the week before.
8  Q   And there is no way you can put a time on when this
9     new bleed started?
10 A   The new bleed is recent. The only thing I will say
11    is that it was there at the time they did the CAT
12    Scan, and it's new, and you go back from that,
13    minutes, hours, but once you start getting into days,
14    it's beyond what it is because the body is healing
15    it, and what is white is the new bleed, becomes more
16    gray, more like the density of the brain. And if
17    it's there longer than three to four weeks, it
18    becomes black like the -- blacker like the chronic
19    subdural that he had.
20       So the new bleed is there before the time of
21    the CAT Scan. There is no way to know whether it was
22    fifteen minutes or an hour, other than the fact that
23    you always like to think good things about people in
24    medicine. You like to think it doesn't have anything
25    to do with that.

**1557**

1  Q   Another way of putting it, Aiden is --
2       THEREUPON, the Reporter cautioned Mr. Boggs
3  to slow down and repeat the question.
4  Q   Aiden is basically a ticking time bomb, he can start
5     the new bleeds at any time without anything being
6     done to him?
7     MR. CASTOR:    Objection.
8     THE COURT:    Overruled.
9  Q   Is that correct?
10 A   Correct. He had the condition all the time, which
11    made him prone to doing things like vomiting. It's
12    amazing how little kids can adjust and how parents
13    can adjust sometimes to what is going on in their
14    little child. So, sure, his condition, his acute
15    condition could have occurred any time after birth.
16    And somehow or another, he and everybody else was
17    adjusting to the subdural when he was already -- when
18    he was only a month of age, and they kept on
19    adjusting until eventually something got worse and
20    now he gets bad enough that he ends up in the
21    hospital and gets hooked up.
22 Q   So if I was the one that was watching Aiden that
23    morning when it happened, I would be the one facing
24    charges, wouldn't I?
25     MR. CASTOR:    Object.

1558

1    ·     THE COURT:      The objection is sustained.
2          He's going to ask another question.
3    Q    Dr. Byrne, whoever would have been watching him on
4          March 15th between 9:30 and 10:30, would be possibly
5          sitting in the chair of Mr. Stein right now?
6    A    Correct.
7    Q    Is there any way it could have been prevented, this
8          last bleed by Aiden?
9    A    Well, I would say yes to that.  In the sense that
10         when he had the problem at a month of age is when he
11         should have been worked up and evaluated.  And then I
12         showed you that picture of the little baby with the
13         fontanel, and you can get between the bones and just
14         use a needle and drain it off, it's very easy to do
15         when they are tiny little babies.  And that's all you
16         have to do.  You do that, they get cured.  You drain
17         it off, and then it accumulates.  You come back the
18         next day and you drain off more, you keep getting
19         less and less until it isn't there.  If you do it
20         like that, the brain gets in the right place, the
21         coverings get in the right place and the problem gets
22         over with.
23              And, I suspect, as strongly as I can suspect,
24         that if that would have occurred at one month of age,
25         Aiden's problem would have been done and cured.

1559

1    Q    Dr. Pope and, I believe, Dr. Olson testified that had
2          they saw the chart on his head circumference, and
3          assuming it was accurate on November 24th, they would
4          have had concern and ordered the tests you are
5          talking about, and performed the procedure that you
6          are talking about, that you are saying, within a
7          reasonable degree of medical certainty, Aiden might
8          be fine today?
9    A    Yes.
10             MR. BOGGS:      That's all, Your Honor.
11             THE COURT:      Okay.  Mr. Castor?
12             MR. CASTOR:     Good morning, Dr. Byrne.
13         My name is Bob Castor.  I sometimes have a tendency
14         to drop my voice.  If I do that, and you have a
15         problem hearing me, please tell me.
16             THE WITNESS:    Yes.
17             CROSS EXAMINATION OF DR. PAUL BYRNE
18   BY MR. CASTOR:
19   Q    You testified that you are a clinical professor of
20         pediatrics at the Medical University of Ohio?
21   A    Correct.
22   Q    Can you describe what that position is?
23   A    Well, it's an academic appointment for teaching, and
24         teaching medical students, residents, you know,
25         fellow positions, is what that is.

1560

1    Q    Isn't it true that your position is a volunteer
2          position, it's not full-time, not tenured track?
3    A    That's correct.
4    Q    And your performance is not reviewed by your
5          department chairman?
6    A    Well, no, I think it's not reviewed for tenure or
7          salary, that's correct, but I strongly suspect that I
8          would not be able to get by with too many things that
9          would not be acceptable.
10   Q    You have testified here, and I believe you've
11         testified before in the probate court in Akron --
12             MR. CASTOR:      If I may, Your Honor.
13   Q    Here's a copy of the transcript of your testimony, in
14         Akron, and direct your attention to Page 183, Line
15         12.
16              You stated:  First of all, the term Shaken
17         Baby Syndrome is a term that is really not based on
18         science as far as any new admission to the hospital.
19         Is that correct?
20   A    That's correct.
21   Q    And that's still your opinion, I assume, based on
22         what you've testified to here today?
23   A    Correct.
24   Q    Are you aware that the curriculum at your medical
25         school includes understanding the epidemiology,

1561

1          presentation, workup and outcomes of Shaken Baby
2          Syndrome for residents?
3    A    I'm not aware of that, but perhaps you want to make
4          me aware of it.
5    Q    If I were to show you a page that I would submit that
6          has been printed off the Internet, and direct your
7          attention to the star that has been placed there.
8          Can you read --
9    A    Yes, it's kind of in between, but I will read both of
10         them.  The identification, management and referral of
11         infants and children who may present to pediatrician
12         with possible abusive head trauma or Shaken Baby
13         Syndrome --
14   Q    That's fine.  So you agree that teaching about Shaken
15         Baby Syndrome is part of the curriculum at your own
16         medical school?
17   A    I agree with that.  And I agree that one of the
18         essential components of a teacher is to teach the
19         truth, and the up-to-date information.  And the
20         up-to-date information about Shaken Baby Syndrome is
21         that the science has been called into question, and
22         biomechanical people are involved, and they are
23         coming to the conclusion that this is a misnomer in
24         many cases.
25   Q    So your own medical school is teaching something that

1564

```
 1         is not based in science?
 2    A    Well, I don't know about that. I'm just telling you
 3         the way that I think the teaching ought to be done.
 4         I'm not in those classrooms when they teach about it.
 5         But there is a good chance that they teach the truth
 6         about it, at least I hope they do.
 7    Q    Do you agree or disagree that Aiden suffered serious
 8         physical harm on March 15, 2004, the day he was
 9         hospitalized?
10    A    I'm not sure that I follow your question. But then
11         if you want to pursue that, I have already pointed
12         out the difference in his fontanel between Mansfield
13         emergency room and Akron Children's emergency room,
14         so if you are going to ask such a question, I
15         encourage you to narrow it down to a time --
16    Q    Prior to his admission to MedCentral Hospital in
17         Mansfield, do you agree that Aiden had suffered
18         serious physical harm?
19    A    The answer to that, no, but I need to know what you
20         mean by serious physical harm. If you mean that he
21         choked and stopped breathing, and you are going to
22         call that serious physical harm, then I would have to
23         say yes. If you are going to try to say that serious
24         physical harm meant doing something to Aiden to make
25         him like that, I see no evidence that that occurred.
```

1563

```
 1    Q    Well, okay. Tell us then, in your opinion, how sick
 2         Aiden was when he got to MedCentral Hospital?
 3    A    Oh, when he got there, he had previously gagged and
 4         choked, and was resuscitated by his father and the
 5         neighbor, and then arrived in Mansfield Hospital.
 6         And there, he was such that at that time he was able
 7         to react to keep them from intubating, was still like
 8         that at that time, and then after that he got to
 9         Akron Children's Hospital, but his condition changed
10         greatly between the admission to Mansfield --
11    Q    I'm just asking you up to his admission at Mansfield,
12         at MedCentral Hospital.
13    A    I'm sorry, sir?
14    Q    I'm just asking you to talk about his condition up to
15         his arrival at MedCentral?
16    A    At MedCentral, Mansfield Hospital?
17    Q    Yes. Now, you testified that he fought off being
18         intubated at MedCentral?
19    A    That's what it says in the record.
20    Q    I will show you State's Exhibit 16-E, and ask you if
21         you can -- if you would show me in that record where
22         it says that Aiden was fighting off the intubation?
23    A    It says: At this time I did decide to electively
24         intubate the patient. However, when I went to take a
25         look the patient had a good, strong gag reflex, arms
```

1565

```
 1         came up and he gagged, but this was not enough to get
 2         the patient breathing better. We continued bagging
 3         this patient. I did treat the patient with Atropine,
 4         Norcuron, which is a paralyzing agent,
 5         Succinylcholine, and also they used Ativan.
 6    Q    Okay. Arms came up and he gagged?
 7    A    Yes.
 8    Q    That's what you are interpreting as fighting off?
 9    A    Well, that's what's on this part of the record, but
10         there's more to the record than that.
11    Q    Where is it? Would you point it out to us, please?
12    A    Oh, that's all that's here. The whole emergency room
13         record is not here.
14    Q    But that's all that Dr. Midkiff indicated in that
15         portion of the record?
16    A    Yes.
17    Q    And if Dr. Midkiff testified here that that's all
18         that happened, then apparently he left out part of
19         what happened, right?
20    A    That's what you said, so.
21    Q    I don't know. I'm asking you.
22              Okay. It's my understanding that it is your
23         position that Shaken Baby Syndrome can't happen
24         without additional evidence of trauma, such as
25         bruises, broken bones, that sort of thing, is that
```

1565

```
 1         correct?
 2    A    Certainly it would be unlikely for that to occur.
 3    Q    Are you familiar with the book Nelson's Textbook of
 4         Pediatrics?
 5    A    Yes.
 6    Q    If I were to read you -- I'm going to read you a
 7         portion of that, and tell me whether you agree or
 8         not.
 9              It says: Although grab marks or metaphysial
10         fractures and rib fractures have been described in
11         association with shaking, parenthesis,
12         acceleration/deceleration, closed parenthesis, and
13         slamming the head against an object, there may be no
14         external marks or fractures.
15              Isn't that different than what you said your
16         position is?
17    A    I don't know that it's necessarily different, but
18         it's what it says there.
19    Q    You disagree with that?
20    A    Well, I think that if you are going to be observing
21         subdural collectional fluid and hemorrhages in the
22         eyes, then it's improper to conclude shaking under
23         those circumstances.
24    Q    It goes on to say: Retinal hemorrhages are seen in
25         85 percent of patients who are shaken. Do you
```



1566

1 disagree with that?
2 A  I would think that it would go along with the same
3    thing. If you come to an improper conclusion and you
4    put an improper name on it, then everything will stem
5    from there. I'm not sure of the date of that
6    textbook of pediatrics.
7 Q  If I were to say it was 2004?
8 A  Yeah, that would be that date, and textbooks are
9    always behind the literature. But 2004 literature
10   certainly calls into question those things.
11 Q  And while we're at it, I believe you mentioned that
12   CPR, is the actual name for that cardiopulmonary
13   resuscitation?
14 A  Correct.
15 Q  Frequently causes subdural, or, excuse me, retinal
16   hemorrhages?
17 A  I don't know that you can put the term frequently,
18   but you can certainly put the term that it causes it.
19 Q  Again, referring to retinal hemorrhages, the very
20   next sentence in the textbook: They occur commonly
21   with normal birth, and rarely with -- and I may
22   pronounce this wrong, I apologize if I do --
23   coagulopathies, blood dyscrasias, meningitis,
24   endocarditis, severe hypertension, cardiopulmonary
25   resuscitation, or impact trauma.

1567

1         Do you agree or disagree with that statement?
2 A  Well, I have no reason to disagree, but what it says
3    there is they do occur. And if you want to use the
4    term rarely, as that author does, then that's what
5    his experience is.
6 Q  You disagree with that, then? Do you disagree -- do
7    you disagree with him?
8 A  Coagulopathy? I've seen many patients with
9    coagulopathy that have hemorrhages in their eyes.
10   That happens. Anybody that knows patients who are on
11   anticoagulants, the fact of the matter is some of us
12   take aspirin, they bleed more easily. Well, if you
13   have somebody who has a coagulopathy, you can get
14   hemorrhages in the eyes or anyplace.
15 Q  So even though the book say rarely this doesn't
16   occur?
17 A  But the book doesn't say it never occurs, it says
18   rarely.
19 Q  Is it fair to say then that apparently it's rare that
20   Aiden had retinal hemorrhages in association with
21   subdural hematomas?
22 A  I don't know about that. We do know -- we do know
23   that Aiden has a chronic subdural. We do know that
24   the acute problem by the time he got to Akron
25   Children's Hospital has something more acute, and

1568

1    they've said that he has retinal hemorrhages, but we
2    don't have a picture of them. That's as far as we
3    can go.
4 Q  While we're on that topic, I'm showing you what has
5    been marked for identification as State's Exhibit
6    16-G, medical records from Akron Children's. You
7    have reviewed these before, is that correct?
8 A  Well, assuming they are what I reviewed, yes.
9 Q  Have you seen that page that I have opened?
10 A  Yes.
11 Q  And what is shown on that page?
12 A  This is a consult sheet from the ophthalmologist.
13 Q  Okay. And can you tell actually how many
14   ophthalmologists were involved in that consult from
15   reading that sheet?
16 A  Well, I can't really -- I can't even tell who was
17   involved. There's a signature here that is somebody,
18   and then there is another signature here that is
19   somebody. I can tell it's 3/15. 1915 is the time, I
20   can tell that.
21 Q  If I were to tell you that there has been previous
22   testimony by Dr. Lowcastro, an ophthalmologist from
23   Akron Children's Hospital, that that was -- that
24   record was created initially by a resident on the
25   date and time you have indicated, and then reviewed

1569

1    by him the following day, and both of them actually
2    observed the eyes. And, further, that Dr. Malhotra
3    looked at the eyes, and they all saw what is drawn on
4    there, as far as retinal hemorrhaging in the eyes,
5    would you have any reason to disagree that that
6    drawing is accurate?
7 A  Well, I have no reason to disagree, but, on the other
8    hand, it's not exactly a picture of what is there.
9    It's some kind of a sketch.
10 Q  Do you understand, based on your training and all the
11   years of experience that you've had, what the drawing
12   shows or is intended to show?
13 A  Yes. It shows pre-retinal hemorrhage. It's labeled
14   as that.
15 Q  Pretty significant retinal hemorrhages, is that fair
16   to say?
17 A  I think every retinal hemorrhage is significant.
18 Q  Do you have any reason to disbelieve that that's
19   accurate?
20 A  No.
21 Q  There has also been testimony that, in fact, there
22   was only one time where photographs ordered of the
23   retina by the doctors at Akron Children's. You
24   indicated that you thought that it had been ordered
25   twice?

Case Compress. STATE OF OHIO VS. MATTHEW STEIN, NO. 03-CR-224, VOLUME VII

1572

Case: 1:07-cv-03696-CAB Doc #: 1-70 Filed: 12/03/07 53 of 71. PageID #: 62

**1570**

1  A   Well, on the chart it indicates that they were taken
2      twice.
3  Q   The chart -- do you have that with you?
4  A   No, but we could easily find it, because it does
5      exist.
6  Q   According to Dr. Lowcastro and Dr. Steiner, it was
7      actually ordered once, that the other order was, in
8      fact, for just pictures of Aiden rather than retinal
9      photographs. Would you dispute that if they
10     testified to that?
11 A   No, but I have no reason to dispute any of that. But
12     I just have to wonder why we don't have these things,
13     whether they are taken once or twice. The issue is
14     if they were taken, why don't we have them? Where
15     are they? Why don't they exist?
16 Q   There has been testimony that the photographs didn't
17     come out. Don't things like that happen sometimes,
18     even in hospitals?
19 A   Well, let's put it this way, when I went to the
20     photography department, they didn't tell me that they
21     didn't come out. They told me they couldn't find
22     them that day.
23 Q   Well, and if later examination, investigation
24     determined that the reason they couldn't find them
25     was because they didn't come out, would you disagree

**1571**

1      with that?
2  A   I would have to accept that.
3  Q   Doctor, how many Shaken Baby cases have you actually
4      been involved with?
5  A   Oh, over the years, I have seen, oh -- and I have to
6      back off of Shaken Baby, the child abuse thing,
7      because I have to tell you maybe ten on child abuse,
8      suspected child abuse.
9  Q   And possibly less than ten?
10 A   It could be less than ten. I don't think it's
11     anymore than ten. They asked me the same thing in
12     probate court. I don't know the significance of it,
13     but they pushed on me, I said five, and I said maybe
14     ten, whatever. I do what I do.
15 Q   Do you consider yourself an expert in child abuse,
16     particularly in the Shaken Baby Syndrome area?
17 A   Well, I see no difficulty in being an expert on
18     identifying it, but I'm not an expert in child abuse.
19 Q   Are you acquainted with Dr. Steiner?
20 A   Only his name from in this case.
21 Q   You have not met him?
22 A   No.
23 Q   Are you aware of his credentials as far as his
24     background and qualifications as an expert of child
25     abuse and Shaken Baby Syndrome?

**1572**

1  A   No.
2  Q   Do you agree that history is very important to the
3      diagnosis?
4  A   Absolutely.
5  Q   And would that apply to a diagnosis of child abuse?
6  A   Well, I don't know about child abuse, but I do know
7      that history is important. And every place in the
8      chart that I have looked for the history on Aiden, it
9      says the exact same thing. There is not any
10     discrepancy. It says it every place where the
11     history is recorded, the exact same thing, that he
12     was being fed and he choked and he gagged and was
13     resuscitated. It doesn't say anything else. I have
14     no reason to do anything except say if the same story
15     keeps getting repeated in multiple places, especially
16     in those first few days, I would pay attention to it.
17 Q   If I were to tell you that -- withdraw that. You
18     then read, I take it, Dr. Steiner's report?
19 A   Yes.
20 Q   And his opinion that this was incidents of Shaken
21     Baby Syndrome?
22 A   Now, hang on, I've got to back off just a little bit.
23     I'm not sure, is there more than one report? Is
24     there only one report, or whatever it is? I read Dr.
25     Steiner's note when -- shortly after Aiden was

**1573**

1      admitted to the hospital.
2  Q   I will show you the report that I am referring to.
3  A   Yes.
4  Q   If I may. It's dated March 16, 2004.
5  A   Sure.
6  Q   Is that what you've read?
7  A   Yes.
8  Q   Now, if I were to tell you that the defendant and
9      several other witnesses have come in here and said
10     that the history that Dr. Steiner has reported in
11     there is wrong, that they told him something
12     different, what would your response to that be?
13 A   I would just have to say you have to go to the source
14     and find out what the difference is, but I can only
15     go by this.
16 Q   So you accept what Dr. Steiner has reported as the
17     history upon which you rely, is that correct?
18 A   I have no reason to do anything except read what Dr.
19     Steiner wrote and go from there. I was very
20     concerned about Dr. Steiner's report within 24 hours
21     after Aiden was admitted to the hospital. I was
22     very --
23 Q   Is it fair to say you were concerned with his
24     conclusions, but not with the history that he took?
25 A   Well, I have to accept the history. I mean, I accept

1576

1       that. I have great difficulty with him coming to
2       these conclusions within -- within a few hours after
3       admission to the hospital.
4   Q   I understand you disagree with his conclusions, but
5       for your purposes, and the diagnosis that you have
6       made here today in response to Mr. Boggs' questions,
7       you accepted Dr. Steiner's history?
8   A   Sure, it's there. Whatever it is, it's there.
9   Q   That's what you relied on?
10  A   I paid attention to it, that's correct.
11  Q   Now, in diagnosing child abuse, would it be important
12      or relevant to know whether the custodian had a bad
13      temper and a history of being rough towards the
14      child? For example, repeatedly picking a child up
15      like this (indicating).
16  A   Like what?
17  Q   Like this (indicating). Would that be important?
18  A   Well, I would think that's an improper way to pick a
19      child up.
20  Q   I understand that. But would that be important in
21      diagnosing whether or not the child was a victim of
22      child abuse?
23  A   Not necessarily, but it's important to teach someone
24      who would do that that they shouldn't be picking a
25      baby up that way. But you asked the question, and I

1577

1   Q   Isn't it true, Doctor, that subdurals that occur at
2       birth are different than the kind of subdural
3       hematoma that Aiden showed?
4   A   Not that I know of, no.
5   Q   They are smaller, more localized, and resolve --
6       generally resolve within three or four weeks?
7   A   I don't know that you can say that resolve thing.
8       Obviously anything that's big or bigger tends -- has
9       a good possibility to be smaller at first. And
10      certainly I would say that Aiden's subdural was not
11      this size (indicating), but we can say that by the
12      time his head was measured at one month when it was
13      16 inches, the circumference, and then it increased
14      by three months another inch, the subdural was bigger
15      during that time, and I suspect continued to get
16      bigger, but his head actually, in proportion to the
17      rest of his body, was down just a little bit, so his
18      body was dealing with it.
19          A subdural, once it's there, it's not unlike
20      a boat that has a leak in it, and has a bilge pump in
21      it. And if it keeps leaking in, as long as the bilge
22      pump takes it out, nothing happens. But if there is
23      a bigger leak in, and the bilge pump can't help it,
24      then that's what happens. And what happens with
25      subdurals, once they are there, they continue to be

1575

1       assume that you have some reason to ask that
2       question.
3   Q   I'm asking you, you're the expert doctor. Would you
4       take that into account in diagnosing whether or not a
5       child has been abused particularly by Shaken Baby
6       Syndrome?
7   A   Well, I think that's the wrong way to pick up a baby,
8       but I don't know that that applies to shaking.
9   Q   If it was testified that that was done in conjunction
10      with the defendant being mad or having a short fuse,
11      would that be important to you?
12  A   Well, that's not a good thing to do, neither one of
13      those things.
14  Q   Are you aware that 30 percent of all Shaken Baby
15      Syndrome admissions have evidence of old subdural
16      hematomas?
17  A   Well, again, you focused on the Shaken Baby. I'm
18      aware of the fact that people identify subdurals and
19      retinal hemorrhages and then Shaken Baby. Once they
20      label that, then, of course. But in Aiden's case, he
21      has evidence of a chronic subdural that is one that
22      was not diagnosed when he was born, or certainly by a
23      month of age, and when he comes in at five months,
24      he's going to have evidence of chronic subdural no
25      matter what happened at five months.

1577

1       there, yes, the body can learn how to heal it, but
2       sometimes there is an acute event that makes for
3       extra blood getting in there however that is, and
4       then it gets manifest, and that's what we're dealing
5       with.
6   Q   Is it fair to say that what you are saying is that,
7       as a general rule, subdurals that exist at birth, or
8       are caused by the birth process, do not generally
9       resolve within a matter of weeks?
10  A   No, there isn't any label as to the time. What one
11      does with such things is --
12  Q   Thank you. I think you answered my question.
13          You have testified that in order for you to
14      diagnose Shaken Baby Syndrome there must be trauma,
15      or generally should be trauma with it, is that a fair
16      statement?
17  A   What I would say is that if you are going to say that
18      the baby was shaken, you ought to have some
19      indication the baby was shaken. If you are going to
20      find subdural collection of fluid and retinal
21      hemorrhage, what you ought to say is subdural
22      collection of fluid and retinal hemorrhage, and
23      approach the situation that way to find out what it
24      is as opposed to concluding that somebody shook the
25      baby. I don't think that's proper.



1578

1  Q  Would it be fair to say that in order for you to
2     diagnose intentionally inflicted trauma on a child,
3     which resulted in retinal hemorrhaging and
4     subdural -- acute subdural hematomas, that there
5     generally should be some sort of trauma associated
6     with it?
7  A  I would say yes, and the trauma that --
8  Q  Isn't a skull fracture trauma?
9  A  A skull fracture, if it's a fracture, and I've
10    already told you, I don't believe that's a
11    fracture --
12 Q  So you disagree with all the doctors, including a
13    radiologist, who have sat there and testified that
14    Aiden did suffer from a skull fracture, and, in fact,
15    that that skull fracture is shown on the CT Scans
16    that you've observed? Those doctors are all wrong?
17 A  Well, I don't know about doctors being all wrong, but
18    I do know this much, that the CAT Scan that we showed
19    you on March 15th was interpreted as no evidence of
20    fracture. And that's a much better indicator of
21    fracture than the AP and lateral of the skull, which
22    can show that anomalous parietal suture.
23 Q  Well, if I told you several doctors have sat
24    right there in that very chair last week, looked at
25    that CAT Scan, the same one you looked at, and

1579

1     pointed out to this jury the fracture of the skull
2     that in their opinion was present on that day, you
3     disagree with that, and it's your opinion that they
4     are all wrong?
5  A  Well, I don't know about they're all wrong, but I
6     didn't see any fracture on there.
7  Q  Is it possible they saw it and you didn't?
8  A  Well, of course, anything is possible, but if they
9     saw it when they were here, they didn't see it when
10    they read it initially. They didn't see it until at
11    least eight days after he was in Akron Children's
12    Hospital.
13       MR. CASTOR:    Excuse me.
14       THE COURT:    Will you let us know when
15    it's convenient to take our lunch break.
16       MR. CASTOR:    Any time is fine.
17       THE COURT:    Let's do it now then. We
18    will come back an hour from now.
19       THEREUPON, there was a lunch recess.
20       THE COURT:    Mr. Castor, you can
21    continue your cross examination whenever you are
22    ready.
23       MR. CASTOR:    Thank you, Your Honor.
24 BY MR. CASTOR:
25 Q  Dr. Byrne, if I understood your testimony correctly,

1580

1     shortly before lunch, you indicated that, in your
2     opinion, Aiden had no skull fracture while he was in
3     the hospital at Akron Children's Hospital, is that
4     correct?
5  A  That's correct.
6  Q  If you would, go to Page 201 of the transcript of
7     your own testimony, starting at Line 3 and read down
8     midway through Line 10, if you would, please. Go
9     ahead and read it out loud.
10 A  The first x-rays, the first CAT Scans that were done,
11    have a whole series of pictures of that skull to look
12    for fractures and there was no fracture. The
13    pictures that were -- he was admitted on the 15th.
14    The pictures that were taken on the 22nd, show some
15    evidence of fracture.
16       I have to tell you that I --
17 Q  Fine, thank you. So are you saying that the day you
18    testified, the x-rays did show evidence of fracture
19    that's not there now?
20 A  No. The x-rays -- the image that's there now is the
21    same image that was there since it was taken, but
22    what it shows --
23 Q  Have you changed your opinion?
24 A  Let's put it this way, I've studied even further then
25    I had at that time, and I can understand how the

1581

1     radiologist would call this a fracture, but if you
2     put together the clinical picture, and often
3     radiologists do not put the clinical picture in, if
4     you put that together, plus the fact that babies have
5     anomalous sutures, and this is a very common place
6     for an anomalous suture in a parietal bone to occur.
7  Q  So you are saying you were wrong at that time?
8  A  Well, I don't know that I was wrong --
9  Q  And you are claiming all the rest of the doctors are
10    wrong here?
11 A  I don't know that I was wrong, but what I would say
12    is that at that time I answered the question to the
13    best of my ability, and I answered the question today
14    to the best of my ability.
15 Q  Even though you said then, and I quote, the pictures
16    that were taken on the 22nd show some evidence of
17    fracture. You are saying now that there is no
18    evidence of fracture?
19 A  Well --
20 Q  Just yes or no, please.
21 A  Yes or no.
22 Q  Pick one, if you would.
23 A  Well, I'm saying, yes, that's what I said then, and
24    that was the best way I knew how to answer it then.
25 Q  Doctor, if you would assume for me, please, that

1584

1    there was a skull fracture present before Aiden was
2    admitted or taken to the hospital, either hospital?
3  A  There was?
4  Q  Would you assume that, please?
5  A  I'd have to assume something that I don't believe.
6  Q  Well, we frequently ask experts hypothetical
7    questions when they are asked to assume things, so
8    would you do that for me? Assume that prior to Aiden
9    being taken to MedCentral Mansfield Hospital, and, in
10   fact, prior to being taken to the neighbors where CPR
11   was administered, he had a skull fracture, will you
12   assume that?
13 A  Yes, but it's difficult for me to do that.
14 Q  Difficult as it may be, will you do that?
15 A  Okay.
16 Q  And base your answer to this question on that
17   assumption.
18       Would there be pain felt by Aiden as a result
19   of that skull fracture?
20 A  I would imagine.
21 Q  All right. And if there has been testimony that the
22   evening before Aiden was taken to the hospital that
23   he was irritable, unhappy, crying, fussy, that sort
24   of thing, and he had the skull fracture at that time,
25   could those attributes be attributed to the skull

1583

1    fracture?
2  A  Yes.
3  Q  So skull fracture could very well make him irritable?
4  A  It could, yes.
5  Q  Could it result, in fact, in him screaming at times?
6  A  Well, you keep on going with this assumption that I
7    have difficulty to start with, so I would accept
8    the fact that somebody with a skull fracture could
9    scream. I would also accept that they might not
10   scream at all.
11 Q  Doctor, would you agree that there are at least three
12   possibilities of the cause of Aiden's large head, in
13   addition to the possibility that you have suggested,
14   of subdural hematoma from birth?
15 A  I certainly agree that he's had a subdural since
16   birth. You said three possibilities --
17 Q  Would you agree there are three possibilities, and
18   I'm going to give them to you.
19       One would be --
20   THE COURT:    Three possibilities for his
21   large head size, other than the subdural hematoma you
22   are asking?
23   MR. CASTOR:    Yes.
24   THE COURT:    Thank you.
25   MR. CASTOR:    Sorry if I didn't phrase

1    it.
2  Q  Do you understand my question? One, being genetics,
3    his parents had a large head, or one of the parents
4    had a large head?
5  A  No, not like this, no.
6  Q  That's not possible?
7  A  No, because he would have a large head at birth.
8  Q  Two, what about the possibility of an inaccurate
9    measurement at birth?
10 A  Well, that's always possible, but my experience with
11   nurses is that they are very conscientious how they
12   do things in making these measurements, and so
13   obviously any nurse can make a mistake. But if the
14   mistake, as you are saying here, was made, then the
15   question would be how come wasn't a similar mistake
16   made with the weight or the length, and the weight
17   and length stayed at the 50th percentile, and you
18   would expect the head to stay at the 50th percentile.
19   And it's very unusual, inappropriate to find that the
20   head goes over the 95th percentile at one month of
21   age when the weight and length stay the same.
22 Q  Isn't it true that after the baby is born, the shape
23   of his head changes frequently?
24 A  Yes, it is.
25 Q  And that can cause the measurement to change?

1585

1  A  Usually it does not. I mean, because you still have
2    the same content, and that's the reason that when we
3    measure the head, this is the stable place, you can't
4    do anything about this. Then we find the place that
5    it's most prominent, and that's the way that heads
6    are measured. And that will usually take into
7    account, even though there was a difference in shape,
8    that the head is still the same, even though it's
9    distributed differently.
10 Q  The shape changes?
11 A  Yes.
12 Q  And with it -- you are saying that even though the
13   shape changes, the size, the measurement doesn't
14   change?
15 A  No, not because of the way -- it does not change, and
16   it has to do with our method of measuring. That's
17   why we measure that way. We have this part that
18   doesn't change. The shape of the head can change
19   because of shaping to the birth canal, so the nurse
20   knows to go to the most prominent part of the occiput
21   and measure that way. My experience is that even
22   though the shape changes, the circumference does not
23   change.
24 Q  So, again, if other doctors have testified here that
25   it does, the circumference does change as a result of



1 the changing shape of the head, they're wrong?
2 A  Well, my goal and objective is not to say that other
3    doctors are wrong, but I can tell you that I've
4    measured many, many, many heads over the years, and I
5    haven't found what you are trying to get me to
6    acknowledge.
7 Q  Isn't it also possible that these old subdurals are a
8    result of abuse early on in Aiden's life?
9 A  Well, it would have to be before a month of age, and
10   then you would have to forget all of the difficulties
11   around birth in that he didn't cry, and he had to be
12   stimulated, he was pale.  You've got to forget all
13   that.  I don't think it's fair or appropriate to pay
14   attention to one thing and not put the whole thing
15   together.
16 Q  Doctor, while we're on the problems around birth, is
17   it your testimony that those problems show that Aiden
18   was suffering from a subdural hematoma immediately
19   after birth, that those are diagnostic of the
20   subdural hematoma?
21 A  Well, I suspect that if you looked for it you could
22   have found it then.  But, on the other hand, Aiden's
23   condition was such that he was in some difficulty
24   after birth, but then he improved and got home from
25   the hospital, and by the time he was one month of

1 know where they got their number.  Like I said, if I
2    wanted to know the answer to that question, I would
3    have to look that one up.
4 Q  So you won't take their word for that either?
5 A  Well, I didn't know I was being asked to take their
6    word for it.
7 Q  Well, what percentage would you say are born with
8    nuchal cords?
9 A  I would say that if you go percentage, I would have
10   to look it up.  It's a common thing, but we know that
11   when the cord is around the neck and the doctor has
12   to clamp the cord before the rest of the baby is
13   born, at that point the baby gets no more oxygen, and
14   the baby doesn't get oxygen then until the baby gets
15   out.
16      We also know, at that point, the baby can't
17   get anymore blood from the umbilical cord, and what
18   happens in the birth process is that after birth the
19   blood that's in the umbilical cord goes into the baby
20   to conserve every place that circulation is needed,
21   and to fill the lungs.  So it adds to the stress when
22   the umbilical cord has to be cut like that.
23 Q  Then why don't we have a whole lot more babies
24   suffering from subdural hematomas than we do?
25 A  Well, the subdural hematoma doesn't come from cutting

1587

1 age, then we know his head was too big.  By the time
2    you get to five months of age, and you see these CAT
3    Scans which shows the chronic subdural, then you have
4    to go back and say, hey, it was there at three
5    months, his head was too big, it was too big at one
6    month, and he had trouble with adjusting to outside
7    the uterus, and his birth process wasn't easy.
8 Q  So even though Dr. Marshall testified that there
9    really was no problems with the birth process, that
10   the actual birthing process was very quick, only took
11   a half hour, was she wrong, too?
12 A  I don't know what Dr. Marshall testified to.  I do
13   know that Dr. Marshall wrote in her note that the
14   cord was around the neck and it had to be divided,
15   and then the baby was delivered, and those kinds of
16   things.  So, anyway, whatever is in her note is in
17   her note.
18 Q  What percentage of babies are delivered with nuchal
19   cords?
20 A  I would have to look it up to be exact.  So I don't
21   know that answer.
22 Q  If I told you that three other doctors have testified
23   that up to 30 percent of babies are delivered with
24   nuchal cords, would you disagree with that?
25 A  That seems like it's a little high to me, but I don't

1589

1 the umbilical cord.
2 Q  What does that have to do with this whole case then?
3 A  The subdural hematoma comes from the difficulty in
4    being born, just like many babies have.
5 Q  Dr. Marshall has testified there was no difficulty in
6    being born.  So if it doesn't have anything to do
7    with the nuchal cord and there was no difficulty
8    being born, where did it come from in this case?
9 A  If Dr. Marshall said that, that's fine, then Dr.
10   Marshall would also have to answer the question why
11   did the baby have to be stimulated after birth?  Why
12   did the baby need oxygen?  Why did the baby have
13   difficulty with crying?  Why was the baby's tone
14   decreased?  Dr. Marshall has to answer those things,
15   too.
16 Q  If she did say that none of those things are unusual
17   at all in newborns, happens all the time, you think
18   she's wrong about that, too?
19 A  I would say that if I were a pediatrician seeing a
20   baby and were presented with that, I would be
21   concerned, as Dr. Olson was, and I would have to go
22   from there.
23      Certainly there was something going on, and
24   it was such that the baby stayed in the hospital for
25   about four days.  And then by one month of age the

1592

```
 1        head was clearly too big.                              1    Q   I'm asking.
 2   Q    If I were to tell you that the records actually show    2    A   No. I don't believe --
 3        the baby being discharged on October 29, having been    3    Q   In your opinion, when did they occur?
 4        born on October 27th?                                   4    A   They were there when they looked at them.
 5   A    Two days, I'm sorry.                                    5    Q   You are saying that they were not there when the
 6   Q    So that's half of what you just based, in part, your    6        child was taken to MedCentral Mansfield?
 7        diagnosis on, correct?                                  7    A   It's every possibility that they were not there. We
 8            Dr. Olson diagnosed the baby from suffering         8        can't say, no one looked. But they don't have to be
 9        from TTN?                                               9        there at that time.
10   A    Yeah.                                                  10    Q   As a pediatrician, do you have an opinion regarding a
11   Q    What is that?                                          11        child, less than three months, rolling over a couple
12   A    TTN, it's Transient Tachypnea of a Newborn. And what   12        of times to roll off a couch? I will expand on that
13        happens is that --                                     13        by showing you the couch in particular.
14   Q    Do you agree with that diagnosis?                      14            If you can see that okay? State's Exhibit
15   A    I have no reason to disagree.                          15        1-I, the couch there. If he had testified that he
16   Q    Does that have anything to do with all these things    16        laid the baby all the way against the back of the
17        you pointed out in response to Mr. Boggs' questions    17        couch on his back.
18        that are contained in the birth records?              18    A   Yes.
19   A    Yes.                                                   19    Q   And the baby was less than three months old. Do you
20   Q    I assume you're also saying that it has to do with    20        have an opinion whether a baby could roll all the way
21        the subdural hematoma?                                21        off that couch?
22   A    Yes, they are all related.                            22    A   Absolutely the baby can. I've seen babies -- I saw a
23   Q    Why do you suppose Dr. Olson and Dr. Marshall missed  23        baby four pounds roll out of an isolette and hit the
24        that?                                                 24        floor. I happened to be in the room. I had nothing
25   A    Why do I suppose -- I didn't quite hear the question, 25        to do with it at the time --
```

1591                                                            1593

```
 1        sir.                                                    1    Q   Even if the mom said that the baby could only roll
 2   Q    Why do you suppose -- well, forget Dr. Marshall. She    2        from his front to his back, he could roll all the way
 3        was not involved after the baby was born.               3        off that couch?
 4            Why do you suppose Dr. Olson only caught the        4    A   Of course he can. That's the reason that no one
 5        TTN and wasn't concerned about subdural hematoma?       5        should put a baby on a couch without keeping their
 6   A    Well, as I alluded to a little bit earlier, babies      6        hands or their eyes on the baby all the time. No one
 7        have a limited way that they can tell you that they     7        should put a baby on a bed, because they can always
 8        are in trouble. And we always, when we see the baby     8        roll.
 9        having trouble with breathing, we know that can be in   9            I've told you at four pounds I've seen them
10        the lungs, it can be in the heart, it can be in the    10        roll. I've seen them roll at one week. The rolling
11        brain, it can be in the kidneys. Then you have to      11        in terms of doing more things with it comes at a
12        find the cause. And the baby had retractions and had   12        later age, but they can roll at any time.
13        flaring of the nose, and then as the baby starts to    13    Q   Doctor, you have testified about all sorts of things
14        improve outside the uterus, then they breathe fast.    14        that could have caused the retinal hemorrhagings on
15            It's very common that the baby in the healing      15        the morning Aiden was taken to the hospital, the
16        process will breathe fast, meaning tachypnea, and      16        bleeding that could have caused -- the bleeding in
17        it's transient, so we call it Transient Tachypnea of   17        the brain that Aiden suffered from.
18        the Newborn, but it's a later manifestation of the     18            Can you tell us what your opinion is why
19        difficulties that were going on right when the baby    19        Aiden stopped breathing, and heart stopped, before
20        was first born.                                        20        dad took him to the neighbors?
21   Q    Let me see if I understand your previous testimony     21    A   This is an assumption question?
22        correctly. Are you claiming that the retinal           22    Q   I'm just asking your opinion, based on everything you
23        hemorrhages occurred while the child was on the        23        know at this point, would you disagree that Aiden --
24        medical flight?                                        24    A   Well, I have a number of difficulties with that.
25   A    I don't believe that I claimed that, no.               25        This is the first time I've heard that his heart
```

**1594**

1     stopped, I haven't read that any place.

2  Q  Okay. If I told you there was testimony to that

3     effect, neighbor did CPR, and his heart started

4     beating again?

5  A  Well, I believe that. I don't know how the neighbor

6     would know that the heart had stopped.

7  Q  Take his pulse maybe?

8  A  Well, I still don't know --

9  Q  Don't people get taught that when they give the CPR

10    lesson?

11  A  Well, I guess I have to think differently than that.

12    The heart is very resistant to stopping. So maybe

13    his heart stopped, I can't tell you that it never,

14    but I have seen babies' hearts beat for two hours

15    without any breathing whatsoever.

16        The heart in young infants is very strong and

17    resistent. Usually it doesn't stop, but maybe it did

18    in this case.

19  Q  Assume that it didn't stop, that he just stopped

20    breathing?

21  A  Just stopped breathing, and exclude all your previous

22    things, whatever you put in there?

23  Q  Stopped breathing.

24  A  Assume that Aiden is at home, and he's been given the

25    bottle, or given the bottle and he chokes and coughs

**1595**

1    on it, and stops breathing, that can happen.

2        Now, what causes him to stop breathing there,

3    it could be the subdural itself finally gets to where

4    it finally does affect his breathing.

5  Q  Has the subdural then become acute, or is this still

6    the old subdural?

7  A  It can be the old subdural.

8  Q  That's been bleeding for four and a half months?

9  A  Yeah, I believe that the bleeding goes on. Remember

10    what I told you, though, it's the chronic subdural

11    becomes a dynamic thing. There is the acute thing

12    with the acute blood. Then the body keeps trying to

13    heal it --

14  Q  Where did acute blood come from in this case? If it

15    was the old subdural that caused him to go -- to stop

16    breathing, to be taken to the neighbors for emergency

17    help, taken to the hospital, was it some of his

18    treatment givers, caregivers that caused the acute

19    subdural after that?

20  A  Well, the original question started out by what made

21    him stop breathing, and we said --

22  Q  And you said the original subdural, is that right?

23  A  And that's correct.

24  Q  So where did the acute subdural come from?

25  A  Okay. So once he stops breathing, then what happens

**1596**

1    is that in his own coughing, vomiting, he could do it

2    to himself.

3  Q  That's it. Instead of being abused.

4  A  I'm sorry, sir, what did you say?

5        MR. CASTOR:    I withdraw that, I'm sorry,

6    I should not have --

7        THE COURT:     Go ahead and finish your

8    answer. He's withdrawing his comment. Go ahead.

9  A  Once he stops breathing, then in that process he can

10    be trying to do things to help himself, which will

11    increase his venous pressure and be the thing that

12    makes it become more acute. The resuscitation itself

13    can also do it, and then the acute bleeding, if it

14    was there before he got to Mansfield Hospital, it was

15    not manifest by bulging of the fontanel.

16  Q  Wouldn't it take a while for the fontanel to start

17    bulging once he starts breathing?

18  A  With the acute bleeding, I doubt it. I doubt it. I

19    think it would be there immediately as soon as you

20    add that extra blood. So already the crowded head, I

21    think it's there pretty quickly. That's why I am

22    very concerned that between Mansfield Hospital and

23    Akron Children's Hospital this condition became

24    worse.

25        Well, anyway, my goal and objective is not to

**1597**

1    be so critical of what was done because I believe

2    they were trying to help him. But the question is

3    what got him to the point where he got to Akron

4    Children's Hospital. And, yes, they can show this on

5    the CAT Scan, the chronic subdural which is the large

6    part, and, yes, there is the acute, but all that says

7    is it got there before they did the examination.

8  Q  Would I be wrong to say that, in your opinion, they

9    may have tried to help him, but they sure screwed up?

10  A  Oh, I don't think that's my goal and objective. I'm

11    sorry, sir.

12  Q  It's not your objective, but that's your opinion?

13  A  I'm still -- my goal and objective --

14  Q  You have previously testified, I believe, that you

15    disagree with Shaken Baby Syndrome as a diagnosis in

16    part because doctors jump to conclusions about it, is

17    that a fair statement?

18  A  I think in this case they came to conclusion far too

19    quickly, yes, sir.

20  Q  Even though they have now testified that they did --

21    ran tests and conducted examinations to exclude every

22    other possible cause that they could all think of,

23    including birth trauma?

24  A  Well, I can't tell you what they can say that they

25    excluded, but I can tell you that the records in the

**1598**

1       clinic clearly show that his head was too big at one
2       month of age.  The records of the hospital show that
3       his head was not too big at birth, and that his
4       difficulty -- he had some difficulties around birth.
5       And while his head was too big at one month, it was
6       still too big at three months.  And when he had the
7       trouble, that aspect of it was not looked at.
8   Q  Is it fair to say, Doctor, the bottom line of your
9       testimony is that the jury should believe you, who
10     have treated less than ten Shaken Baby Syndrome
11     babies, when you disagree with specialists in the
12     field of child abuse and Shaken Baby Syndrome, other
13     pediatricians, a radiologist, a trauma specialist,
14     standard textbook on pediatrics, and you dispute the
15     scientific basis of the curriculum of your own
16     medical school?
17  A  The truth is the truth, and it doesn't waver.  The
18     truth will always be the truth.  And the truth is
19     this baby had difficulty being born, his head was too
20     big at one month of age, the CAT Scan shows a large
21     chronic subdural that had to be there for weeks,
22     months, before he came in the hospital, and that will
23     always stand.  It will never go away no matter what
24     anybody says.
25         MR. CASTOR:   Thank you.  I have no

**1599**

1       further questions, Your Honor.
2         THE COURT:    Your turn again, Mr. Boggs.
3         REDIRECT EXAMINATION OF DR. PAUL BYRNE
4     BY MR. BOGGS:
5   Q  Dr. Byrne, when he asked you about the curriculum
6     there at the medical school, don't they teach all the
7     known theories so doctors have everything available
8     to them when they make a diagnosis?
9   A  Yes.
10  Q  Kind of like we did when we had the flat earth,
11     people saying it was round and flat, same ideas?
12  A  Yes.
13  Q  We haven't went back that far in the medical science,
14     have we?
15  A  I hope not.
16  Q  Now, at what age did you say babies can roll?
17  A  Well, they can roll at any age, but usually they
18     don't roll until three, four months kind of thing.
19     At least we don't get concerned until we get back
20     past the four and a half months.  They can roll at
21     any age.  I've seen them do it.
22  Q  He asked you about your transcript, Page 203, I think
23     it was.
24  A  What page?
25  Q  Page 203?

**1600**

1  A  201, I think, is where he was, but go to 203.
2  Q  Wherever he had you, he wanted you to read something
3     and you started to explain and then he stopped you.
4     Can you go ahead and explain what your answer was,
5     regarding the fracture, what you meant to say, more
6     information at the time you gave that answer?
7         THE COURT:    It's about the skeletal
8     survey, whether it showed a fracture in the skull, is
9     that what you're asking?
10        MR. BOGGS:    Right.
11  A  And then what I went on further to say is that, and I
12     have to tell you that I didn't concentrate on that so
13     much as I did the first ones, because the fracture
14     was going to be there on the 22nd and not on the
15     15th, how did it happen if the baby was in the
16     hospital the whole time?
17        So if somebody was saying fracture on the
18     22nd, and they had -- the same people were saying no
19     fracture on the 15th by a better test, then what were
20     they trying to do?
21  Q  Okay.
22  A  And I might add, sir, since that time I've tried to
23     find a better answer, if that's the right way, but to
24     find out how you differentiate to that line from a
25     fracture.  A fracture usually has a straighter line.

**1601**

1       The fracture will have swelling over it, and also
2       there will be some bleeding in it.  And this is a
3       common place for what is called, in the literature,
4       an anomalous parietal suture.  And so I can
5       understand how they went that route, but I think they
6       should reconsider.
7  Q  Okay.  Now, also when you testified at the Akron
8     proceedings, you had not had full access to all the
9     records, a chance to review everything in its
10     entirety and study it carefully, had you?
11  A  That's correct.  The fact of the matter is I asked
12     for all the records, but the records about the well
13     baby clinic and his head circumference, other than I
14     had it at birth, but his head circumference at one
15     month and three months and that I didn't get until
16     after I had to give that testimony.
17        MR. BOGGS:    That's all.  Thank you,
18     Your Honor.
19        THE COURT:    Recross?
20        RECROSS EXAMINATION OF DR. PAUL BYRNE
21     BY MR. CASTOR:
22  Q  You have had free access to all the records for your
23     testimony here, have you not?
24  A  I have had free access to what you have shown me.  I
25     have not had free access to all of the records of

1602

1    Aiden. The last time I was able to get any records
2    had to do with a few days before I testified at the
3    probate court.
4  Q  Well, you have had contact with Mr. Boggs, have you
5    not, in preparation for your coming here?
6  A  Yes.
7  Q  Have you asked him for any records that you thought
8    you might need in order to confirm your diagnosis?
9  A  Well, if I had my way, I would like all of the
10   records, but the significant -- you know, all of the
11   records of Aiden, which I haven't been able to get
12   any -- but the significant records have to do with
13   what happened to Aiden prior to the CAT Scans, and I
14   do have all those records.
15       MR. CASTOR:    Thank you.
16       THE COURT:    Do any of you folks have a
17   question for Dr. Byrne? We do have a couple.
18       THEREUPON, the attorneys approached and read
19   the questions posed by the jury and the following
20   bench conference began.
21       THE COURT:    Objection to any of them?
22       MR. CASTOR:    No.
23       MR. BOGGS:    No.
24       THEREUPON, the bench conference concluded.
25       THE COURT:    Doctor, I have several

1603

1    questions that I want to ask in addition to what's
2    already been asked. The first have to do with
3    meningitis.
4        Can you explain aseptic meningitis?
5        THE WITNESS:    Yes. Should I explain it
6    to you or to them?
7        THE COURT:    To them.
8        THE WITNESS:    Aseptic meningitis is when
9    we do the spinal tap and we see white cells in the
10   spinal fluid, but we don't culture a bacterial germ.
11   And, in modern times, we do much better in culturing
12   a virus germs that can cause that. But aseptic
13   meningitis often is due to a virus or something else
14   that doesn't have to do with bacterial meningitis.
15       THE COURT:    Can you explain lymphocytic
16   predominant meningitis?
17       THE WITNESS:    Yes. Lymphocytic
18   predominant meningitis would be similar. In
19   bacterial meningitis you get probably more from
20   nuclear leukocytes, those kind of white cells that
21   respond to bacteria. Lymphocytes tend to respond to
22   a virus more, and they are more slow, later coming,
23   that kind of thing. Aseptic meningitis could also be
24   diagnosed as lymphocytic meningitis.
25       THE COURT:    I think the next one says

1604

1    can you explain melanitis (phonetic) meningitis?
2        THE WITNESS:    I'm not sure about
3    melanitis. I'm not sure what that word is.
4        THE COURT:    I'm not sure either.
5        THE WITNESS:    It's close to melanoma.
6    I'm not sure if that's --
7        THE COURT:    I'm not sure what the word
8    is either. Can anybody tell me what that word is?
9        THE JUROR:    Mallorits (phonetic).
10       THE COURT:    Mallorits meningitis?
11       THE WITNESS:    I can't. Is it a man's
12   name, a person?
13       THE JUROR:    Mallorits meningitis,
14   that's all I'll ask.
15       THE WITNESS:    I don't know what it is,
16   sir. I'm very sorry.
17       THE COURT:    How about recandescent
18   (phonetic) meningitis?
19       THE WITNESS:    Maybe it comes back some
20   way or another. I don't know. Recandescent,
21   sometimes -- like rekindling type of thing.
22       THE COURT:    So the two types that you
23   recognize, at least from these terms here as they've
24   been written, is aseptic and lymphocytic predominant?
25       THE WITNESS:    Right.

1605

1        THE COURT:    In which of these cases do
2    you see a brain bleed? Or, which of these cases can
3    you see a brain bleeding?
4        THE WITNESS:    Usually more likely --
5    well, you can see the brain bleed in any of them, as
6    far as that goes. But the ones that are associated
7    with the subdural hematoma tend to be more of the
8    bacterial kind of meningitis than the aseptic ones.
9        THE COURT:    And would you consider
10   yourself an infectious disease specialist?
11       THE WITNESS:    No, but I have to know a
12   lot about infectious disease in terms of
13   pediatricians have a lot of infections that we have
14   to deal with, and then a neonatologist takes care of
15   everything in the newborn. So you have to know a
16   fair amount about infection, a fair amount about
17   nervous system problems and the like.
18       THE COURT:    How many babies have you
19   seen who have been delivered and qualify as cyanotic?
20       THE WITNESS:    I have seen a lot, yeah.
21   Usually, you know, if it's normal, it clears up right
22   away. It's normal for a baby to be cyanotic at
23   birth. Inside the uterus, the oxygen that the baby
24   is exposed to is like the oxygen in our veins. It's
25   exposed to a venous pool, the placenta is, so the



1606

1　highest oxygen before the baby is born is what's in
2　our veins, which makes the baby blue at birth. But
3　as soon as the baby starts to breathe, the baby gets
4　pink, maybe not with hands and feet quite so much,
5　but pink right away, and is crying and vigorous and a
6　normal baby like we always hope to have.
7　　　THE COURT:　　The next question is: What
8　were some of the fates of these babies? I guess it
9　would depend on --
10　　　THE WITNESS:　　Oh, with cyanosis? Just
11　general, they can get better right away, with
12　cyanosis. And then if a baby would have persistent
13　cyanosis, then we get into things like does the baby
14　have congenital heart disease, does the baby have
15　lung disease or something else. And we always think
16　of the nervous system, so that if the baby has
17　trouble with breathing, and we identify it's not the
18　lungs, we identify it's not the heart, often times we
19　will get an ultrasound of the head, and can make the
20　diagnosis of what that problem is. But then even
21　then, if we don't get the answer, then we think more
22　about kidneys. Babies can be born with serious
23　kidney problem, it gets manifest with difficulty with
24　breathing, and that's what draws our attention.
25　　　THE COURT:　　Is it extremely unusual for

1607

1　a newborn to be given oxygen by means of an oxygen
2　mask?
3　　　THE WITNESS:　　No, it's not unusual, but
4　it's unusual that it would persist to the point where
5　they're even weighing the baby, they are concerned
6　about taking that oxygen mask away. Usually by the
7　time they are to the point of weighing the baby and
8　measuring the length and that, they are usually
9　pretty content. The nurse is pretty content that the
10　baby has adjusted okay. Since people are anxious to
11　get weight and length, they might try to get that
12　done, but they keep the oxygen going because they're
13　concerned, the nurse is concerned.
14　　　THE COURT:　　Do you have any estimate of
15　how many babies are born with subdural hematomas?
16　Percentage terms of the birth, perhaps.
17　　　THE WITNESS:　　No, I don't have a percent.
18　All we know is that it does happen. I saw a baby not
19　too long ago that probably has a subdural. The fluid
20　is more clear. It makes you always wonder if it
21　hadn't been there for a while. Then I saw a baby not
22　too long ago that had a fracture of the skull at
23　birth, like I told you about. We don't see too many
24　of them. Over the years, I have seen a number of
25　them, but we don't see too many.

1608

1　　　THE COURT:　　The next question has to do
2　with your testimony that people can live a normal
3　life with one lung.
4　　　THE WITNESS:　　Yes.
5　　　THE COURT:　　Are they subject to a
6　greater frequency of subdural hematoma as a result of
7　that?
8　　　THE WITNESS:　　No, it's a different kind
9　of setup by that time. If a person has the lung
10　removed because of, say, cancer of the lung, the body
11　adjusts and the like, and those are adults, kind of
12　thing, so it's different.
13　　　THE COURT:　　Can bleeding in the brain
14　cause high sugar levels?
15　　　THE WITNESS:　　I think the answer to that
16　is yes, that, yes, the answer to that.
17　　　THE COURT:　　Okay. And did you want to
18　explain the mechanism of that?
19　　　THE WITNESS:　　Well, it can be with the
20　abnormal function of control, which has to do with
21　the brain. A lot of things can go wrong, but also in
22　a baby who could have had a good supply of sugar in
23　the body, and then something happens to the
24　circulation, all kinds of things can go wrong. And I
25　think it was a concern, as evident on the record when

1609

1　they were transferring the baby, that the sugar was
2　so high, but it cleared up right away. So I am sure
3　they were happy for that.
4　　　THE COURT:　　The next question is: How
5　many cases of meningitis have you seen? And I think
6　they mean in infants.
7　　　THE WITNESS:　　Oh, I have seen a lot.
8　I've done this work for a long time. We don't see so
9　much meningitis anymore. One of the things we do to
10　prevent meningitis in a newborn is we give the
11　mothers antibiotics which prevents the Group B Strep.
12　Group B Strep is the common cause of meningitis in
13　infants these days.
14　　　When I was a younger physician, it was
15　Gram-negative rods/Ecoli and the like, but I have
16　seen a fair number of babies with meningitis over the
17　years.
18　　　THE COURT:　　In the babies with
19　meningitis, how often have you seen that result in a
20　brain bleed?
21　　　THE WITNESS:　　Well, you can get that. I
22　haven't seen a brain bleed, you know. When we see
23　the brain bleeds, the subdurals occur from the
24　pressure at birth. The other time we see brain
25　bleeds is in premature babies. The premature babies



1610

1    are prone to having interventricular hemorrhage that
2    occurs, but that's deeper in the brain. Down in this
3    area (indicating) is where the prematures get theirs.
4    Up on the surface is when the term babies, more
5    likely vaginal deliveries, get the pressure on
6    hemorrhage there, different kinds of hemorrhage all
7    together.
8         THE COURT:      How many anomalous sutures
9    have you seen in your professional career?
10        THE WITNESS:      Oh, I have seen a number
11   over the years. I started the Neonatal Intensive
12   Care Unit in Cardinal Glennon Hospital in 1963, and
13   by the time I left there, I was getting more than six
14   hundred babies a years, coming from more than fifty
15   hospitals, and we saw a lot of things. Every day one
16   of the things I did when I would get done rounding on
17   the babies, is go with the residents and two of the
18   radiologists and review every film. So we would see
19   that, and the radiologist would teach us how to, if
20   there was a fracture, the line was straighter, and
21   would teach us to pay attention to the clinical
22   picture. I don't know what that radiologist would
23   say, I mean, the ones I worked with, I was certainly
24   tempted, but I didn't know how to get hold of them,
25   to look at that and see what they would come up with.

1611

1         But what we would be taught is to say, yes,
2    that could be a fracture. You put the whole thing
3    together, I would say not a fracture, and in modern
4    times, we have CAT Scans. The CAT Scan, if there is
5    a fracture, it's better at showing the fracture. It
6    would also show bleeding, you know, the hemorrhage at
7    the fracture lines. Anybody who has ever had a
8    fractured wrist or an ankle, they know immediately it
9    swells, and there's lots of blood. Same way with the
10   bone of the head, you know. And so I would expect,
11   if there was a fracture there, to have bleeding on
12   the CAT Scan if it was there before the 15th. They
13   certainly hunted for it, and they specifically wrote
14   no evidence of fracture. And so I was surprised when
15   they came up later with this thing.
16        THE COURT:      Do all doctors and health
17   organizations use the same types of scales and graphs
18   to figure the percentiles on head circumference,
19   weight and height of a newborn?
20        THE WITNESS:      Yes. The two kinds that I
21   showed you, they both come from the same data, and
22   you can get them on the growth.com kind of thing and
23   look them up, and you can find those on there. The
24   one that I showed you, those things are reproduced by
25   the drug companies, but you can get them online, and

1612

1    they are all the same, and they are put together by
2    data.
3         There are different kinds of graphs, though,
4    because one of them uses standard deviation, just a
5    statistical thing, and then the other uses
6    percentiles. The percentiles go from zero or two up
7    to 98; whereas the standard deviations are a
8    statistical thing, you get the mean and then you take
9    one standard deviation, which is 34 percent above and
10   34 percent below, which makes 68 percent. Then when
11   you go to two standard deviations, you get 95 percent
12   in there.
13        So there are two different ways, but they
14   show the same thing, but you have to know what's
15   behind it when you look at it.
16        THE COURT:      The juror goes on to ask
17   whether these charts differentiate between different
18   types of babies, is there one type for premature
19   births, another for five to seven pound births, and
20   possibly another for large babies. Are there
21   different charts for each class of infant?
22        THE WITNESS:      Yeah, we do have some
23   differences, but that's the reason that the one that
24   I made, it has on there about the premature babies.
25   And you can see the angle of the curves is a little

1613

1    different for prematures. But Aiden was term, so it
2    doesn't really get into that.
3         THE COURT:      Are you saying there is one
4    chart for all term babies?
5         THE WITNESS:      Pretty much so. Those
6    statistics came from primarily, my memory says,
7    caucasians. And there are some differences in
8    different races and that kind of thing. But they
9    were done by people trying to do the best they could
10   to get the mean, and then the deviation from the
11   mean.
12        THE COURT:      The next question has to do
13   with your testimony about seeing the four pound baby
14   roll out of the isolette. They are asking how did
15   that happen, don't isolettes have sides? How did
16   this four pound baby roll out of the isolette?
17        THE WITNESS:      Isolettes are made
18   differently now from what they were before. And the
19   way the isolette was made in the past is that the top
20   of it would roll back. And it happened to be a nurse
21   who was going to catheterize the baby, and she had
22   set the basin and the catheter, it was actually on
23   the windowsill right next to it, and then when she
24   reached to get the catheter to insert it into the
25   baby's bladder, the baby rolled on the floor. She



**Page 1614**

1  was devastated. Nothing happened to the baby, thank
2  God. She was so upset she quit taking care of
3  babies, I remember her, so.
4      THE COURT:    She quit taking your
5  babies?
6      THE WITNESS:    She quit taking care of
7  babies. She quit pediatrics. She couldn't stand
8  herself for letting it happen.
9      The rule is -- and I've taught many medical
10  students and residents over the years, nurses -- the
11  rule is any time you look at the baby, you have your
12  hands and your eyes on the baby. If you have to take
13  your eyes off, you hold on to an extremity, an arm or
14  a leg, to make sure the baby doesn't fall. If you
15  have to take your hands off, then you don't take your
16  eyes off so that you can grab the baby quickly so the
17  baby doesn't fall.
18      THE COURT:    If subdural fluid would
19  have been collecting from birth in Baby Aiden causing
20  pressure to his brain, would his motor skills be
21  impaired?
22      THE WITNESS:    They could be, but not
23  necessarily so because the body in the healing learns
24  to compensate. And Baby Aiden did fairly good in
25  terms of his head getting bigger, so that takes the

**Page 1615**

1  pressure off. So I would expect that whatever he did
2  he would have done better if he would have been
3  diagnosed at one month of age. Even if he couldn't
4  have been diagnosed right at birth, he would have
5  done better if he would have been diagnosed then.
6      THE COURT:    Follow-on question to that:
7  How noticeable would any impairment be as to physical
8  functions, such as rolling over, during the first,
9  second or third month?
10      THE WITNESS:    Well, it can be a problem
11  because the head is bigger. So it makes it much more
12  difficult for the baby to control his head. Babies
13  who have big heads like that, often times, you know,
14  ordinarily when a mom or caretaker picks up a baby,
15  especially a newborn baby, they watch their head,
16  although the neck gets pretty strong, pretty quickly.
17  But babies who have what, we call it macrocephaly,
18  for whatever it is, whatever the cause is, babies who
19  have bigger heads, you have to be more careful with
20  them because in order for them to control their
21  heads, they have to have stronger muscles and that
22  kind of thing. And Baby Aiden's head was too big.
23      THE COURT:    Does counsel have any
24  follow-on questions to those questions?
25      MR. CASTOR:    No, sir.

**Page 1616**

1      MR. BOGGS:    No, sir.
2      THE COURT:    Thank you. You can step
3  down, Dr. Byrne.
4      THE WITNESS:    Thank you very much, Your
5  Honor.
6      THE COURT:    You're welcome.
7      THE WITNESS:    It will take me a couple
8  minutes to gather up my --
9      THE COURT:    We will let you do that.
10  And we will give you back your extension cord, too.
11      Folks, this doctor has to get his things
12  together, another doctor is coming in and they are
13  going to set up some exhibits for him, so let's take
14  a break.
15      THEREUPON, there was a brief recess.
16      THE COURT:    Are you ready, Mr. Castor?
17      MR. CASTOR:    Assuming the defense has
18  rested, Your Honor?
19      THE COURT:    Okay.
20      MR. BOGGS:    We'd rest subject to our
21  exhibits, Your Honor.
22      THE COURT:    All right. He's rested
23  subject to admission of the exhibits. Go ahead.
24      MR. CASTOR:    Call Dr. Max Wiznitzer.
25      THE COURT:    Before you sit down, I'll

**Page 1617**

1  swear you in, Dr. Wiznitzer.
2      THEREUPON, the witness was duly sworn by the
3  Court.
4  DIRECT EXAMINATION OF DR. MAX WIZNITZER
5  BY MR. CASTOR:
6  Q  For the record, would you state your name, please.
7  A  Max Wiznitzer.
8  Q  And your business address?
9  A  I'm at Rainbow Babies & Children's Hospital, 11100
10  Euclid Avenue, Cleveland, Ohio 44106.
11  Q  What is your business profession or occupation?
12  A  I'm a child neurologist.
13  Q  And let me ask you a few questions about your
14  qualifications to testify as an expert today.
15      What educational institutions did you attend
16  after high school, and what degrees did you obtain?
17  A  I attended Northwestern University. I was in the
18  honors program in medical education, which is a six
19  year program in which you get a Bachelor's of Science
20  in medicine, followed by your M.D. This was done
21  first at the Evanston Campus, for anyone who knows
22  Illinois, followed by being done in the Chicago
23  Campus down at the University.
24  Q  And did you receive any additional formal medical
25  training in hospitals?



P.A. Byrne MD
577 Bridgewater Drive
Oregon OH 43616
419-698-8844
pbyrne@toast.net

Re: Aiden Stein (DOB 10-27-03)

Dear Dr. Byrne:

I have reviewed the brain CT (3-15-04, 3-16-04, 3-17-04, 3-22-04) and skull x-rays (3-22-04) on the above child along with the clinical summary provided. The initial CT shows bilaterally large extracerebral low density collections (nonspecific subarachnoid or subdural fluid) along with some less extensive extracerebral high densities (hemorrhages or thromboses), especially high convexity frontal, left greater than right, and interhemispheric. Less obvious high densities are also present along the tentorium, dural venous sinuses, and falx. There are bilateral cerebral low densities with decreased gray-white matter differentiation (likely edema). There is prominence of the fontanelle and sutures and a question of cranial osteopenia. The parietal cranial irregularities likely represent suture variants rather than fractures. The skull radiographs show parietal cranial lucencies, likely representing accessory sutures or fissures as normal variants. The follow-up CT examinations show the presence of bilateral frontal extracerebral catheters post-surgery, increased high densities (hemorrhages), especially left extracerebral with rightward brain shift, and evolution / progression of the cerebral density abnormalities (edema to necrosis). An MRI was not done.

The CT findings of extracerebral low densities are nonspecific and may represent benign extracerebral collections of infancy or subdural collections of indeterminate content and age. Only an MRI can clarify this (in the absence of proper and timely neuropathologic analysis). The high densities represent subarachnoid and/or subdural hemorrhages. Some of the high densities may also represent venous thromboses. Again, only an MRI can clarify this. The evolving cerebral low densities likely represent edema evolving to necrosis. The findings are in no way characteristic of, or specific for, nonaccidental injury. In fact, as correlated with the clinical data, the imaging findings are consistent with long-standing extracerebral collections (e.g. benign extracerebral collections of infancy vs. chronic subdural collections) with superimposed hemorrhage (e.g. rebleed) complicated by hypoxia-ischemia. Other considerations for the imaging findings would include superimposed infection, coagulopathy, cerebral venous thrombosis, and accidental trauma, including surgical effects. My opinions in this case are expressed to a reasonable degree of medical certainty and based upon my more than 25 years of clinical, teaching, and research experience in injury to the developing brain. Please notify me at any time if I may be of further assistance.

Sincerely,

Patrick D. Barnes, MD
Chief, Pediatric Neuroradiology
Director, Pediatric CT and MRI
Lucile Packard Children's Hospital
Associate Professor of Radiology
Stanford University Medical Center
pbarnes@stanford.edu

*EXHIBIT #7*

*AF*

*EXHIBIT*

*# 8*

WS-186-04 STATEMENT: MATT STEIN
G.O. 8,543 (Child Abuse)
SUSPECT: MATT STEIN

BEGIN TYPING STATEMENT: 1700 hours, 3-16-04

This will be a voluntary statement reference to report number 8,543. It will be at Akron Children's Hospital. It is approximately 1920 hours. Present is myself, Detective Blust, Detective Cassidy, and Michelle Flaherty of Children Services and MATTHEW STEIN. We will be at Fourth Floor Conference Room, at Children's Hospital.

Q: Matt, can you state your name for the tape?
A: Matthew Paul Stein.
Q: And you are here voluntarily, on your own free will, to give this statement, is that correct?
A: Yes sir.
Q: There's been no promises, threats, or force used against you to get you to make this statement?
A: None, no sir.
Q: And you are aware that the Mansfield Police Department is investigating an incident involving your son, Aiden Stein?
A: Yes sir.
Q: Let us start at the beginning. Today is the 15th.
A: Do you want me to just go over it.
Q: Yeah, Erica, that's your girlfriend, is that correct?
A: That's correct.
Q: And did you wake up when she went to work today?
A: Briefly she woke me up. Sometimes I drive her in the morning, 'cause we only have one vehicle, she tried to wake me up and I was like "man, I just wanna sleep, call my mom, you know, tell her after she gets out college just come and pick me up and watch Aiden for the hour that I have to work and you have to go to work", she had to work.
Q: So you are the primary caretaker of that point, after she went..anyone else there?
A: No, nobody else was there, sir.
Q: And what time does..is this normal, that you do this about every day that Erica goes to work?
A: Oh yeah, that's why we work different shifts, 'cause we don't trust people, the day cares.
Q: What time did you wake up this morning, and how did you wake up?
A: It was between 10:00 and 10:15, it was at that time that I woke up because I heard my son in the other room crying and it was time to feed him.
Q: And what did you do?
A: I woke up, I walked into his room and checked on him, to make sure he was all right, 'cause sometimes he will pull the blankets up over his head.
Q: Was you still tired though, at this point?
A: Was I still? Oh yeah. I mean, I barely remember going in there but, so then I stumbled into the kitchen, make his bottle, got his little bassinet ready 'cause I had to go to the bathroom, it's a morning ritual.



WS-186-04 STATEMENT: MATT STEIN
G.O. 8,543 (Child Abuse)
SUSPECT: MATT STEIN

Q: Was he still in the crib at this point?
A: Yes sir. So I did that, got his little pillow, ready to prop it for him.
Q: Was he still crying while you were making the bottle?
A: Well, he cried until I got the bottle ready and then he quit crying, so that's when I went in and checked on him and I discovered the blanket was over his head.
Q: Was he laying down or standing up, or what was he doing?
A: He was laying down. He can't stand.
Q: And the blanket was over his head?
A: Yeah, well, it wasn't like over his head but it was pulled up, you know what I am saying, like he had just pulled it up, and he had fallen back asleep or something 'cause when I pulled the blanket back off of him he rolled around a little bit and then he opened his eyes and they were kind of red and bloodshot.
Q: The blanket wasn't stopping him from breathing, is that correct?
A: It shouldn't have been.
Q: And did he smile or anything at you?
A: No, and that's really funny. He didn't smile and he always smiles when he sees one of us, and so I got him out of his bed and he woke up a little bit and he started getting a little bit more playful but he just wasn't acting like his normal self, 'cause he an energetic kid and he likes to play, so I kind of just held him for a little bit and showed him his bottle and he opened up his mouth like he always does, and then I had to go to the bathroom, checked out the bassinet, you know, put it in front of the door of the apartment, the bathroom door that way I could sit and see him and I put him in there, put the pillow across his mid section right here and I sat the bottle on top of it and he started eating and he just got pissed, mad, because I had him in there and I wasn't holding him, I wasn't paying attention to him and he started screaming and I picked him up before I went to the bathroom.
Q: Did you ever leave out of sight of him at that point?
A: Just when I sat him in there before I went to the bathroom. We have connecting doors. Like we have a door here for our bathroom and we also have a door that goes into our bedroom. Both doors were open. I sat him in there and I walked around, grabbed a magazine, and went back in.
Q: But he was still in his bassinet though?
A: Yeah.
Q: He never fell or anything like that?
A: Not that I know of..not that I saw.
Q: He couldn't have because..
A: No, he can't move, I mean, he's just kind of...
Q: Is that correct?
A: Yeah.
Q: So then what happened after that point?
A: Ok, I got him out, he stopped crying, 'cause I was holding him. I said "hey, Dad's gotta go to the bathroom, you are gonna just have to deal with it". I sat him in his bassinet. He did bump his head but it wasn't..it was nothing, I

WS-186-04 STATEMENT: MATT STEIN
G.O. 8,543 (Child Abuse)
SUSPECT: MATT STEIN

    swear it was like that, and he looked right at me and he
    just kind of like..
Q:  What did he bump his head on?
A:  There is a metal bar that runs..on our bassinet there is
    like a metal bar that comes around it, but there is a little
    bit of padding over it so I didn't think it really did
    anything to him, didn't think anything about it until you
    asked me.
Q:  How did he bump his head on that?
A:  I was just sitting him in there and he was flailing 'cause
    he knew he was getting set down.
Q:  So he was flailing, trying not to be sat?
A:  Yeah, he knew. He knew he was going on his bassinet and
    eat and I was going to the bathroom. That was how it was
    gonna happen.
Q:  So did you kind of have to force him into the bassinet?
A:  No, he's a little kid, you ain't gonna have to force a
    little kid.
Q:  Right, but he flailing around?
A:  Yeah, I mean, he's flailing but it's not like you got to
    force him in there. You are the father, you know, you put
    him in there, what's he gonna do.
Q:  So then what happened?
A:  So then I put the pillow back over his chest. I put the
    bottle back on him, on the pillow, and in his mouth, and as
    soon as it went in there he started screaming and I could
    hear something like the milk was getting caught in the back
    of his throat or something, so I thought he was choking. I
    threw the bottle, I picked him up and started patting him on
    his back, trying to get it out. He started turning real red,
    got real angry, and so I grabbed his little nose sucker. I
    sucked the snot out of his nose, figured maybe if he could
    breath through his nose he would be fine, but by the time I
    got the nose sucker, he quit breathing. I ran and I
    picked..I had him in my arms, I ran to the neighbor, knocked
    on the one door, she didn't answer, I am yelling "help,
    help", turned around and knocked on the other door and she
    must have heard me in the hallway 'cause she was kind of
    opening it as soon as I was knocking and, you know, she was
    like 'what's wrong' and I told her what's wrong and she took
    Aiden from me and rushed him over to the couch and sat him
    on the couch and her boyfriend, I don't know the peoples
    names, he came in and started giving him CPR and we called
    9-1-1, you know, and they got there less than five minutes,
    I would say.
Q:  Was he dressed at that point?
A:  He had his little nightie on..his little green outfit, but
    when they got there they took that off him, and his shoes.
Q:  Did you change his outfit at any point?
A:  No, 'cause I didn't even have a chance to change his diaper
    yet.
Q:  Has he ever been injured or anything like that in the past,
    that you know of?
A:  Yes sir. A couple of months ago, and we did take him to

WS-186-04 STATEMENT: MATT STEIN
G.O. 8,543 (Child Abuse)
SUSPECT: MATT STEIN

the emergency room..a couple of months ago he rolled off the
couch..I sat him up on the couch and I was gong to make a
bottle and I didn't realize he could roll like that and I
sat him all the way on the end of our couch, like if you
take the cushions off there is..you've got another six
inches, I didn't think he was going anywhere.  He rolled off
and he hit his head and he had a little..he had some like..I
don't know what you would call that, blood, they were kind
of bloodshot but it was like a little patch, and we got
concerned about it and we took him to Med-Central and we
told them what happened and they said 'oh, it could be
anything'.  They didn't do no test or nothing and a cou-
ple..I would say about a week or so later it went away.

Q: Did he have any marks on his head, or anything like that?
A: No.
Q: Did you ride up to the hospital with him today?
A: I rode to Med-Central with him and then they life-flighted
   him so Erica..obviously she is lighter than I am and they
   said there was a weight capacity so she rode with him and I
   came up with my mother, her mother and my grandmother and
   her friend.
Q: Have you talked to any of the doctors or nurses about what
   the problem is with Aiden?
A: I asked  them and at first they told me it was a trauma to
   the head and I was real, you know, curious on how that
   happened, and then my mom said she spoke with the doctor and
   she said that somebody shook him.
Q: Is that possible?
A: Not on my part, it's not.
Q: Was there anybody else around him this morning?
A: No.

I have read and/or have had read to me the above typewritten
statement consisting of ____ pages of typewritten matter. Each
page bears my signature, the corrections, if any, bears my
initials.  I swear or affirm that the contents are true and
correct to the best of my knowledge.

4

WS-186-04 STATEMENT: MATT STEIN
G.O. 8,543 (Child Abuse)
SUSPECT: MATT STEIN

Sworn to and subscribed before
me this _____ day of_____
2004.

WITNESSES:

_____

_____

_____               Notary Public

My Commission Expires

Transcribed by Patsy Ballitch 547
1800 hours, 3-16-04

IN THE COURT OF COMMON PLEAS
RICHLAND COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO | ) | CASE NO.: 05-CR-224D |
| | ) ss: | |
| COUNTY OF RICHLAND | ) | JUDGE JAMES DEWEESE |

### SUPPLEMENTAL AFFIDAVIT
### OF SEAN BERENDT

I, Sean Berendt being first duly sworn, do hereby depose and state:

1)   That I was involved with a conversation with Lindsay Smith, a juror in this case, at our mutual place of employment during the trial in which she expressed her firm opinion that the State of Ohio had no evidence upon which to convict the defefendant Matthew Stein of any crime against his son Aiden Stein;

2)   Although my father immediately contacted the Court and the Prosecutors involved to complain of this juror's conduct in discussing the case outside of court during trial, the Court never contacted me nor called me to testify at any hearing regarding this fact;

Further, Affiant sayeth naught.

_Sean Berendt_
SEAN BERENDT

Sworn to before me, a Notary Public, and subscribed in my presence this 27th day of February, 2006.

_____
Notary Public (No expiration date, R.C. 147.03)

EDWARD MARKOVICH, Notary Public
Residence - Summit County
State Wide Jurisdiction, Ohio
My Commission Expires _RC 147.07_

*EXHIBIT # 9*

*Appx. B*